**UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF NEW YORK**

| | |
|---|---|
| ANTHONY HALL, STANLEY MARTIN, NICHOLAS ROBERTSON, DEVORAH CHATMAN, REYNALDO DEGUZMAN, EMILY GOOD, WINONA MILLER, DYNASTY BUGGS, LORE MCSPADDEN-WALKER, EMILY MCINTYRE, FREE THE PEOPLE ROC, and NATIONAL LAWYERS GUILD ROCHESTER, INC., *on behalf of themselves and other people similarly situated,* | No. |
| Plaintiffs, | **CLASS ACTION COMPLAINT** |
| -against- | **JURY TRIAL DEMANDED** |
| LOVELY ANN WARREN, LA'RON SINGLETARY, CYNTHIA HERRIOTT-SULLIVAN, HENRY C. FAVOR, RAYMOND W. DEARCOP, RALPH MONTINARELLI, SAMUEL LUCYSHYN, RANDY POTUCK, WILLIAM BAKER, ALEXANDER ELMORE, JOHN CLINKHAMMER, DOMENIC BORRELLI, MATTHEW DRAKE, DAKOTA VANBREDERODE, ETHAN PASZKO "JOHN DOE" ROCHESTER POLICE DEPARTMENT OFFICERS 1–200 (the names and numbers of which are currently unknown), ADAM BELLO, TODD BAXTER, THE CITY OF ROCHESTER, COUNTY OF MONROE, "RICHARD ROE" MONROE COUNTY SHERIFF'S DEPUTIES 1–200 (the names and numbers of which are currently unknown), STEPHEN A. DELLASALA, "SALLY SUE" NEW YORK STATE POLICE OFFICERS 1–200 (the names and numbers of which are currently unknown), | |
| Defendants. | |

## INTRODUCTION

1.      In September 2020, the world witnessed Rochester Police Officers callously kill

Daniel Prude, an unarmed Black man in obvious need of help. Although Mr. Prude was killed in

March 2020, the Rochester Police Department suppressed the video for nearly six months. The

footage is truly shocking to watch: Mr. Prude—naked, bound and covered with a "spit hood"—is

asphyxiated and left to die in the middle of the street as police officers stand about, chatting and mocking him.

2.    The people of Rochester were heartbroken, but many—especially those in Rochester's Black and Latinx communities, which account for more than 60% of the City—were not surprised. As the Mayor later acknowledged: "**institutional structural racism led to Daniel Prude's death**." The Mayor also conceded that "we have a pervasive problem in the Rochester Police Department."

3.    This problem is indeed pervasive. The same year Mr. Prude was killed, a Ph.D. dissertation was published that analyzed over 3,000 use-of-force reports by Rochester Police Department officers from 2011 to 2016. The study concluded: "**The frequency and severity of force are higher in neighborhoods with larger percentages of Black and Hispanic residents**," even when controlling for other factors, like crime rates. In other words, the Rochester Police Department uses more force and more extreme force in Black and Hispanic neighborhoods.

4.    For decades, Rochester City officials have responded with deliberate indifference to this problem. By failing to meaningfully train, supervise, and discipline officers who use excessive force and instead suppressing evidence of officer misconduct and attacking critics of the department, the City has fostered a culture of violence and impunity in its ranks.

5.    The City's stubborn refusal to confront the pervasive problem of racism in the Police Department is perhaps best illustrated by this fact: in developing the City's plan to reform the Department pursuant to Governor Cuomo's recent Executive Order to "reinvent" policing in New York, the Mayor's proposed plan refused the call from community members and the Police Accountability Board to terminate police officers with ties to white supremacist groups.

2

Although the City Council eventually voted to include that provision, it is the Mayor who has final authority over the police department. It is little wonder why people of color in Rochester fear and distrust the police.

6.      Last fall, protesters, a vast majority of whom are Black, came together to protest the killing of Mr. Prude and to demand an end to the racist policing they have endured for decades. The City, in keeping with its long history, responded with the use of extreme violence and militarized police tactics—including deploying batons, tear gas, flash-bang grenades, armored vehicles, and police dogs—to intimidate the protesters. Over the course of just three days Rochester Police Department officers severely injured hundreds of protesters. Despite being legally obligated to preserve all video evidence of the protests and the RPD's response, the City failed to do so.

7.      Simply put, a stunning historical record spanning more than four decades demonstrates that the Rochester Police Department's use-of-force practices continue to be inhumane, racist, and antithetical to the functioning of a civilized society. These practices violate the Fourth Amendment's proscription of excessive force by the police, the Fourteenth Amendment's guarantee that a person's race will not condemn them to violence or death at the hands of law enforcement officers, and the First Amendment's protection of free speech.

8.      Yet, the City is either unwilling or unable to stop these practices. Time and time again, going back decades, the City and RPD have made hollow promises of reform but the culture of violent, racialized policing has not changed.

9.      Detailed more fully herein are more than fifty incidents of RPD officers using excessive force against people of color. The victims of these incidents suffered devastating injuries, and the following people were killed as a result of their encounters with the RPD:

Ronald Frazier, Denise Hawkins, Alecia McCuller, Kenneth Jackson, Louis Davila, Calvin

Greene, Vandre Davis, Willie Carter, Craig Heard, Lawrence Rogers, Patricia Thompson, Shawn

Dukes, Hayden Blackman, Israel Andino, Richard Davis, Daniel Prude, and Tyshon Jones.

10.     This lawsuit calls on the Court to fulfill its most fundamental role—to protect and

defend the Constitution. The need for meaningful change in the Rochester Police Department is

real and for people of color in Rochester, it could not be more urgent. Plaintiffs bring this suit to

end the RPD's decades-long use of violent, unconstitutional force—before more lives, more

Black and brown lives, are lost.

## THE PARTIES

11.     Plaintiff ANTHONY HALL (he/him) is a Black resident of the City of Rochester

and a community organizer who was subjected to excessive force on September 2, 3, 4, 5, and

12, 2020.

12.     Plaintiff STANLEY MARTIN (they/them) is a Black resident of the City of

Rochester, an organizer with Free the People ROC, and a candidate for City Council who was

subjected to excessive force on September 2, 3, 4, and 5, 2020; September 16, 2020; and

October 13, 2020.

13.     Plaintiff NICHOLAS ROBERTSON (he/him) is a Black resident of the Town of

Irondequoit City and a professor of Criminal Justice at the Rochester Institute of Technology

who was subjected to excessive force on September 2, 3, 4, and 5, 2020.

14.     Plaintiff DEVORAH CHATMAN (she/her) is a Black resident of the City of

Rochester and a military veteran who was falsely arrested, maliciously prosecuted and subjected

to excessive force on September 3, 2020, and was subjected to excessive force on September 4

and 5, 2020.

15.     Plaintiff REYNALDO DEGUZMAN (he/him) is a Black/Asian resident of the City of Rochester and a professional photojournalist who was targeted by police and subjected to excessive force on May 30, 2020; September 2, 3, 4, and 5, 2020; and September 12, 2020 for legally videorecording and documenting the violent police response to peaceful protesters.

16.     Plaintiff EMILY GOOD (she/her) is a white resident of the City of Rochester, and a Legal Observer with National Lawyers Guild Rochester. Ms. Good was targeted by police officers and subjected to excessive force on September 4 and 5, 2020 for documenting the violent police response to peaceful protesters.

17.     Plaintiff WINONA MILLER (she/her) is a disabled Black resident of the City of Rochester who was violently arrested and subjected to excessive force on September 16, 2020.

18.     Plaintiff DYNASTY BUGGS (she/her) is a Black resident of the City of Rochester who was violently arrested and pepper sprayed in the face during a routine traffic stop on December 18, 2019.

19.     Plaintiff LORE MCSPADDEN-WALKER (they/them) is a white resident of the Town of Irondequoit who was subjected to excessive force on September 2, 2020, September 5, 2020 and September 12, 2020, and falsely arrested on September 5, 2020.

20.     Plaintiff EMILY MCINTYRE (she/her) is a white resident of the City of Rochester who was subjected to excessive force on September 2, 3, 4, and 5, 2020, September 12, 2020, and October 13, 2020. Ms. McIntyre was also falsely arrested on August 2, 2020.

21.     Plaintiff FREE THE PEOPLE ROCHESTER ("FTP ROC") is an organization that fights for justice alongside the families most impacted by racially motivated violence and marginalization of Black communities, while working to create just and equitable systems. Individual members of FTP ROC regularly plan and participate in protests and political actions,

have participated in the recent demonstrations, and are likely to be subjected again to the

unconstitutional policies and practices described herein. These constitutional violations require

FTP ROC to spend additional time and resources providing support to its members, diverting

resources away from FTP ROC's mission of providing support to movements and increasing the

capacity of community members involved in movement work. FTP ROC brings this action on its

own behalf and as an organizational representative for its members.

22.     Plaintiff NATIONAL LAWYERS GUILD ROCHESTER, INC. ("NLG

Rochester") is a local chapter of the National Lawyers Guild, an organization of lawyers, law

students, legal workers, and jailhouse lawyers, who operate as a political and social collective,

working to build a world where human rights are regarded as more sacred than property interests.

Individual members of NLG Rochester have been subject to aggressive policing and

incommunicado detention because of their support for First Amendment-protected activity. NLG

Rochester trains Legal Observers, who document police behavior during protests, including the

most recent protests opposing police violence. NLG Rochester also helps coordinate legal

representation for protesters who are arrested. Individual members of NLG Rochester regularly

attend protests as Legal Observers, attended the recent Daniel Prude protests in Rochester—at

which many were injured—and they are likely to be subjected again to the unconstitutional

policies and practices described herein. NLG Rochester brings this action on its own behalf and

as an organizational representative for its members.

23.     Defendant LOVELY ANN WARREN ("Mayor Warren" or "WARREN") is and

was at all times relevant herein the duly elected Mayor for the City of Rochester and had control

over the Rochester Police Department including the ability to fire the Chief of Police at will. At

all relevant times, Defendant WARREN was acting within the scope of her employment and under color of state law. She is sued in her individual and official capacities.

24.     Defendant LA'RON SINGLETARY ("Chief Singletary" or "SINGLETARY") is the former Chief of the Rochester Police Department ("RPD"). Defendant Singletary was appointed to this role on or about August 6, 2019 and was fired on September 14, 2020. Before his appointment as Chief, Defendant SINGLETARY was Deputy Chief of the RPD. In his capacity as both Deputy Chief and Chief, Defendant SINGLETARY was responsible for all RPD matters, including the appointment, training, supervision and conduct of all RPD personnel. In addition, Defendant SINGLETARY was responsible for enforcing the rules of the RPD and ensuring that RPD personnel obey the laws of the United States and the State of New York, including by conducting thorough and expeditious investigations into officer misconduct. He is sued in his individual capacity.

25.     Defendant CYNTHIA HERRIOTT-SULLIVAN ("Chief HERRIOTT-SULLIVAN") is the current interim Chief of the RPD. Chief HERRIOTT-SULLIVAN was appointed to this role or about October 14, 2020. In this capacity, she is responsible for all RPD matters, including the appointment, training, supervision and conduct of all RPD personnel. In addition, Chief HERRIOTT-SULLIVAN is responsible for enforcing the rules of the RPD and ensuring that RPD personnel obey the laws of the United States and the State of New York, including by conducting thorough and expeditious investigations into officer misconduct. She is sued in her individual and official capacity.

26.     Defendants WARREN, SINGLETARY, and HERRIOTT-SULLIVAN are referred to collectively as "the City Officials" herein. At all relevant times, the City Officials were acting within the scope of their employment and under color of state law.

Case 6:21-cv-06296-FPG   Document 1   Filed 04/05/21   Page 8 of 96

27.     Defendant HENRY C. FAVOR ("FAVOR") was, at all times relevant herein, Commander of the Special Operations Division ("SOD") of the RPD. In that role, he oversaw the Mobile Field Force ("MFF"). In his capacity as Commander of the SOD, he was responsible for all MFF matters, including the appointment, training, supervision and conduct of all MFF personnel. In addition, Defendant FAVOR was responsible for enforcing the rules of the MFF and ensuring that MFF personnel obey the laws of the United States and the State of New York. He is sued in his individual capacity.

28.     Defendant RAYMOND W. DEARCOP ("DEARCOP") is the Commander of the Special Operations Section ("SOS") of the RPD. At all relevant times herein, he was a Captain with the RPD assigned to the SOD. On September 3–5, 2020, and other dates described herein, DEARCOP was the SOD commanding officer at the scene. In that role, he oversaw the MFF and all its personnel and was responsible for all MFF matters, including the appointment, training, supervision and conduct of all MFF personnel. In addition, Defendant DEARCOP was responsible for enforcing the rules of the MFF and ensuring that MFF personnel obey the laws of the United States and the State of New York. He is sued in his individual capacity.

29.     Defendant RALPH MONTINARELLI ("MONTINARELLI"), at all relevant times herein, was a Lieutenant with the Tactical Unit ("TACT") of the RPD. On September 3–5, 2020, and other dates described herein, MONTINARELLI was the TACT commanding officer at the scene. In that role, he oversaw the TACT and all its personnel and was responsible for all TACT matters, including the appointment, training, supervision and conduct of all TACT personnel. In addition, Defendant MONTINARELLI was responsible for enforcing the rules of the TACT and ensuring that TACT personnel obey the laws of the United States and the State of New York. He is sued in his individual capacity.

30.     Defendant SAMUEL LUCYSHYN, ("LUCYSHYN") at all relevant times herein, was a Lieutenant with the RPD. On September 3–5, 2020, and other dates described herein, LUCYSHYN was the Grenadier Team Leader. The Grenadier Team is a component of the MFF, comprised of selected members who are trained to deploy chemical munitions, and to utilize other crowd dispersal technology and techniques. As Grenadier Team Leader, Defendant LUCYSHYN oversaw the Grenadier Team and was responsible for all Grenadier Team matters, including the appointment, training, supervision and conduct of Grenadier Team personnel. In addition, Defendant LUCYSHYN was responsible for enforcing the rules of the Grenadier Team and ensuring that Grenadier Team personnel obey the laws of the United States and the State of New York. He is sued in his individual capacity.

31.     Defendant RANDY POTUCK ("POTUCK") was, at all times relevant to this Complaint, a Sergeant with the RPD assigned to the Mobile Field Force ("MFF"). On September 5, 2020 and September 12, 2020, and other dates described herein, SGT. POTUCK was assigned as MFF Team Leader and was responsible for all MFF matters, including the appointment, training, supervision and conduct of all MFF personnel. In addition, Defendant POTUCK is responsible for enforcing the rules of the MFF and ensuring that MFF personnel obey the laws of the United States and the State of New York. He is sued in his individual capacity.

32.     Defendants WILLIAM BAKER, ALEXANDER ELMORE, DOMENIC BORRELLI, MATTHEW DRAKE, DAKOTA VANBREDERODE, and ETHAN PASZKO were, at all times relevant to this Complaint, Police Officers with the RPD. Defendant JOHN CLINKHAMMER was promoted from Police Officer to Sergeant in September 2020. At all relevant times, these defendants were acting within the scope of their employment and under color of state law. They are sued in their individual capacities.

9

33.     "JOHN DOE" ROCHESTER POLICE DEPARTMENT OFFICERS 1–200 (the names and numbers of which are currently unknown), were, at all times relevant to this Complaint, Police Officers with the RPD. At all relevant times, these defendants were acting within the scope of their employment and under color of state law. They are sued in their individual capacities. They are referred to collectively as "the RPD officers."

34.     Defendant CITY OF ROCHESTER ("CITY") was and is a municipal corporation duly organized and existing under and by virtue of the laws of the State of New York. Defendant CITY maintains the City of Rochester Police Department, a duly authorized public authority and/or police department, authorized to perform all functions of a police department. RPD acts as Defendant CITY's agent and Defendant CITY assumes the risks incidental to the maintenance of a police department and the employment of police officers.

35.     Defendant COUNTY OF MONROE ("COUNTY") was and is a municipal corporation duly organized and existing under and by virtue of the laws of the State of New York.  Defendant COUNTY maintains the MONROE COUNTY SHERIFF'S OFFICE ("MCSO"), a duly authorized public authority and/or sheriff's department, authorized to perform all functions of a police department. MCSO acts as Defendant COUNTY'S agent and Defendant COUNTY assumes the risks incidental to the maintenance of a police department and the employment of police officers.

36.     Defendant ADAM BELLO ("Executive Bello" or "BELLO") is and was at all times relevant herein the duly elected Executive for the County of Monroe. At all relevant times, Defendant BELLO was acting within the scope of his employment and under color of state law. He is sued in his official capacity.

37.   Defendant TODD BAXTER ("Sheriff Baxter" or "BAXTER") was, at all times relevant herein, the duly elected Sheriff of the County of Monroe. At all relevant times, Defendant BAXTER was acting within the scope of his employment and under color of state law. He is sued in his individual and official capacity.

38.   "RICHARD ROE" MONROE COUNTY SHERIFF'S DEPUTIES 1–200 (the names and numbers of which are currently unknown), were, at all times relevant to this Complaint, Deputy Sheriffs with the MCSO. At all relevant times, these defendants were acting within the scope of their employment and under color of state law. They are sued in their individual capacities. They are referred to collectively as "the Sheriff's Deputies."

39.   STEPHEN A. DELLASALA ("DELLASALA") was, at all times relevant to this Complaint, a New York State Trooper. At all relevant times, he was acting within the scope of his employment and under color of state law. He is sued in his individual capacity.

40.   "SALLY SUE" NEW YORK STATE TROOPERS 1–200 (the names and numbers of which are currently unknown) were, at all times relevant to this Complaint, New York State Troopers. At all relevant times, these defendants were acting within the scope of their employment and under color of state law. They are referred to collectively as "the State Police."

## JURISDICTION AND VENUE

41.   This Court has federal-question jurisdiction pursuant to 28 U.S.C. §§ 1331 and 1343 over claims arising out of violations of the United States Constitution and 42 U.S.C. §§ 1983 and 1985.

42.   Equitable relief is authorized by 28 U.S.C. §§ 2201 and 2202; Rule 57 of the Federal Rules of Civil Procedure; and the Court's inherent equitable authority.

43.     Pursuant to 28 U.S.C. § 1391(b), venue is proper in the Western District of New York, the judicial district where the claims arose and in which the Defendants conduct business.

## JURY TRIAL DEMAND

44.     Plaintiffs demand a trial by jury on each and every claim to which they are legally entitled to a jury.

## BACKGROUND

45.     Rochester Police Department officers are sworn to serve and protect the City's people. But for decades, when Black and brown people in Rochester have turned to the police, they have been met not with aid or empathy—but with excessive, unconstitutional force.

46.     One year ago, on March 23, 2020, Daniel Prude's family sought help from the RPD as Daniel was suffering an acute mental health crisis. Tragically, that call for help ended with Daniel naked and handcuffed with his face covered by a "spit hood," as an RPD officer pushed his head into the freezing asphalt for several minutes. RPD officers on the scene mocked Daniel and chatted with each other while he asphyxiated. Daniel was declared brain dead that night; he was taken off life support and died on March 30. As Daniel's brother Joe Prude later explained in the most heartbreaking way, he called the police to get help for Daniel, "not for [his] brother to get lynched.



(Photograph included with permission of Joe Prude)

12

47.     Daniel's death was foreshadowed by the RPD's decades-long practice of using excessive force on Black and brown residents of Rochester. That history is checkered with the RPD using that same excessive force against Rochester residents protesting police violence and racism—just as it did in the recent demonstrations following Mr. Prude's murder.

48.     In 1975, Denise Hawkins, an 18-year-old Black woman, was shot and killed by a young, white RPD officer, Michael Leach, who responded to the domestic dispute between Ms. Hawkins and her husband. The RPD claimed the shooting was justified. Leach would retire decades later as a police captain.

49.     Public outrage about Ms. Hawkins' killing and RPD's investigation led to calls for reforming the RPD. In response, the City created the Citizens Committee on Police Affairs (known as the "Crimi Committee") to examine how policing in Rochester could be improved. The Committee found that police brutality both exists and is widespread in the City and recommended sweeping changes. While the City claimed to adopt many of those changes, the RPD's brutal and racist policing practices did not change.

50.     Only eight years later, in 1983, another Black woman—the 21-year-old daughter of a Crimi Committee member—was fatally shot by an RPD officer. Alecia McCuller was a young mother in the midst of a domestic dispute. As her 6-year-old son powerfully described what happened: "My mom told me to go to Cousin Ida's house and tell her to call the police. Then the police came…and the police shot. That's the end of the story."

51.     In the wake of Ms. McCuller's death, Rochester's Black community again called for reform and accountability, emphasizing the Crimi Committee's findings. Demands for a civilian review board increased, but the RPD did not change.

52.     By 1990, three more Black citizens—Kenneth Jackson, Louis Davila, and Calvin Greene—were killed during encounters with the RPD. Mr. Greene was shot five times at close range while cowering, unarmed, in a crawlspace in his own apartment. But the RPD's practice of using excessive force, particularly against Black people, continued unabated.

53.     The front page of the *Times-Union* in April 1991 declared: "*Police Use of Force Soars. 852 People Were Injured in Encounters with City Officers Last Year—Up 136%.*" The paper's multi-part series detailed the disproportionate use of force against Black and Hispanic people in the City. Rev. Raymond L. Graves, a prominent leader in the community, beseeched the City and RPD Chief: "Stop looking the other way."

54.     The following year, RPD's former Police Chief, Gordon Urlacher, was convicted in federal court of embezzlement after being indicted—along with five officers under his command—for "wide-ranging brutality and corruption" committed by the department's Highway Interdiction Team or "HIT" squad. This rotating squad was started in 1988 to combat drug activity, but the HIT squad patrolled almost exclusively in the City's communities of color. All of the indicted officers were white.

55.     After his embezzlement conviction, RPD Police Chief Urlacher separately pled guilty to civil rights conspiracy for condoning the officers' violence and shielding them from accountability. During a 10-week trial of other RPD officers, dozens of police witnesses testified with immunity that they had witnessed egregious violence but lied during internal affairs investigations—acknowledging the "code of silence" within the department. The indicted officers were ultimately acquitted by a jury made up of 11 white people and one Black person. One of the officers, Michael Mazzeo, is now an RPD Investigator and the President of the Locust Club, Rochester's Police Union.

56.     RPD officials claimed race was "not at all an issue" in the HIT squad's alleged abuses, even though the allegations included shouting racial slurs, keeping a wooden stick that squad members referred to as their "n----- stick," writing "illegal alien" in pen on the forehead of a young man, cutting a dreadlock from the head of another man, and dumping a "flour-like, powdery substance" on yet another. Federal authorities ultimately found the HIT squad had terrorized more than 30 victims—kicking, punching, throwing them against walls or down stairs while restrained, and beating them with unauthorized weapons including blackjacks, a cattle prod, and lead-filled leather gloves.

57.     Yet Police officials took no meaningful action to curb the RPD's deeply embedded culture of racism and impunity despite abundant evidence of its existence. Then-Police Chief Roy Irving instead defended the RPD's internal review process even while the former Chief and five officers were under federal indictment: "The system is fine. There's nothing wrong with the system." The City meanwhile paid over $200,000 in settlements for at least ten civil rights suits brought by victims of the HIT squad's brutality. The City also paid $625,000 to settle the wrongful conviction of Maurice James, who was framed by HIT squad members and served over two years in a maximum-security prison for crimes he didn't commit.

58.     In a transparent effort to pacify the community, in 1992, the City Council passed legislation creating a Civilian Review Board ("CRB"). But rather than give the CRB any actual oversight power, the Council made it "advisory" only and allowed the RPD to continue conducting its own investigations, with the Chief of Police still having final say over any discipline.

59.     The CRB remains, as community members described it at the time, a "toothless tiger." A comprehensive review of CRB's efforts in 2017 concluded:

The current Civilian Review Board has seemingly had no effect on reducing incidents of police misconduct and excessive force…. This lack of effectiveness is primarily due to the fact that the CRB is not independent of the RPD; thus, it cannot conduct its own investigations, it cannot issue subpoenas to compel testimony or evidence, it cannot discipline officers, and it relies solely upon the investigative materials and recommendations provided by the [RPD].[1]

60.     Without external oversight, RPD's culture of impunity continued to fester—with incidents of racist policing and excessive force becoming more widespread and brazen. In 2002, for example, Lawrence Rogers—a mentally-ill Black man—was running in a parking lot, unarmed, wearing only his briefs. RPD officers tackled him to the ground and beat Mr. Rogers with nightsticks, punched him, and pepper sprayed him. A video of the arrest showed an RPD officer with his knee on Mr. Roger's neck during the incident. RPD officers also threatened and pepper sprayed the woman who was filming the arrest and her daughter, which interrupted the filming of Mr. Rogers' arrest. Mr. Rogers suffered 27 lacerations, contusions, respiratory trauma, asphyxiation, and ultimately died from his injuries.

61.     Protesters marched in the City demanding answers and accountability after the video and several witness statements contradicted the officers' account of what happened. Though the NAACP called for an outside investigation, none came. The RPD cleared the officers of any wrongdoing; all four are still employed by the Department, one has been promoted to Sergeant, another has been made an Investigator.

62.     Time and again, RPD officers who use excessive force are promoted within the Department. Officer Mark Simmons, for example, was eventually promoted to interim Police Chief and most recently, Deputy Chief, long after a 2005 incident in which he shot an unarmed 13-year-old girl, Lashedica Mason. Officer Simmons claimed Lashedica "rushed" him with a

---

[1] *The Case for an Independent Police Accountability System* (2017), report available at: http://enoughisenough.rocus.org/wp-content/uploads/2017/02/The-Case-for-an-Independent-Police-Accountability-System-2.1.17-FINAL.pdf

knife. But family members reported that the girl, who had locked herself in the bathroom, dropped the knife out the window before she emerged, and police photographs showed a knife in the driveway and the bathroom window screen askew. Nevertheless, the Department declared Officer Simmons "acted in an appropriate manner…the way he was trained to act," and he was named the July 2005 "officer of the month" for his actions. Lashedica suffered years of surgeries, had her right fingertip amputated, and still has a bullet fragment in her right kidney.

63.     The following year, Officer Jeffrey LaFave shot a mentally distraught Black woman, Patricia Thompson, in her home. Her husband, who called the police, explained: "I called them to take her to the hospital, I never called for them to kill her." Although Ms. Thompson had a knife at one point, witnesses reported that she had retreated and tripped before Officer LaFave shot her. LaFave received the "Excellent Police Service" award that year; he is now a Lieutenant.

64.     Just a few months later, Russell Davis, a Black man, was outside of his own apartment building when several RPD officers approached him with guns drawn. Sergeant Ronald Malley and another officer jumped Mr. Davis and violently wrestled him to the ground. Even though the building superintendent told the officers that Mr. Davis lived there, officers still handcuffed him and placed him in the cruiser. When Mr. Davis filed a civilian complaint with RPD, it was Malley who conducted the internal investigation and he was cleared of wrongdoing. Malley has since been promoted to Lieutenant.

65.     In response to Ms. Thompson's death, people marched from City Hall to the Public Safety Building ("PSB") demanding change and accountability. City and RPD officials responded with lip service about the integrity of the Department's internal investigations and took no meaningful steps toward reform.

66.     Predictably, the City's persistent indifference led officers to continue engaging in unlawful, racialized violence, which resulted in the senseless deaths of many more Black and brown men— Shawn Dukes in 2008, Hayden Blackman in 2011, Israel "Izzy" Andino in 2012, Richard Gregory Davis in 2015—and the routine abuse of countless other people of color.

67.     In 2011, City Councilmember Adam McFadden wrote a letter to the Mayor, Police Chief, and Council President charging that the City had "lost control of its police force." He detailed how, for eight years, the overwhelming majority of calls to his offices were complaints from citizens of color about their treatment by officers—with the hundreds of complaints by Black and Latinx residents about being racially profiled, arbitrarily stopped, and falsely arrested without cause. His letter concludes: "Of the hundreds and hundreds of phone calls I have received regarding police complaints, I have never been informed by the Rochester Police Department of any disciplinary procedure brought against a police officer for any of these complaints."[2]

68.     And yet, to this day, City and RPD officials have not taken any meaningful action to curb these abuses and continue to foster a culture of racism and brutality within the Department by failing to train, supervise, and discipline officers who use unlawful force against Black and brown people. Instead, time and again, the Department grants these officers awards and promotes them. As a result, RPD officers know they can engage in unlawful force with impunity.

69.     Though the people of Rochester have continued to fight for accountability and change, these efforts have been thwarted. In November 2019, residents voted overwhelmingly

---

[2] Letter from City Councilmember Adam McFadden, Public Safety Chair, to Mayor, then-Council President WARREN, and Police Chief (June 29, 2011), http://rochester.indymedia.org/sites/default/files/McFadden%20Letter.pdf.

for the creation of a Police Accountability Board ("PAB"). But the Locust Club filed a lawsuit to strip the PAB of its disciplinary powers. (That case remains pending on appeal as of this complaint.)

70.     Indeed, not only are City and RPD officials complicit in failing to train, supervise, and discipline officers who openly and repeatedly use violence against people of color, but they are actively involved in covering up evidence of such violence to protect the officers and the Department.

71.     As the six-month investigation conducted by Special Counsel Investigator Andrew G. Celli Jr., recently concluded: Defendants WARREN, then-Police Chief SINGLETARY, and other Rochester officials knew about the circumstances of Mr. Prude's death in March 2020, six months before the footage was made public, and yet, WARREN, SINGLETARY, and other City officials suppressed the circumstances surrounding Mr. Prude's death and made untrue statements to the public concerning the timing of their knowledge.[3]

72.     Deputy Mayor James P. Smith's preliminary investigation in September 2020 reached the same conclusion: "[T]he lens of the badge and culture of acceptance appears to extend to City Hall and the highest reaches of the Administration." The handling of Mr. Prude's murder by both City Hall and the Department, he continued, "raises questions regarding the reporting of other such arrests," including the fatal TASER death of Richard Gregory in May 2015 and the use-of-force in the arrest of Christopher Pate in May 2018.[4]

---

[3] Andrew G. Celli, Jr., Independent Investigation of the City of Rochester's Response to the Death of Daniel Prude Final Report (Mar. 12, 2011), https://ecbawm.com/wp-content/uploads/2021/03/Final-Report-of-the-Independent-Investigation-of-the-City-of-Rochesters-Response-to-the-Death-of-Daniel-Prude-issued-March-12-2021-00452102x9CCC2.pdf.
[4] Deputy Mayor Justin Smith, Managerial Review of the Death of Daniel Prude (Sept. 16. 2020), https://www.cityofrochester.gov/WorkArea/DownloadAsset.aspx?id=21474845191.

## PROTESTS FOLLOWING DANIEL PRUDE'S MURDER

73.      When the video of RPD Officers killing Daniel Prude was finally made public, it sparked nationwide outrage. In Rochester, thousands of people gathered to mourn the loss of Black lives, demand the City finally end its racist and brutal policing practices, and call for new visions of public safety that value Black lives. These protests continue to the present day.

74.      Protesters have gathered outside the PSB, chanted, and held signs. Some of the protesters' chants and signs were specific to Daniel Prude; others decried the pattern of racialized, violent policing in Rochester, of which Mr. Prude's killing was the latest, most egregious example. Many protesters, including several named Plaintiffs, chose to protest because of their firsthand experiences or experiences of family members with the RPD, which left them hurt or afraid.

75.      The largest of these protests took place between September 2 and September 5, 2020. As part of its common practice, the RPD responded to these protests with extreme and unnecessary force—including the indiscriminate use of tear gas and pepper spray, 40 millimeter blunt-impact projectiles, thousands of pepper balls, flash-bang grenades and other supposedly "less-than-lethal" munitions. The City's use of violent, militarized police tactics against Black and brown protesters and their allies was in line with their decades-long practice of suppressing police critics through unconstitutional means.

76.      Although termed "nonlethal" or "less-than-lethal" force, military-grade crowd control devices like those used by the RPD involve serious risks of injury, and even death. Chemical irritants ("CIs"), like tear gas, are banned in warfare because they are indiscriminate weapons by design, especially when deployed by firing a grenade or canister. CIs can cause

severe injury or death, and, even at low concentrations, exposure to tear gas presents a risk of serious, irreversible health effects.

77.     Over the course of three nights, RPD officers fired tear gas canisters 77 times into groups of protesters expressly gathered to support Black lives, at journalists and legal observers attempting to report on and record the abuse, and at medics there to provide care and safety to the protesters—often when people had no escape route to get away from the chemical clouds. The tear gas canisters are themselves projectile weapons; direct impact can cause significant blunt trauma, including bone fractures, lacerations and internal bleeding, and death. One protester struck in the face by a canister required stitches both inside and outside her mouth and has permanent facial scarring.

78.     Over those three nights, RPD officers also discharged 6,100 pepper balls at people who had gathered to protest the Department's aggressive and racist practices. Other cities responded to last summer's racial justice protests without a fraction of this amount of force. In New York City, for example, which saw thousands of demonstrators take to the streets, NYPD officers fired not one pepper ball. By contrast, one RPD officer the night of September 4, 2020, fired 148 pepper balls in the span of just twenty minutes, at a group of people who were penned in or "kettled" by police on the Court Street Bridge in downtown Rochester.

79.     RPD officers also shot protesters with 40mm direct-impact foam bullets—known as kinetic impact projectiles ("KIPS")—which can cause a range of injuries including death. KIPs are inherently inaccurate when fired from afar and so they often injure bystanders and strike vulnerable body parts of intended targets and bystanders. RPD officers fired CTS 40 mm munitions during the protest. The CTS website cautions that shots to the head, neck, thorax,

heart, or spine can result in fatal or serious injury. Use of force reports by RPD officers detail

deploying 40mm munitions at individuals' abdomens at the September 5 demonstration.

80.     Other indiscriminate, military-grade weapons employed by the RPD and law

enforcement agencies working with the RPD included flash bang grenades and a Long Range

Acoustic Device ("LRAD"), which is both a sound system and a sonic weapon that can cause

permanent hearing damage. Beyond these militarized weapons, in keeping with the long-

standing practice, RPD officers also struck countless peaceful protesters with their batons. Per its

website, the Locust Club—RPD's Police Union—is named for "the kind of wood that all

Rochester police nightsticks were once made from." Baton strikes can cause severe blunt injuries

including bone fractures, internal bleeding, and death; a recent study by Physicians for Human

Rights concluded that the baton in particular has a greater risk of death than tear gas.

81.     As part of the City and RPD's coordinated strategy to deny members of the Black

and brown communities of Rochester their right to grieve, express anger, and demand justice

from the Department, Mayor WARREN and then-Chief SINGLETARY asked the New York

State Police and Monroe County Sheriff's Department to send law enforcement officers to

Rochester.

82.     City Defendants invited State Troopers and Monroe County deputies to create an

intimidating law enforcement response that was militarized; the State Police, for example, were

outfitted in full riot gear and brought with them armored vehicles. Mayor WARREN and then-

Chief SINGLETARY also asked the State Police to come to Rochester with full knowledge—as

they later acknowledged in a briefing to City Council—that the State Police would bring dogs as

part of their formation. RPD's own general orders expressly prohibit the use of police dogs for

crowd control.

83.     Along with the RPD, these law enforcement agencies contributed personnel and resources to create a massive police presence to confront those assembled in peaceful protest to call the RPD to account for its widespread use of violence against people of color.

84.     PAB Chair Shani Wilson described the impact of the RPD and law enforcement's staggeringly violent response to the September racial justice protests:

> Over the past year, police response to protest have defined our City. … What Rochesterians saw and experienced has left them with deep scars, both physical and mental. Citizens have said that they were confronted by military-styled police formations and vehicles, they were chased through neighborhoods, tackled on the pavement, some were struck by police vehicles, whacked with batons, shot in the chest with pepper balls, hit in the head with flashbangs, fumigated by tear gas, and overwhelmed by sound cannons…. They [have] suffered serious injuries that were sustained from the use of so-called "less-lethal" weapons and many are still experiencing the health impacts of harm done to them during protests.

85.     Local lawmakers denounced RPD's use of chemicals and projectiles against citizens exercising their First Amendment right to protest police brutality. After attending the demonstrations one night, City Council member Mary Lupien and Monroe County Legislator Rachel Barnhart asked the U.S. Department of Justice to investigate the RPD's actions—citing the presence of tanks, dogs, pepper balls, pepper spray, tear gas and the RPD's escalation and disproportionate use of force. Both elected officials were hit with pepper balls and pepper sprayed while peacefully protesting.

86.     Zachary Roberts—an international photojournalist who has published in Al Jazeera and produced pieces for the BBC—was covering the protests in Rochester. He called the RPD's use of force "one of the single most violent things I've seen in my years in journalism," after a hundred officers charged protesters using pepper bullets on September 3. "Almost every single person here is affected."

87.     Plaintiff REYNALDO DEGUZMAN—also a photojournalist who was at the protests as a member of the press—described the RPD's response in a statement to City Council as one "of unmitigated aggression, violent military grade tactics, and weaponry used on undergrads, nurses, construction workers, teachers, elderly clergy, men and women in wheelchairs holding umbrellas to shield themselves from chemical warfare." In filming the protests, he "captured people with lost eyes, broken limbs, and many suffering from early stages of PTSD—including colleagues who work for local news that haven't been able to go out in the field because of what they witnessed."

88.     While hundreds of peaceful protesters, many of them Black and brown, were injured by RPD's violent response to the demonstrations, the Department condoned its officers' actions. Former-Chief SINGLETARY stated that RPD officers "showed restraint" on a day that many peaceful demonstrators, including elected officials, were shot with pepper balls, pepper sprayed, and worse. Deputy Chief Mark Mura declared that the tactics RPD used were "tactful, per policy and training, and appropriate for the situation at hand." Mayor WARREN also praised RPD officers afterward: "[Y]ou made us very, very proud."

89.     The policies and practices of the City of Rochester were the moving force of the events and injuries described below and they continue to threaten and violate the constitutional rights of the people who oppose these policies and practices and seek to petition the City to reform the RPD.

### Wednesday, September 2, 2020

90.     On September 2, 2020, Plaintiffs FREE THE PEOPLE ROC ("FTP ROC") and STANLEY MARTIN held a press conference with the family of Daniel Prude, where they announced the release of body worn camera video showing RPD officers Mark Vaughn, Francisco Santiago, and Troy Taladay using wholly unlawful—and patently unnecessary—

physical force against Daniel Prude during a "mental health" arrest nearly six months prior on

March 23, 2020. The footage showed several other RPD officers laughing with each other and

ridiculing Mr. Prude rather than intervening to stop the illegal use of force.

91.     At the press conference, MARTIN, FTP ROC, and Joe Prude—Daniel Prude's

brother— revealed that the City and RPD had suppressed the body worn camera video to cover

up the RPD's responsibility for Mr. Prude's death.

92.     In response, Defendants WARREN and SINGLETARY held a press conference

at the PSB. RPD Officer Taladay, one of the officers directly responsible for Mr. Prude's death,

was on duty that day at the PSB. Although SINGLETARY reviewed the footage of Mr. Prude's

arrest in March 2020, six months earlier, he affirmatively decided not to reassign any of the

officers involved to administrative duty but rather to permit them to keep working in public-

facing roles.

93.     The RPD refused to allow Mr. Prude's family, MARTIN, or members of FTP

ROC to attend the press conference at the PSB. When members of FTP ROC attempted to gain

entry, RPD officers arrested MARTIN and others inside of the PSB.

94.     MARTIN was violently arrested by Defendant Officer WILLIAM BAKER and

falsely charged with trespass. As a result of the excessive force used against them, MARTIN

sustained a sprained ankle. The false criminal charges against MARTIN were later dismissed.

95.     As word spread about the press conference, people assembled outside of the PSB.

Meanwhile, the City and RPD developed and implemented a strategy to silence this peaceful and

lawful exercise of rights—this included calling in the State Troopers and Sheriff's Deputies to

assemble a massive police presence. This coordinated strategy validated and encouraged the use

of intimidation, excessive force, and illegal arrests by RPD officers during the protests.

96.     First, the RPD along with troopers and deputies erected barriers in front of the PSB, closing portions of Exchange Boulevard to vehicular traffic. As a peaceful demonstration took place, RPD officers pepper sprayed protesters and indiscriminately shot pepper balls into the crowd



(RPD officer firing pepper balls at the crowd in front of PSB; State Troopers in the background)



(Plaintiff EMILY MCINTYRE holding an umbrella against pepper balls)

97.     Officers also targeted and shot at journalists, legal observers, and people who were recording officers, including Plaintiff ANTHONY HALL. Around 12:30 a.m., HALL was

standing in front of the Public Safety Building recording the police actions with his cellphone

when an officer shot him in the hand with a pepper ball, knocking his phone out of his hand.

**Thursday, September 3 to Friday, September 4, 2020**

98.     The evening of September 3, 2020, a larger group of peaceful protesters, many of

them Black and brown, assembled in front of the PSB to call for justice for Mr. Prude and an end

to the RPD's brutal and racist policing.



(Plaintiff Stanley Martin, left, at the protest)[5]



---

[5] This photograph and others herein are included with permission of the photographer subject to her copyright.

99.     Again, the law enforcement response was violent and chaotic. Within hours, Rochester would resemble a war zone, with RPD officers, NYS Troopers, and MSCO officers unleashing flash grenades, tear gas, and thousands of pepper balls on the crowd.

100.     At approximately 10:00 p.m., RPD officers began indiscriminately firing pepper balls and pepper spray at the peaceful protesters. Shortly thereafter, Defendants POTUCK, LUCYSHYN, CLINKHAMMER, and other officers assigned to the RPD's Mobile Field Force indiscriminately assaulted protesters closest to the barricades with pepper spray.





101.     Soon thereafter, RPD officers also began violently using their batons against protesters—striking and shoving them with unjustified, unnecessary force.

102.     At approximately 11:15 p.m., MFF and other RPD officers were suddenly ordered inside the PSB. There, upon information and belief, they were given instructions by senior RPD command staff, including SINGLETARY, to forcibly "retake the loop" and push protesters back to the street. On these orders, RPD officers, including MFF Sergeant POTUCK, came out of the PSB, rushed toward the peaceful crowd, and began indiscriminately shooting pepper balls at demonstrators. Many shots were fired at head level. RPD officers also launched multiple tear gas cannisters into the crowd indiscriminately.



103.     One of the pepper balls hit *Democrat & Chronicle* photographer Tina MacIntyre-Yee in the head as she was video recording.  The video of that incident, incorporated herein, is available at https://tinyurl.com/2hy52d5d.

104.    RPD officers also once again used excessive force to arrest individuals who were not committing any crime but rather lawfully exercising their First Amendment rights. RPD and other law enforcement used their batons and physical force to push the peaceful protesters across the street into a parking lot. Eventually, the legion of RPD officers, MSCO deputies, and NYS Troopers separated the protesters into two groups and used their batons to push the first group south on Exchange Street towards Corn Hill. RPD officers chased the second group towards the Court Street Bridge.

105.    Eventually, RPD officers and Sheriff's deputies began shooting the peaceful protesters in the face and body with pepper balls. Many protesters sustained serious injuries including being shot in the face, neck, and upper body from close range under circumstances where officers were clearly aiming at those areas. One young man was shot in the eye with a pepper ball from close range; on information and belief, he is now permanently blind in that eye. RPD officers and sheriff's deputies also shot intentionally at volunteer street medics—wearing helmets and jackets with large red crosses prominently identifying them as medics—who rushed to aid the young man and others injured by the assault.

106.    The second group of protesters that RPD officers chased away from the PSB were pushed into a parking lot and towards the Court Street Bridge. There, Jamia McCuller, a Black woman, was lawfully video recording RPD officer Amber Grosch assaulting another protester when, without warning, RPD Sergeant Michael Collins, RPD Officer Justin Whitmore, and several MSCO deputies chased Ms. McCuller, tackled her to the ground, placed a knee on her neck, and violently arrested her. A portion of that incident can be viewed here: https://twitter.com/i/status/1302235538649427968. In the video, Ms. McCuller can be heard exclaiming, "I can't breathe" as officers pin her to the ground.

107.     Plaintiff REYNALDO DEGUZMAN, a photojournalist, attempted to film the

police assaulting Ms. McCuller but a supervising officer ordered other RPD officers to

physically block DEGUZMAN from recording the event. After Ms. McCuller was taken into

custody, as DEGUZMAN walked away, an officer said: "A media badge isn't a free pass." That

officer then shot DEGUZMAN in the neck with a pepper ball from approximately five feet away.



(Plaintiff Deguzman's injuries after being shot at close range)

108.     Plaintiff DEVORAH CHATMAN also tried to record Ms. McCuller being held

on the ground by RPD officers. While doing so, CHATMAN was shot approximately six times

with pepper balls from close range by RPD officers, MSCO deputies, and NYS Troopers,

including Defendant Trooper STEPHEN DELLASALA. Two of the shots hit CHATMAN in her

left shoulder, causing her to lose feeling in her arm.

109.    While street medics attended to CHATMAN's injuries, she informed the officers that she was an army veteran who served in Iraq and Afghanistan to defend the First Amendment freedoms that police were violently suppressing. As she was speaking, several officers, including DELLASALA, suddenly rushed at her, forcibly seized her, grabbed her phone and threw it to the ground. They placed handcuffs upon her wrists and arrested her. CHATMAN was falsely charged with disorderly conduct; the charges were dismissed on November 4, 2020.

110.    Many RPD officers engaging in the use of force against protesters covered both their nametags and their badge IDs—making it difficult, if not impossible, for affected citizens to identify those officers who violated their rights. On information and belief, RPD officers had no legitimate reason to cover both their name tags and their badge IDs in responding to protesters. By encouraging or allowing officers to do so, the City and Department, in line with longstanding practice, insulated individual officers from accountability, criticism, or consequence for their role in the unlawful response to the protests.

### Friday, September 4, 2020 to Saturday 5, 2020

111.    On September 4, RPD officers used the Court Street bridge to "kettle" protesters, spray them with tear gas, and attack them with pepper balls – a scene tragically reminiscent of the 1965 "Bloody Sunday" attack on civil rights demonstrators on the Edmund Pettus Bridge in Selma, Alabama. Videos from that night show heavily armored phalanxes of police using pepper balls, 40mm kinetic bullets, tear gas, and batons to assault diverse groups of protesters outfitted only with umbrellas, cardboard boxes, and plastic children's sleds against the RPD's military-grade arsenal but who nevertheless assembled to protest for racial justice and reformed policing.





112.    RPD officers first escorted peaceful protesters along Court Street from Martin

Luther King Jr. Memorial Park towards the PSB, and directed them onto the Court Street Bridge.

But when protesters reached the other side, law enforcement stopped them with metal barricades.

113.    After thousands of protesters had marched onto the bridge and had nowhere to go, the police ordered the protesters to "disperse." But the protesters towards the back of the bridge near South Avenue could not hear the dispersal orders, and there was nowhere for the protesters in the front near the police barricades to go.





114.    Suddenly, without giving the protesters the time or opportunity to disperse—*and knowing it was physically impossible for them to comply with the dispersal orders*—law

enforcement officers began violently attacking protesters. At the direction of RPD Grenadier Team Leader SAMUEL LUCYSHYN, RPD officers indiscriminately shot pepper balls and tear gas into the crowd. Video available at: https://twitter.com/i/status/1302075393428590592. On the video, officers can be heard giving the order to disperse while pepper balls are being shot.

115.    The order to fire was given by RPD command staff at approximately 10:43 p.m. By 11:00 p.m., RPD officers had fired hundreds of pepper balls at the penned-in crowd. One RPD officer fired at least 148 pepper balls in that time, another fired well over 120. At least 16 RPD officers shot peppers balls at protesters trapped on the Court Street Bridge.

116.    Plaintiff NICHOLAS ROBERTSON, a Black man and criminal justice professor at Rochester Institute of Technology, was one of many individuals struck in the head by pepper balls shot at protesters trapped on the Bridge. He suffered a laceration and permanent scarring. ROBERTSON was also shot with pepper balls numerous times in his body and legs.

117.    Edward Fitzgerald was shot in the forehead with a pepper ball. After officers rushed through the barricade, an officer ripped Mr. Fitzgerald's umbrella from his hand and shot him directly in the face with a pepper ball, causing a large laceration and permanent scarring:



118.    After spraying the crowd with tear gas and pepper balls, officers then rushed at

protesters, violently wielding batons and using physical force to push and shove them. RPD

officers also baselessly arrested peaceful protesters for allegedly failing to comply with the

dispersal order and "unlawful assembly."



119.    For example, RPD officers arrested Christopher Hildebrandt, a paraplegic

wheelchair user who is the Chief Operating Officer of the Center for Disability Rights. When the

police rushed towards the crowd, they crashed into Mr. Hildebrandt, knocked over his

wheelchair and threw him onto the ground. An RPD officer grabbed Mr. Hildebrandt and

dragged him a dozen or so feet before officers handcuffed him and placed him back into his

wheelchair. Officers then wheeled Mr. Hildebrandt to the PSB and told him he had been arrested

for disorderly conduct and unlawful assembly; however, after being detained for hours, Mr.

Hildebrandt was released without charges.

120.    At a subsequent briefing to City Council, Defendants SINGLETARY and

FAVOR stated that the decision to position officers at the end of the bridge was part of the

Department's "overall operational plan to not allow access points to the PSB," even though on both earlier and subsequent nights the Department allowed such access.

121.    When questioned about the decision to use force on peaceful protesters trapped on the bridge, the Chief said that was a decision ultimately made by the Command Post. SINGLETARY and other RPD officials have stood by this decision despite RPD officers' clearly excessive use of force and the countless physical injuries sustained by peaceful protesters.

122.    The police assault was not over: even after protesters were allowed off the bridge, RPD officers continued to shoot pepper balls at them and pushed them past Dinosaur BBQ, and across South Avenue. Video available at: https://twitter.com/i/status/1302086982940717056. Retreating protesters can be seen using signs and umbrellas to shield themselves from the pursuing officers who are firing pepper balls at them indiscriminately. RPD officers also attacked protesters with tear gas and other chemical weapons throughout the night.

123.    RPD officers targeted NLG Rochester Legal Observers, who were wearing bright green "NLG" hats that clearly indicated they were Legal Observers. One NLG Legal Observer, Plaintiff EMILY GOOD, was shot with pepper balls and exposed to tear gas. Shortly after midnight, GOOD was standing alone near the entrance to the Court Street Parking Garage, struggling to take notes in her notepad, when she was targeted and shot in the hand with a pepper ball. Ms. Good was wearing a clearly identifiable neon NLG hat at the time she was shot. Officers also targeted photographers and other members of the media.

124.    In addition to the RPD's indiscriminate use of tear gas, pepper spray, and pepper balls that night, RPD officers also employed excessive force by shooting peaceful protesters with 40mm direct-impact rounds and firing smoke and tear gas canisters from grenade launchers.

**Saturday, September 5 to Sunday, September 6, 2020**

125.    On Saturday night, police violence peaked against people who had gathered to protest the RPD's racialized violence and support the sanctity of Black lives.

126.    Similar to the previous night, peaceful protesters marched from MLK Park towards the PSB. But during the march, protesters were met with an overwhelming presence of RPD officers, Sheriff's deputies and State Police in full riot gear with military grade weapons—including a bearcat tank—and police dogs.



127.    As videos of the law enforcement response on that night demonstrate, the officers unleashed a torrent of violence on the peaceful protesters—causing many protesters serious injury. One such video, incorporated herein, can be seen here: https://tinyurl.com/vra3x4j7.


(NY State Troopers with police dog)

128.    One protester who was seriously injured was Monroe County Legislator Rachel

Barnhart. Ms. Barnhart and several other elected officials—including City Council Members

Mary Lupien and Mitch Gruber—had joined the demonstrations and positioned themselves at the

"front line" where they were clearly visible to police, believing the RPD would not use the same

level of indiscriminate excessive force against elected officials engaged in peaceful protest.

129.    While on that front line, Lupien was also texting Mayor WARREN asking her to

ensure that law enforcement did not escalate or use violence against the people.



130.    But several minutes after the march was stopped by police at the intersection of Broad Street and Exchange Boulevard, RPD officers began to launch flash bang grenades, release tear gas, and shoot pepper balls into the crowd indiscriminately.



131.    One of those pepper balls struck Ms. Barnhart in the head, causing her to sustain a concussion, as well as irritation to her skin, eyes, mouth, nose, and lungs.



132.    Rochester City Council Member Mitch Gruber was standing next to Ms. Barnhart and was shot in both the thigh and the shoulder with a projectile.

133.    Several pepper balls hit ANTHONY HALL in the body, and one hit him in the face causing a large welt.



134.    Defendant POTUCK and other RPD MFF officers and Grenadier Team then advanced towards protesters while deploying chemical weapons. POTUCK indiscriminately deployed tear gas at the protesters using a "fogger" and launched multiple tear gas cannisters into groups who were protecting themselves with makeshift shields and umbrellas.





135.    Former Irondequoit Councilwoman Nicole Hushla Re was standing apart from the

crowd, livestreaming the events when she was suddenly, and without warning, struck in the face

by a tear gas cannister. Once hit, she describes blood flying everywhere and being unable to see anything due to the cloud of smoke.



136.    Ms. Hushla Re sustained facial fractures and her upper lip required numerous stitches, both inside and outside of her lip. Her face has permanent scarring:

137.    While Ms. Hushla Re was being treated at Strong Memorial Hospital, another protester was also getting stitched up after having been hit in the head with a pepper ball.

138.    Members of RPD's Grenadier Team also launched numerous Flash Bang Grenades at protesters that night. After several minutes of deploying chemical weapons, the police suddenly and without warning ran full speed towards the crowd at the intersection of Exchange Boulevard and Main Street, pushed them and struck them with batons:



139.     Another group of protesters, including Plaintiff LORE MCSPADDEN-WALKER (they/them), dispersed towards City Hall. On the sidewalk in the vicinity of Church and Fitzhugh Streets, MCSPADDEN-WALKER and other protesters encountered a group of police who stopped them. The police then rushed towards the protesters, as documented here: https://tinyurl.com/ydska5st.

140.     When a police officer charged MCSPADDEN-WALKER, they had their hands in the air. An officer violently seized MCSPADDEN-WALKER and threw them to the ground, causing them to fall onto their knees. The officer then slammed MCSPADDEN-WALKER's shoulder into the ground, told them they were under arrest, and placed handcuffs on their wrists. The officer then pulled MCSPADDEN-WALKER to their feet and began escorting them to a police vehicle. When MCSPADDEN-WALKER informed the officer their driver's license listed their gender as "female," the officer laughed and made fun of them for their gender identity.

141.     Another large group of injured protesters sought refuge from the police inside of Spiritus Christi church. Police surrounded the church and shot hundreds of rounds of pepper

balls at the building, splattering its walls with chemical irritants. RPD Officer Dylan Minnick, for example, fired pepper balls at individuals who had taken shelter in the church's alcove.

142.    One protester who sought refuge in the church was Jaeylon Johnson. Mr. Johnson was riding his bicycle on State Street near the intersection with Church Street when police shot him in the neck several times with pepper balls. The pepper balls exploded at the base of Mr. Johnson's gas mask, causing all the chemicals to go directly into his mask, which he inhaled. As a result, Mr. Johnson passed out, fell to the ground, and had a seizure (for the first time in his life). Other protesters then came to Mr. Johnson's aid and escorted him to Spiritus Christi. While he was inside the church, Mr. Johnson had a second seizure.

143.    Inside the church, a young girl who was shot in the knee—apparently by a direct-impact projectile—could barely walk. Another woman was having seizures from exposure, and people were lined up outside the bathrooms to rinse off tear gas and pepper spray residue. Many people had bruises, welts, and bleeding sores where they had been hit by police projectiles.

144.    Eventually, police announced that protesters could leave the church without being arrested or beaten if they dispersed from the area and went home. A young man named Andrew Trammell ran out of the church and past City Hall to try to make his way home. While walking on the sidewalk in the vicinity of Platt Street and State Street, an RPD SUV drove quickly towards Mr. Trammell, then suddenly drove up onto the sidewalk and ran into him, knocking him on the ground. Mr. Trammell hit his head on the ground and lost consciousness. RPD Officer Adam Johnston and other officers handcuffed him, arrested him, and charged with him with unlawful assembly. Those false charges were all later dismissed.

145.     RPD Officials, including then-Chief SINGLETARY, have defended the RPD's response that night, stating that the RPD "showed restraint" and that the tactics used were appropriate for the situation.

146.     Based on statements by City Officials and RPD command staff to date, no RPD officer has reported any fellow officer for their unlawful use of force and no RPD officers have been disciplined for their unlawful use of force on September 2, 3, 4 or 5, 2020.

147.     Instead, the City has taken steps to ensure that important evidence of officer misconduct during these events was not preserved. Many RPD officers in their reports indicate that their body cameras "fell off" or "would not record" but state that cameras mounted on the PSB and/or bluelight cameras around the city should have captured the timing and circumstances of their use-of-force on protesters. On September 14, the City acknowledged receipt of a preservation letter for all such video from the blue-light and PSB cameras—well within the 30-day retention period for those recordings. To date, the City has produced less than 3 minutes of footage from the night of September 4. The City has indicated the rest of the footage was destroyed—despite the preservation letter and their own retention policies.

### Saturday, September 12 to Sunday September 13, 2020

148.     Protests in support of Black lives and calling for an end to RPD's racialized violence continued. The night of September 12, 2020, several hundred peaceful protesters marched from the location where Daniel Prude was killed on Jefferson Avenue towards the RPD station on Child Street. RPD officers, Sheriff's deputies and State Police in riot gear blocked the road at the intersection of Child Street and Wilder Street, where they stopped the protesters.



149.    Defendant POTUCK was commanding RPD's MFF. After stopping the peaceful

march, the police issued dispersal orders but without giving the protesters an opportunity to

disperse. Protesters were chanting and exercising their First Amendment rights to decry RPD's

racist policing and demand change. Thereafter, in retaliation for what the RPD claimed was

"anti-police rhetoric," POTUCK issued an order for the officers to "move forward," and the

police began violently attacking the protesters. First, the police unleashed chemical weapons:



150.     Then, the police rushed the protesters and pushed and struck them with batons.

151.     On information and belief, no RPD officers have been disciplined for their excessive use of force—including the indiscriminate spraying of chemical weapons into crowds of protesters—on September 12, 2020.

**Wednesday, September 16, 2020**

152.     The night of September 15, FTP ROC organized a peaceful "sleep-in" protest in front of City Hall. In the morning, protesters awoke to police issuing dispersal orders. Without justification or provocation, police immediately began arresting people. Several of the people arrested, including Plaintiff MARTIN, were subjected to excessive force.

153.     The male police officer who handcuffed and arrested MARTIN was being aggressive, so MARTIN asked that a female officer search them before they were placed in a police vehicle. The officer refused, and when MARTIN again asked for a female officer to perform the search, the male officer—believed to be either officer ALEXANDER ELMORE, JOHN CLINKHAMMER, or DOMENIC BORELLI—forcefully slammed MARTIN's head into the side of the police vehicle. MARTIN suffered a concussion as a result.

154.     Plaintiff WINONA MILLER, a 52-year-old disabled Black woman, was sitting on a bench across the street from City Hall when several RPD officers, including Defendant ETHAN PASZKO, surrounded her and ordered her to stand up. MILLER said in response that she was just sitting on the bench. The officers abruptly grabbed MILLER, pulled her to her feet, forced her arms behind her back, and applied handcuffs to her wrists in an unreasonably tight manner. When MILLER complained the handcuffs were too tight and requested they be loosened, instead of helping her, PASZKO kneed her in the stomach.

48

155.    MILLER was detained on the street for approximately one hour, during which time she repeatedly asked that her handcuffs be loosened but the RPD officers refused. Eventually, MILLER was transported to the PSB, where she was detained for approximately four hours before she was charged with disorderly conduct, issued an appearance ticket, and released from custody. The false charges against her were dismissed on October 22, 2020.

156.    PASZKO and his partner VANBREDERODE were named "Officers of the Month" for September 2020. On information and belief, no RPD officers have been disciplined for their excessive force and/or illegal arrests on September 16, 2020.

### Tuesday October 13, 2020

157.    On October 13, 2020, after attending a peaceful protest at the Webster Police Department organized by FTP ROC, Nicholas Wilt was arrested by a Monroe County Sheriff's Deputy. The Deputy claimed there was a bench warrant for Mr. Wilt for missing a court date for his September 12, 2020 arrest (during the protests described above). Mr. Wilt informed the Deputy that he had not missed a court appearance because his court date was October 22, 2020— not September 22, 2020, as the Deputy said. The Deputy still detained Mr. Wilt and transported him to the PSB where the RPD confirmed that Mr. Wilt's court date was October 22, 2020. Nevertheless, RPD refused to release Mr. Wilt from custody.

158.    About 20 protesters arrived at the PSB to ask why Mr. Wilt was detained.

159.    Although the protesters were peaceful, an RPD supervisor ordered officers to "just push them." Officers suddenly, and without giving the protesters an opportunity to exit the building, began pushing protesters with batons towards the front doors, where a bottleneck occurred.

49

160.    Defendant MATTHEW DRAKE was one of the Defendant officers who struck protesters with his baton, including Plaintiff EMILY MCINTYRE, who he repeatedly struck with his baton in the neck, back and body without provocation or justification.

161.    Another protester who was caught in the bottleneck was India Maring (they/them). They were shoved by officers and thrown to the ground. As a result, Mx. Maring's head hit the ground with such force that they sustained a concussion.

162.    On information and belief, no RPD officers have been disciplined for their excessive force and/or illegal arrests on October 13, 2020.

## THE CITY OF ROCHESTER'S UNCONSTITUTIONAL POLICIES AND PRACTICES

163.    The RPD's violent response to these demonstrations was simply the most documented and largest-scale example of the Department's widespread pattern and practice of using excessive force, particularly against people of color.

164.    For decades, despite countless lawsuits, news reports, protests, and public outcry, the RPD and City of Rochester have remained deliberately indifferent to the need to train, supervise, and discipline RPD officers who use excessive force in routine police encounters with Black and brown citizens. In particular, the RPD has for decades maintained an internal disciplinary system that is a sham and which utterly fails to discipline officers who have engaged in abuses—fostering the culture of brutality and impunity that was on full display during the September 2020 protests, even as the world watched.

## The RPD has engaged in a pattern of policing of using force, conducting stops, and engaging in other law enforcement actions disproportionately against people of color.

165.    There is a pattern and practice within the RPD of engaging in law enforcement actions – including using force and more substantial force, and conducting pretextual stops – disproportionately against people of color.

50

166.    Data from five years' of RPD "subject resistance reports" ("SRRs"), which officers are required to prepare for any use of force beyond handcuffing, show that RPD officers use force, and more serious force, disproportionately against people of color. The RPD provided every SRR completed between October 9, 2011 and June 30, 2016 to a former RPD Investigator, Charles LoFaso, to analyze for his doctoral thesis.[6] During that time period, RPD officers documented 3,368 use-of-force incidents—which averages out to two per day.[7]

167.    **This data revealed that RPD officers' use of force was overwhelmingly against people of color: 66.8% against Black people and 11.5% against Hispanic people.** That is 2,243 Black people and 389 Hispanic people who had force used on them by RPD officers during a 1726-day period.

168.    Of the 3,368 documented force incidents, nearly a quarter (23.9%) were classified as "high force," meaning the force involved the use of a TASER, baton, canine, bean bag gun, or gun. "Low force" incidents include officers using tactics such as nerve pressure points, punches and jabs, kicks and knee strikes, takedowns, and pepper spray.

169.    From the SRR data, LoFaso determined that **"as the percentage of Black and Hispanic residents [in a neighborhood] increases, uses of force significantly increase"** even after controlling for factors such as crime rates. He further discovered that, again after controlling for factors like crime rates, "the odds of being subjected to high force, relative to low force, increase by 17.1% on average, as neighborhood percentage of Black residents increases, and by 17.7% on average, as neighborhood percentage of Hispanic residents increases." In other

---

[6] Charles LoFaso, *The Effect of Race, Place, and Time on Police Use of Force: How Social Context Influences Legal Decision-Making* (2020), http://rave.ohiolink.edu/etdc/view?acc_num=osu1594479446661188.
[7] The actual rate is higher. The 3,368 number refers to use-of-force incidents against a single subject, rather than SRRs filed. Where multiple officers used force against a single subject and each submitted an SRR, LoFaso collapsed those reports into a single use-of-force "incident" for purposes of his analysis.

words, "**officers use force more often and at more severe levels only when interacting with citizens in neighborhoods with higher percentages of Black and Hispanic residents.**"

170.    Because SRRs rely on officers to self-report data, it is not possible to know how many uses of force went unreported during that time period. This is true in part because, if a citizen files a complaint with the Department and there are no independent witnesses or corroborating evidence (like an SRR), the case will be closed and the officer will face no disciplinary consequences. LoFaso thus concludes: "**Frequency and severity of force may be higher in minority neighborhoods than the results suggest**."

171.    Similarly, Black people, especially Black people in predominantly Black neighborhoods, are disproportionately subject to pretextual stops by the RPD. The Monroe County Public Defender ("MCPD") has observed that RPD officers frequently stop young Black men and boys for riding bicycles without bells or walking in the street when sidewalks are congested. Over 90% of people ticketed by the RPD last year for no lights or bells on bikes, failure to use the sidewalk, and "inadequate turn signals" were Black.

172.    These stops are not precipitated by accidents or other dangerous conditions. Rather, RPD officers initiate these stops as a tactic to interfere with the movement of Black residents and to leverage searching them. White men, women, and children ride bikes without bells and walk in the streets when sidewalks are available but are almost never ticketed for this.

173.    The RPD also arrests Black people in Rochester at a disproportionate rate. While the RPD itself collects but does not publish data on arrest rates by race, a 2014 study of the Department's arrest records concluded that RPD officers arrest Black people at a rate 2.7 times higher than non-Black residents; that is, 66% of RPD arrests were of Black residents, though Black people made up only 42% of the City's population at the time.

174.    The RPD's pattern of racially discriminatory policing, including pretextual stops, dates back decades. In 1997, Black residents were arrested 2.6 times as often as white residents, and Latinx residents were arrested 1.4 times as often. As the *Democrat & Chronicle* reported in 1999: "Racism—as evidenced by allegations of racial profiling—has woven its way into [Rochester] law enforcement." A 1993 local task force showed that 70% of people stopped and questioned by RPD were Black or Hispanic. And in 2011, community groups called for a federal inquiry into the RPD's practice of racial profiling after a study concluded that Black residents had a one-in-two chance of being stopped by the RPD for questioning, while white residents had a one-in-11 chance.

175.    The RPD's needless, aggressive, and intimidating tactic of pretextual stops often leads to escalation and unnecessary use of force against Black people for minor traffic infractions.

176.    LoFaso's observations in coding the SRRs echo this: "[A] disturbing number of incidents…might have been resolved without the use of force if the officer had simply continued talking." For example, an officer who became irritated at the use of profanity and quickly decided to make a disorderly conduct arrest. "Had the officer ignored the profanity and continued trying to resolve the issue, a use of force could potentially have been avoided."

177.    In the last decade alone, the City was named as a defendant in at least 40 federal lawsuits alleging the use of violent excessive force by many of the same RPD officers. These lawsuits include shocking accounts of the RPD's extreme and unprovoked violence against Black and brown people.

178.    These civil rights lawsuits include shocking, documented accounts of the RPD's

extreme and unprovoked violence against Black and brown citizens.[8] For example:

- **Dudley Scott:** Mr. Scott was a 33-year-old college student who was driving home
  one night in August 2014, when RPD Officers Michael Stephens and Evan Henry
  stopped him without cause, handcuffed him, and repeatedly punched and kicked
  him while restrained and not resisting. Other RPD officers, including Defendant
  RANDY POTUCK, were present and did not intervene. Mr. Scott had to undergo
  surgery and was permanently blinded in his right eye, with permanently
  diminished vision in his left eye as a result of the brutal beating. The City paid
  $750,000 to settle the case in 2018. Stephens, Evans and POTUCK remain
  employed by the RPD.

- **Rickey Bryant:** Rickey was 17 years old when multiple RPD officers knocked
  him off his bike, pepper sprayed him, and violently beat him—fracturing his eye
  socket—in a case of mistaken identity in 2016. An internal RPD investigation
  claimed that Bryant's allegations were "unprovable." Officers did not have their
  body worn cameras on but a video captured one RPD officer choking Rickey after
  he was handcuffed, and the teenager had multiple documented injuries. The City
  settled the lawsuit for $360,000. The involved officers are all still employed by
  the RPD.

- **Miriam McKnight**: Ms. McKnight called the police to report a stabbing next
  door to her house in July 2010. When Officer Gregory Vasile insisted on putting
  crime scene tape in her yard, Ms. McKnight informed him that he had the wrong
  property. Audio recording captured on Ms. McKnight's phone shows that Vasile
  then ordered McKnight to turn around and "put [her] hands behind her back,"

---

[8] The City of Rochester has settled the majority of these excessive force lawsuits, including but not
limited to *Blackman v. City of Rochester*, No. 13-cv-6152 (W.D.N.Y.) (fatal shooting of Hayden
Blackman); *Maddox v. City of Rochester*, No. E2018010768 (Sup. Ct. Monroe Co.) (unprovoked assault
on 16-year-old); *Lucas v. City of Rochester*, Index No. 499-16 (Sup. Ct., Monroe Co.) (RPD officer struck
plaintiff with his car); *Pagan v. City of Rochester*, No. 17-cv-6073 (W.D.N.Y.) (assault on mother of
young man just shot and killed); *Santos v. Barber*, No. 17-cv-6475 (W.D.N.Y.) (slammed plaintiff face
down into the concrete sidewalk requiring surgery to fix and fuse plaintiff's vertebrate); *Johnson v. City
of Rochester*, No. 17-cv-6229 & 17-cv-6490 (W.D.N.Y.) (use of excessive force on two separate
occasions); *Taylor v. City of Rochester*, No. 16-cv-6606 (W.D.N.Y.) (same officer as *Johnson*, called
plaintiff the n-word and assaulted him, causing tooth to break off and lodge in his lip); *Rodriguez v. State
of New York*, No. 13-cv-6301 (W.D.N.Y.) (Officer POTUCK and another officer tased plaintiff causing
him to fall to the ground from the second story and then beat him); *Dowdell v. City of Rochester*, No. 11-
cv-6493 (W.D.N.Y.) (unjustified assault, causing fractured nose, chipped teeth, bruising and swelling);
*Libbett v. City of Rochester*, No. 12-cv-6697 (W.D.N.Y.) (assault by multiple RPD officers on restrained
and prone plaintiff, batons, pepper spray and tasering); *Lawhorn v. Algarin*, No. 16-cv-6226 (W.D.N.Y.)
(unlawful stop by 13 RPD officers, broke car window, pulled plaintiff from the car, and punched him –
one officer criminally convicted three years later); *Turner v. City of Rochester*, No. 11-cv-6200
(W.D.N.Y.) (Officer Ferrigno slammed plaintiff onto the concrete and threatened to send her to jail
because she was "on his last nerve").

stating "I've had enough of this shit." He then violently pepper sprayed Ms. McKnight. Her injuries included lacerations, scarring, and breathing difficulties due to the pepper spray. She was awarded $216,875 after a bench trial in her civil rights lawsuit. Vasile is still an RPD officer.

- **Tina Cabisca:** In 2013, Officers Daryl Hogg and Jason Prinzi used force against Ms. Cabisca after Investigator Nolan Wengert fatally shot Ms. Cabisca's dog. After a bench trial in February 2019, the judge concluded that after Ms. Cabisca's dog was shot, Hogg escalated the encounter by yelling at Ms. Cabisca to leave her front yard and abandon her dog. When she objected, Hogg "lost his temper" and used the "straight arm bar technique" to force her to the ground, then placed his full bodyweight on her back. When Ms. Cabisca objected that she could not breathe and had asthma, Hogg "lean[ed] on her even harder." The Court concluded Prinzi also used excessive force when he used his full bodyweight to pin down the lower half of Ms. Cabisca's body. She was awarded $50,000 in damages and $75,000 in attorney's fees. Both officers are still employed by the RPD; Hogg was promoted to Sergeant in September 2020.



- September 2015, RPD Officers Steven Mitchell, Jeffrey Kester, and Defendant MATTHEW DRAKE beat a Black man for over two minutes after he was handcuffed and arrested for purportedly trespassing at a convenience store. While the man was handcuffed, RPD officers slammed him facedown into the ground, Officer Mitchell then beat him with closed fists and punched him in the face. Though the man was restrained and lying face-down on the sidewalk, Officer Mitchell also pepper sprayed him directly in the face. After a month in solitary confinement at the Monroe County Jail, the man was ultimately transferred and admitted to a medical facility for four months. The RPD officers' brutal treatment of the restrained man was captured by four of the convenience store's security cameras. In 2017, the man was acquitted on all charges after jurors reviewed the camera footage. That year, Kester was promoted to Investigator; the involved officers are all still employed by RPD. The victim's civil lawsuit is ongoing.



- **Christopher Pate:** In 2018, Christopher Pate was beaten and tased by RPD officers Michael Sippel and Spenser McAvoy even after he provided them with identification proving he was not the suspect they were looking for. The officers accused him of "obstructing traffic" when he walked across the street to get away from them. Sippel and McAvoy handcuffed Mr. Pate, tased him, and violently assaulted him. Mr. Pate suffered serious injuries including fractured occipital and jaw bones. The City delayed release of the body worn camera footage for a year. On video, after beating Mr. Pate, Officer Sippel says, "I blasted my hand off his head," then laughs, "Wrong guy." City Officials, including WARREN, did not take action against the officers until after Mr. Pate's attorney served notice on the City that he would sue. Sippel was prosecuted and found guilty of third-degree misdemeanor assault.

179.    Beyond bodily injury, the people—like Plaintiffs—who have been injured in these encounters experience fear and anxiety, disruption to their everyday activities and employment, and restrictions on their freedom to travel within their own neighborhoods and cities. They, and their families and friends, are impacted by these incidents. These encounters leave physical scars as well as deep dignitary harms including anguish and humiliation.

<u>**There is a pattern and practice in the RPD of using excessive force
to suppress demonstrations against the RPD's racist policing practice.**</u>

180.    The RPD's violent response to Black and brown protesters and those standing in solidarity with them last fall was foreshadowed not only by RPD officers' widespread unlawful use of force against people of color in routine police encounters, but also by the Department's

response to other protests—in particular, its use of force against Black protesters and those allied in support of Black lives in the past.

181.    For example, in May 2015, Katrina Perkins was protesting police brutality on a public street in a residential neighborhood, where two of her daughters and six of her grandchildren resided. Though Ms. Perkins was peacefully demonstrating, RPD officers violently seized and arrested her and then charged her with disorderly conduct and disruption. Those charges were dismissed two months later. Police violence is a personal issue for Ms. Perkins: her daughter Lashedica was shot three times by former-Deputy Chief Simmons in 2005.

182.    In July 2016, in Rochester as across the nation, people took to the streets to uphold the sanctity of Black lives and call for an end to racist policing. In response to the BLM protests, the RPD beat, shoved, and pepper sprayed protesters. As one young man described it: "I started to turn and they tackled me to the ground.…They're beating citizens for no reason whatsoever. I wasn't doing anything. I was taking pictures."

183.    RPD officers, in keeping with their pattern and practice, particularly targeted Black protesters with unlawful force, including Black journalists. Carlet Cleare and Justin Carter of WHAM-TV were both handcuffed and detained by police, even though Ms. Cleare was wearing a WHAM-TV shirt and they identified themselves as members of the press. Press colleagues who were there described RPD ignoring white reporters standing right next to Ms. Cleare and Mr. Carter and instead targeting the two Black journalists. Over the course of one weekend, Rochester had more arrests at its BLM protest than the rest of the nation combined.

184.    By contrast, the RPD has not used force in policing protests that are not about Black Lives and are made up of predominately white protesters—including for example the

57

several "Back the Blue" protests that took place during the summer and fall 2020 as a show of support for the RPD in response to calls to "defend the police."

185.    Despite widespread condemnation of the Department's response to the September 2020 protests, RPD officers continue to employ the same unlawful tactics. For example, on December 18, 2020, a group of approximately 20 protesters held a demonstration to object to the unjust eviction of a single mother and her three children in the middle of the winter during the pandemic. New York State Assemblyman Demond Meeks attended the protest in solidarity; soon after he arrived, he began a Facebook Live recording of the events. Cell phone video shows that immediately after he arrived, two dozen or more RPD officers in riot gear approached the scene. Though Assemblyman Meeks was neither standing on the property nor interfering with the officers' execution of the warrant, officers went directly toward Meeks, informed him he was under arrest, and ordered him to put his hands behind his back. Immediately after Meeks complied, officers repeatedly told him to "stop resisting" even though the video shows he was not resisting in any way.

186.    RPD officers' unconstitutional response to citizens exercising their right to free speech is indicative of the Department's widespread practice of interfering with the same when citizens exercise their right to record officers engaging in abuses. In carrying out this practice, RPD officers frequently make legally baseless arrests of individuals engaged in First Amendment activity who do not comply with an officer's unlawful order to stop recording or to leave the area. These arrests are commonly referred to as "contempt of cop" arrests. To conceal the illegality of these arrests, RPD officers charge the victim of the unlawful arrest with a low-level crime that does not require a criminal court complaint. This is known as a "cover charge."

The most common cover charges are disorderly conduct, resisting arrest, and obstruction of governmental administration.

187.    Plaintiff EMILY GOOD was a victim of one such "contempt of cop" arrest on May 12, 2011, prior to joining NLG Rochester. GOOD was standing on the front lawn of her home filming—from 10 to 15 feet away—RPD officers engaged in the traffic stop of a young Black man. RPD Officer Mario Masic noticed GOOD filming and ordered her back into her home, stating she seemed "anti-police" and he did not feel safe with her there. GOOD remained calm and stated she was only standing on her property and did not pose any threat. Masic responded that he'd had enough: "You know what? You're going to go to jail." He then came onto GOOD's lawn, handcuffed her, and forcibly led her to a squad car while she pleaded for him to explain why she was being arrested. A video of the unlawful arrest can be found here: https://tinyurl.com/yff34jaw.

188.    GOOD was charged with "obstructing governmental administration" but the charges were later dropped. Though RPD's internal view concluded Masic should not have arrested GOOD for recording the traffic stop, then-Police Chief James Sheppard praised Masic for maintaining his "professional demeanor" in effecting the illegal arrest.

189.    The RPD has continued to target GOOD since this incident. For example, when community activists held a meeting to discuss GOOD's case and the need for police accountability in Rochester, RPD officers responded to the meeting, harassed and intimidated the people present, and falsely ticketed all the cars parked outside of the meeting space.

190.    In a strikingly similar incident last June, **Tobias Massey** was also falsely arrested for recording RPD officers violently arresting a man in his front yard. Mr. Massey was woken up by screaming from his front yard, where three RPD officers were on top of a Black man, who

was crying that he could not breathe and did not want to die. Mr. Massey went outside to record the event. When the RPD officers noticed he was recording, they chased him into his home, wrestled him down, handcuffed and arrested him. Mr. Massey was taken to the emergency room because of injuries he sustained from the encounter, where the officers gave him an appearance ticket charging him with resisting arrest and obstructing governmental administration for filming the police. After reviewing the video, former Chief SINGLETARY dropped the charges against Mr. Massey. Mr. Massey's civil lawsuit against the three RPD officers is pending. All three officers remain employed by the RPD.

191.    In a report this month, the Monroe County Public Defender's Office observed that certain charges are regularly filed against a defendant where excessive use of force is alleged by the client or a defendant has injuries that appear to be more severe than the situation warranted. These charges include Assault in the Second Degree, Resisting Arrest, and Obstruction of Governmental Administration.

192.    Examples of this practice, detailed above, include the false charges filed—and all later dismissed—in the cases of Katrina Perkins, Miriam McKnight, Plaintiff GOOD, and Tobias Massey.

193.    Plaintiff DYNASTY BUGGS's experience with the RPD is emblematic of these illegal patterns: BUGGS was subjected to excessive force, prevented from recording her abuse by the police, and then charged with false cover charges. On December 18, 2019, Defendants VANBREDERODE and PASZKO unlawfully stopped BUGGS while she was driving. VANBREDERODE approached the driver's side and ordered BUGGS to exit the car without lawful justification. When BUGGS objected and tried to record what was happening on her phone, VANBREDERODE grabbed her phone and threw it. He then pepper sprayed her in the

face while she was still in the car. After, VANBREDERODE forcibly removed BUGGS from the car, placed handcuffs on her wrists, and pepper sprayed her again after she was handcuffed.

194.    VANBREDERODE falsely charged BUGGS with obstruction of governmental administration, resisting arrest, and driving without a license. All the false charges were dismissed at her first court date.

195.    After VANBREDERODE pepper sprayed BUGGS the first time, her cousin Lonnie Buchanan—who was in the front passenger seat—exited the vehicle. PASZKO immediately seized Mr. Buchanan, threw him against the side of the car, pepper sprayed him in the face, handcuffed him in an unreasonably tight manner, then placed him in the back of the police car. PASZKO falsely accused Mr. Buchanan of committing a crime; those charges were also dismissed.

196.    Thereafter, BUGGS tried to file an internal complaint against VANBREDERODE for his unlawful use of force, but she was repeatedly thwarted. She called the RPD several times to make a complaint, but no one would speak to her or tell her how to file a formal complaint. Eventually, BUGGS spoke with an RPD supervisor who told her she could not file a complaint and that she "should have gotten out of the fucking car."

197.    The widespread practice of RPD officers using force against individuals for filming them while they are performing their police duties in public places, and then filing patently false "cover charges" in an attempt to justify their unlawful conduct, is part and parcel of the RPD's culture of impunity. Even when these false charges are dismissed by prosecutors, and the officers' unlawful conduct is captured by video evidence, the RPD routinely fails to discipline the offending officers. This failure of supervision and oversight encourages officers to use force without justification because they know there are no consequences.

**The City and RPD have utterly failed to train, supervise, and discipline officers, despite the widespread unconstitutional practices described above.**

198.     For years, the City has been deliberately indifferent to the obvious need to supervise and discipline officers who use excessive force against citizens, particularly citizens of color. Instead, the RPD has maintained a sham internal disciplinary system that consistently and deliberately fails to discipline substantial numbers of officers who are known to have engaged in racist policing and unlawful use of force.

199.     The RPD investigates civilian complaints internally through its Professional Standards Sections ("PSS"). From 2008 to 2013, the PSS did not sustain a single civilian complaint for unnecessary use of force. During that time, countless people of color were injured and at least one—Hayden Blackman—was killed by RPD officers. Examples include: Benny Warr, a 52-year-old Black man and wheelchair-bound amputee who was beaten by RPD officers while waiting for the bus in 2013; Robinn Turner, a Black woman who had her rib broken by RPD Officer Joseph Ferrigno in 2010, after he body slammed and assaulted her; Darren Williams, a Black man who was punched in the face and thrown to the ground by Ferrigno in 2012, while Ferrigno uttered racial slurs about "teaching [him] to respect authority"; and Dwayne Ivery, a Black man who was punched in the head and tackled to the ground by Officer Alexander Baldauf, who continued to beat Mr. Ivery even after he was placed in handcuffs. The unprovoked beating of Mr. Ivery was captured on video but Baldauf was never disciplined, nor were any of the other RPD officers in the above incidents.

200.     Based on the most recent data available, the PSS investigated 65 officers for 144 complaints of misconduct in 2019. Of the 61 use of force complaints, PSS's overall "sustained" rate was approximately 1% (with a single sustained allegation). Of the 7 discourtesy complaints, the overall PSS sustained rate was 0% (with none sustained).

201.    On paper, the Civilian Review Board also reviews complaints against officers. But the CRB does not have any independent investigative power and almost always reaches the same outcome as PSS. In 2019, for instance, the CRB exonerated officers in 48 use of force complaints—two more than PSS (which exonerated 46 complaints).

202.    RPD's disciplinary process ultimately ends with the Chief of Police. Any outcome including discipline is completely at his or her discretion. From 2001 to 2016, of 923 civilian-generated allegations of force, the Chief sustained only 16—or 1.7%. One former CRB member recognized the futility of the process: "I remember one case when our panel and the investigating officers separately concluded that unreasonable, abusive force had been used by the arresting officers. The chief overruled all of us—we had no authority or power. I quit after that."

203.    In the rare case where RPD officer misconduct has been exposed through video recordings or court proceedings, leading the Chief to sustain an allegation, the RPD has not imposed meaningful discipline against the offending officer. From 2001 to 2015, for example, the harshest penalty given out for the 16 sustained use of force complaints were 6 suspensions, most ranging from 1 to 20 days.

204.    By comparison, Officer Justin Linton failed to report for duty in July 2015 and lied to his supervisor about the reason—saying his flight had been delayed when, in fact, he had not booked a return flight until the following day. Linton received a 30-day suspension for "Absence from Duty" and "Truthfulness" violations. In 2005, David Williams conducted a background check using the RPD system without authority. He received a 30-day suspension.

205.    The RPD sends a clear message to its officers based on the degree of discipline (if any) meted out for excessive force against people of color compared to other internal

departmental violations. That message is that RPD will tolerate, if not condone, violence against Black and brown people.

206.    For example, Sergeant Kevin Leckinger was found to have used unjustified force during his June 2017 arrest of Joseph Gangemi—including grabbing Gangemi by his neck, applying clavicle notch pressure point while Mr. Gangemi was constrained, and repeatedly telling Mr. Gangemi to "calm down" while applying "a pain compliance technique." Leckinger was also found, based on body worn camera video, to have said: "Bring your wrists behind your back or I will rip your arms out of your sockets" and "Stop being an idiot, honestly, how stupid are you?," while pulling upwards on Mr. Gangemi's arms. Leckinger signed a settlement with the RPD three years later, in 2020, agreeing to a penalty of 8 days suspension, with 4 to be taken as forfeited vacation time.

207.    RPD officer Jason Vaughn was investigated for unlawful use of force against Brian Norford after he hit Mr. Norford with a patrol car in February 2016. Although video footage showed Vaughn intentionally striking Mr. Norford—the CRB review notes the "vehicle was headed directly in a direct line toward subject" and that Vaughn's alternative explanation (that he was aiming for a driveway that was not near Mr. Norford) did not make sense—he was disciplined only for failing to fill out a "Fleet Accident" report and received a letter of reprimand.

208.    In 2013, Defendant MATTHEW DRAKE was also found by the PSS to have driven his marked police vehicle in "an unsafe manner" into a crowd of people—striking an individual who sustained injuries that necessitated medical attention. But DRAKE received only a letter of reprimand.

209.     Put simply, the RPD has a sham disciplinary and internal investigation process. After an assault, officers routinely falsify documents or fabricate claims to cover up their unlawful conduct. RPD officers also routinely fail to report any use of force or under report the amount of force used in an attempt to justify their use of unnecessary and excessive force—generally by claiming the victim had resisted arrest or otherwise "obstructed" officers. Use of force reports frequently include implausible narratives of a single individual who is reported to have assaulted or threatened the officers, even when unarmed and restrained, while that officer is accompanied by multiple other officers.

210.     Even when a complaint is made, the RPD systemically fails to conduct meaningful investigations into its officers' uses of force. When the PSS does conduct an investigation, the supervisors routinely credit officers' accounts that are implausible on their face, inconsistent with citizens' injuries, or obviously manufactured collaboratively after the fact. Relatedly, the Department has for years failed to credit citizen accounts of officer violence, even when those accounts are supported by video footage or other eyewitnesses and consistent with documented injuries.

211.     By intentionally failing to in any way meaningfully supervise or discipline officers who are known to have used excessive force against Black and brown people, supervisors signal to officers that they can engage in unnecessary and excessive force with impunity because their lies and attempts to cover up wrongdoing will not be questioned.

212.     Rather, instead of disciplining officers known to engage in racist, violent policing, the RPD has a practice of commending and promoting officers who have credible (or even sustained) allegations of excessive force against them. For example, the Department awarded Officer Patrick Giancursio its "Officer of the Year" Award in May 2017, even though he was

suspended at the time while the Department allegedly investigated his use of force against Alexander Grassies in an April 2017 incident that was caught on surveillance tape. Giancursio was made an Investigator three years later.

213.    In 2011, a PSS investigation determined that Officer Gary Wegman used "inappropriate force" on a Latino man—specifically that Wegman struck him in the face with a straight punch without justification. That same year, Wegman received a "Chief's Letter of Recognition." The following year, in 2012, Wegman pled guilty to inappropriate use of force; he received a letter of reprimand in his file. He was nevertheless honored with both an "Excellent Police Service Award" and a "Chief's Letter of Recognition" that year. He has since been promoted to Sergeant.

214.    The rampant use of force by several notorious officers—known throughout Rochester's Black and brown communities—make clear that RPD's internal disciplinary mechanisms are entirely feckless. The Department knowingly has and continues to retain officers with demonstrated history of using unnecessary and excessive force against people of color. Examples of officers who have demonstrated such propensities include but are not limited to the following:

215.    **Thomas Rodriguez**: Until he was permitted to voluntarily retire with his full pension last spring, Officer Rodriguez was known for using excessive force and seriously injuring citizens in Black neighborhoods during his thirty-year career in the RPD. For example, in August 2002, he participated in the brutal beating and TASERing of Lawrence Rogers, which led to his asphyxiation and death; in 2016, he participated in the beating of 17-year-old Ricky Bryant, fracturing Mr. Bryant's orbital socket. And in 2017, Rodriguez placed DKuan Webb in an illegal chokehold, which was recorded on his body camera. The video was not released

publicly. But the judge dismissed all criminal charges against Webb, and the City settled his lawsuit for $125,000 only days after it was filed.

216.   **Mario "Cowboy" Masic**: Despite an egregious history of excessive force, Masic also voluntarily retired with his full pension last spring after fifteen years in the Department. Rochester residents dubbed him "Cowboy" because of his well-known lawless tactics. Masic embraced the nickname—he even had a "cowboy" themed wedding—and became notorious for referring to himself as "the Cowboy" during interactions with citizens. It was Masic who illegally arrested Plaintiff GOOD in 2011 because she was lawfully recording him stopping a Black man from her own property. And in 2014, Masic burst into a laundromat where Quintin Keene, a Black man, was talking to his grandmother on the phone, rushed him without warning, threatened to shoot him if he did not comply, beat him, pepper sprayed him, and then falsely charged him. The false charges were all ultimately dismissed, with the Judge stating: "This case raises a lot of issues for our community."  The City later paid to settle Mr. Keene's civil suit. Only a year later, in 2015, Masic and other RPD officers were harassing Rasheed Griner, a young Black man, and his family; when Mr. Griner asked for Masic's badge number, Masic stated, "I've had enough of your mouth" and hit Mr. Griner in the face with his baton. Mr. Griner received stitches for his facial injuries; Masic's false charges against him were dismissed after the Judge determined the arrest was unlawful.

217.   **Officer Joseph Ferrigno**: Ferrigno, who is still employed by the City is well-known for using unlawful force against Black and brown citizens. Ferrigno joined the force in 2007. By April 2016, he had at least 23 citizen complaints against him. His egregious violence includes slamming a Black woman to the ground, breaking her rib; punching a Black man in the face and repeatedly striking him in the head and body; and throwing a disabled Black man from

his wheelchair, pepper spraying, and beating him with the help of his RPD partner, Anthony

Liberatore. The man, Benny Warr, suffered three broken ribs and irreparable damage to his leg.

Warr filed a complaint with the CRB but Ferrigno and Liberatore were exonerated despite a

citizen capturing the beating on film. In April 2016, Ferrigno mistakenly pursued a Black man,

Silvon Simmons, and shot him three times—in his back, buttock, and right thigh. Simmons had a

fractured rib, collapsed lung, and bullets that were left in his chest and pelvis. He was charged

with attempting to kill a police officer but the gun allegedly found at the scene did not have

Simmons' DNA or his fingerprints on it. The RPD also would not test Simmons' clothing for

gunshot residue despite his repeated requests. And a woman who was directly across the street

testified she heard only the number of shots fired by Ferrigno that night—no more. Simmons was

ultimately clearled of all criminal charges. Ferrigno was nevertheless cleared by PSS and the

CRB; he was also honored with the "Officer of the Month" award for his actions that April.

218.    The only discipline Ferrigno has received to date is a three-day suspension for

"securing" a 13-year-old juvenile without contacting his parent in 2013. One of the involved

children said Ferrigno and Liberatore told them, if the kids were older, the officers would "beat

the fuck out of [them]." He remains an RPD officer.

### The City and RPD have created, condoned, and encouraged a culture of impunity for racist, violent policing of Black and brown people by RPD officers.

219.    The violence inflicted by RPD officers on Rochester's Black and brown

communities is appalling and unlawful. But it is neither a surprise nor a coincidence; rather, it is

the tragically foreseeable result of a Department that has for decades turned a blind eye to racist

actions by officers and still today employs officers who have used racial slurs and shown

affiliation for white supremacist groups.

220.    The Department's culture of racism—both implicit and overt—is deeply entrenched. In 1984, RPD officer Ron Evangelista, then-President of the Locust Club, stated in an interview with the *Democrat and Chronicle*: "Minorities, not just Blacks, are not popular with police, who are mostly white, middle-class people." Evangelista repeatedly dismissed concerns about racism within the department. When asked about how to improve trust between Black residents and the RPD, he responded that Black leaders should stop promoting "police mistrust" and rejected calls for civilian oversight as unnecessary "public appeasement" for Black people who felt the police cannot police themselves. RPD officers re-elected Evangelista as police union president for nearly three decades; he served from 1981 until 2008.

221.    Current-Locust Club President Mazzeo echoed this view more recently when he acknowledged there is some level of systemic racism in the RPD.

222.    LoFaso, in analyzing the Department's disproportionate use of force against Black and brown people, also observed: "Most officers who join the RPD are white, male, from middle-class backgrounds, and have little life experience outside of school…. [T]hey are now interacting daily with racial and ethnic minorities whose lived experiences are vastly different from theirs."

223.    Indeed, in contrast to the population of Rochester, the RPD is overwhelmingly white, and nearly all live outside of Rochester. Though only 37% of Rochester's population is white, **75% of RPD officers are white**. This is despite the fact that the City has been under a federal consent decree for the past 46 years requiring at least 25% of the Department be officers of color. When that decree was entered in 1975, 25% of the City's population was Black or brown. But this overwhelmingly white police force now patrols a City that is predominantly Black and Latinx (40% and 19% respectively). Moreover, **only 6.6% of RPD officers live in**

**Rochester.** By long failing to hire a proportionate number of officers of color and Rochester residents, the City has created a police force that is wholly separate from the community it is meant to serve.



224.    The RPD's culture of racist, violent policing was on full display in the 1992 federal trial of RPD's HIT squad officers. Dozens of white officers testified, on condition of immunity, about witnessing—and participating in—physical abuse of "suspects" in Rochester's Black and brown neighborhoods. There was also specific testimony of misconduct by the defendant officers. For example, police witnesses testified that one defendant officer, Sergeant Thomas Alessi, kicked a suspect in the mouth, knocking out his teeth, and had held a gun to another suspect's head while the man was bleeding.

225.    After the acquittals, despite these damning accounts of widespread brutality and cover-ups, the RPD did not apologize to the community or display remorse. Instead, RPD officers openly celebrated and officials did nothing to reign in the rampant misconduct that had been exposed. On hearing the verdict, Alessi declared: "I can get my pistol permit back."

70

226.    The RPD's permissive attitude toward officers who openly espouse violent, unlawful inclinations towards the citizens they purport to serve persists. In 1997, for example, RPD officer John Fiorica started Crime Dawg Gear, a T-shirt company marketed toward RPD and other law enforcement. On the Crime Dawg website, he described company's T-shirt slogans as all coming "from ideas inspired by fellow officers." Some of those designs are shown below:







227.    On the Crime Dawg website, Fiorica expressly thanked his partner, now-Captain Frank Umbrino and various "Crime Dawg Gear supermodels" including Officer Theresa Bell (now Dearcop), who has been made an Investigator, and John Koonmen who currently commands the Department's Special Operations Unit. Anthony Bongiovanni, "The Frisk" model, recently retired as a Sergeant after over 30 years on the force. He is named as a defendant in at least two excessive force lawsuits pending against the City.

228.    Though the company's website has since been taken down, Fiorica openly maintained Crime Dawg Gear for at least 10 years, selling apparel, including infant clothing and thongs, and promotional products with these slogans to RPD and other law enforcement officers. Fiorica was made an Investigator in 2001 (when the website was still active). He remains an RPD Investigator today.

229.    The RPD's longstanding and continued acceptance of—and complete failure to discipline—officers who overtly reference killing or beating citizens sets the tone for RPD officers to act with impunity when they, unsurprisingly, use unjustified violence against residents, particularly Black and brown people

230.    Racist policing, including racial epithets and derogatory language, by RPD officers is widespread and consistently tolerated by fellow officers and the Department. The below examples are illustrative.

231.    In 2002, RPD Officer Brian Sexstone and several other RPD officer created a memo entitled "Ghetto Lingo" that listed over 70 street slang terms and definitions— like "sammich" for "sandwich" or "reap what you soap" for "reap what you sow"—which Sexstone said he wrote as a "joke." After the memo came to light, Sexstone was terminated by the RPD— but only for a few years.

232.    Sexstone was rehired in 2006, and within two years, he was accused of making racist remarks to two Black citizens, including calling a Black woman the "n-word" while arresting her and asking when she would "learn white people don't care about Black people." The woman was acquitted of all charges after the Judge heard her testimony. A spokesperson for the RPD at the time said Sexstone was on active duty and no internal investigation was being done. Sexstone has never been disciplined and remains an RPD officer.

233.    In 2005, an RPD officer verbally harassed 12-year-old Shakirrah Sinclair, calling her a bitch. When her 16-year-old brother Jamar tried to report the officer's conduct, he was assaulted by the officer, who said he "couldn't stand n---- like you" and called him an "asshole." Multiple RPD officers then pepper sprayed and arrested both Jamar and Shakirrah. The children were both treated at the hospital, and the criminal charges against them dismissed. The City paid to settle a lawsuit brought on the children's behalf, but, on information and belief, the officers were never disciplined. The one who used racial slurs voluntarily retired in 2016.

234.    In 2013, three Black teenagers—15-year-old Raliek Redd and two of his teammates on the Edison Tech High School basketball team—were on the sidewalk at the designated pick up on Main Street for a school bus to transport them to a game. They were approached by an RPD officer who ordered them to move and, when they explained they were waiting for the school bus, the RPD officer handcuffed them, searched their belongings and arrested them for purportedly "obstructing traffic" on the sidewalk. While they were at the scene in the back of the police cars, their coach and teammates arrived to catch the bus also. When their coach tried to explain that Raliek and his two teammates were waiting for the bus and had done nothing wrong, the officer told him: "If I had a big enough caravan, I would arrest all of you." The young men were transported to the PSB where they were subjected to a humiliating

73

strip search. The criminal charges against them were all dismissed the next month when the

District Attorney refused to prosecute them. The City paid a total of $50,000 to settle the three

lawsuits, but the officer was never disciplined.



235.    A year later, in 2016, Lentorya Parker went to pick up her 6-year-old daughter

from daycare, when she encountered several RPD officers on the street. After she yelled at the

police, "What are you doing?," Officer Jonathan Marsh told her to stop yelling and get out of the

street. As she turned to go into the yard, Marsh said, "Oh, too late." As captured on bodyworn

camera video, Marsh then ran and tackled Parker to the ground from behind as other RPD

officers joined him. Ms. Parker was pepper sprayed three times, as her young daughter was

screaming nearby. She suffered injuries to her back and elbow.

236.    Officers can then be heard on the camera footage discussing what to charge

Parker with—one asks: "Were there five people around?," wondering if she can be charged with

"inciting a riot" on the nearly deserted street. Another officer, while watching Ms. Parker's daughter says to the little girl: "Sorry, your mom's an animal." Ms. Parker was charged with disorderly conduct, resisting arrest, harassment, and obstructing government administration. The criminal charges against Ms. Parker were all dismissed. All six of the RPD officers involved, including Marsh, are still employed by the Department. None was disciplined for the incident; at least one has since been honored by the Department for his "Distinguished Service."

237.    In March 2017, Rakim Yancey, a Black man, was accosted by RPD Sergeant Timothy Pancoe who used racist language when ordering Mr. Yancey to move his car. In response to Mr. Yancey's asking why he used that language, Pancoe pepper sprayed and assaulted Mr. Yancey. Two other RPD officers, Chris Kosch and Bradley Pike, were also involved in assaulting Mr. Yancey—who required hospital treatment for wrist fractures, a chipped tooth, and multiple contusions and abrasions. None of the involved officers have been disciplined; Pancoe was promoted to Lieutenant in 2019. Mr. Yancey's civil lawsuit against the officers remains pending.

238.    During a City Council's public forum in March 2021, several Rochester residents gave statements about the RPD's racist policing practices, in particular the verbal and physical abuse of people of color. For example, one white resident who runs the Rochester Teen Empowerment Center spoke about comments made to him firsthand by RPD officers about the Black children he works with—like "I hate these effing kids"—or officers describing their job as "keeping crime contained in these areas so it doesn't get close to where we live." He continued: "I have met with Chief after Chief giving officers' names, quotes, actions I have seen, heard, and heard about—we still cannot get these officers off these streets." He further highlighted the

damage done to Rochester's young Black and brown people by officers' "offensive and racist" comments.

239.    On the rare occasion the Department investigates and sustains racist behavior by its officers, those officers receive little discipline, no increased supervision, and no remediation. For example, in 2015, Officer Ryan Hartley was investigated for an off-duty argument at a bar during which he yelled, among other things, "go back to the hood" at a Black employee and "bitch" and "c---" at a woman bartender. Based on the testimony of multiple eyewitnesses, the PSS investigation determined Hartley had "directed prejudicial comments toward an African American employee." Four years later, in 2019, he was suspended for 12 days without pay, with 6 of those days to be forfeited from his vacation. Hartley remains an RPD officer today.



240.    In 2013, the RPD received multiple concerned calls regarding Officer Andrew Klein. seen in the photograph above with his tongue sticking out driving his marked Rochester police vehicle with a black stuffed-toy monkey hanging from its spotlight. Klein received only 10 days suspension, with 3 days taken from paid leave. During his interview with PSS, Klein

alluded to being directed to stay out of a predominantly Black neighborhood, "for about six months because of an incident that happened, you know, a while ago." But Klein denied having any "problem with Black people," claiming his intention in hanging the monkey on his car was to attract kids.

241.    The Department's racial bias is evident in other ways. For example, the RPD routinely deploys militarized-forces—including a mine-resistant ambush-protected vehicle, State Police helicopters, pepper spray and pepper balls, and officers clad in riot gear—to police the annual Puerto Rican festival. Yet the Department sends recruitment officers to the City's annual "Little Italy" Italian festival to look for future RPD officers:



242.    Members of Rochester's Puerto Rican community have for years pressed RPD on the militarized police presence at their festival and raised officers' problematic behavior at the festival. Seventeen-year-old Rickey Bryant was stopped and beaten by several RPD officers after the festival in 2017, for example. Yet again, the RPD has not changed its tactics.

243.    A 2017 Report on the Department observed that "**structures of white supremacy…may exist in the RPD's culture and practices**." The examples above bear this out, as does the following:

244.    In 2011, PSS investigated RPD Officer Braddon Elliott for conducting personal business during his shifts. That business was related to his involvement in a motorcycle club of which he was a co-founder and club Treasurer. Though heavily redacted, the interview of Elliot reveals that his motorcycle club has only white members. When questioned about a graphic of "two fists and an 88" featured on T-shirts "for people to buy and show their support for the club," Elliott responded the number "88" represents the phrase "*Heil* Hitler," because H is the eighth letter in the alphabet. The number "88" features prominently in white supremacist ideology.

245.    Three RPD supervisors—Sergeants Kavanaugh, Hayes, and Gagliano—conducted the interview. Towards the interview's end, after having testified about the club's T-shirts featuring a symbol of white supremacy and other club media, Officer Elliott is cut off by Sgt. Gagliano, who states: "If that's your answer, that's your answer. Who gives a shit. Let's end it." Sgt. Gagliano further complains, "we've been here for an hour discussing this shit."

246.    Despite Elliott's admission that he was a founding member and third-in-command of a club that supported white supremacy and that he wore a white supremacist symbol, the Department did not discipline him. Instead, years later, Elliott was suspended for five days for "neglecting his duties as a sworn police officer by attending meetings [] of the motorcycle club while on duty."

247.    For decades, the RPD has been notorious for its racist, brutal policing. But City and RPD officials have ratified, permitted, and encouraged RPD officers' physical and verbal

abuse of Black and brown citizens by denying the prevalence of racist attitudes among white

RPD officers, refusing to investigate or discipline such attitudes—even in the face of overt

evidence—and covering up the prevalence of these racist attitudes among its officers.

248.    The Department's longstanding permissive attitude and failure to train, supervise

and discipline officers who have engaged in egregious displays of racism or force has fostered a

culture of impunity that has led RPD officers to understand they can beat people of color without

consequence.

### City and RPD officials are deliberately indifferent to, and complicit in, the widespread unconstitutional abuses by RPD officers.

249.    As Mayor WARREN has admitted: "Institutional structural racism led to Daniel

Prude's death. I won't deny it. I stand before it and I call for justice upon it." But those words

ring hollow to the countless Black and brown residents of Rochester who have watched

WARREN and other City officials for years take no action to curb violence by officers against

communities of color.

250.    City Officials and the RPD have instead maintained a custom or practice of a

"code of silence," pursuant to which officer misconduct—including excessive force,

manufacturing of false charges, racial discrimination, and the use of racial epithets or other

derogatory language—is routinely not reported by fellow officers or disciplined or held

accountable by the Department. To the contrary, officers acting pursuant to the code customarily

engage in misconduct themselves to cover up misconduct they witnessed by a fellow officer.

Police brutality in particular is indicative of a "code of silence" because it often occurs in the

presence of, or with the knowledge of, other officers.

251.    By the time of Mr. Prude's death, it was clear to the RPD and City Officials that

this pervasive "code of silence" was leading officers to engage in race-based, unlawful conduct.

Nevertheless, City and RPD Officials failed to take any necessary steps to remedy the Department's rampant culture of both engaging in abuses and affirmatively shielding fellow officers from any accountability. That is because City Officials and RPD supervisors are themselves complicit in—and a core part of—the Department's "code of silence"

252.   On March 12, 2021, the Final Report of the Independent Investigation into the City's Response to the Death of Daniel Prude was published. The Investigation entailed six months' worth of document review and the depositions of thirteen critical witnesses, including Defendants WARREN and SINGLETARY. The Final Report concludes that City Officials suppressed information about the arrest and death of Daniel Prude from Mr. Prude's family and from the public. And that City Officials, including WARREN, subsequently made statements that were not truthful about the extent and timing of their knowledge of these circumstances.

253.   Internally the RPD and City cited concerns that publicly releasing the video— which clearly shows RPD officers joking and laughing while Mr. Prude asphyxiates—"might spark civil unrest" in Rochester. Senior Officials also expressed concern that they would lose their jobs if the video were to be released.

254.   In other words, consistent with past practice of intentional cover up and allowing officers at all levels to act with almost complete impunity, City Officials and the RPD were concerned not with public transparency or accountability but with conspiring to suppress the footage and protect the officers and the Department. City Officials and RPD Defendants took several overt steps in furtherance of that conspiracy.

255.   For example, although Mr. Prude's family was legally entitled to the footage after submitting a FOIL request on April 3, 2020, RPD placed pressure on the City's Law Department to withhold the footage—knowing it had no lawful basis to do so.

256.    Further, though it was evident to City Officials that there was no lawful basis to withhold the footage, they nonetheless engaged in other tactics to prevent its release including, for instance, telling Mr. Prude's attorney he had to submit a HIPPA Authorization Form, which was not legally required for disclosure, to unnecessarily delay the City's response.

257.    In the meantime, the City—with WARREN's knowledge—attempted to settle Mr. Prude's case before releasing the footage to his family. But the footage was inadvertently sent to Mr. Prude's lawyer.

258.    A few weeks prior, on July 13, 2020, the RPD quietly updated its departmental policy on usage of the PepperBall Launching System ("PLS"). Specifically, the Department amended the policy to allow officers on the patrol division to use the PLS. Prior to this amendment, only officers on the Special Weapons and Tactics ("SWAT") team were eligible to use PLS. The RPD did not update the policy in any other way.

259.    Under RPD General Order 630, an officer is ineligible to join the SWAT team if he has "any instance of sustained excessive force" or "serious" misconduct in his disciplinary history. The Patrol Division (or Mobile Field Force team) does not have any such eligibility requirement.

260.    On information and belief, the Department updated this policy to ensure more officers could (and would) be able to use the PLS in anticipation of protests after the suppressed footage was released. By removing any "disciplinary history check," the Department knew or had reason to know that RPD officers would use excessive force when engaging with protesters—which they did.

261.    Defendant WILLIAM BAKER is one such officer. In 2016, BAKER was assigned to police the Rochester BLM protests. He was subsequently investigated by PSS after

several news outlets provided video footage depicting him using force against two different protesters. The PSS investigation determined that BAKER: (1) used excessive force on an individual who was not resisting by "directing two or three jabs to [his] upper body"; (2) failed to document his use of force as required by department policy; and (3) undertook "unnecessary" actions that "were impetuous and committed with haste," specifically raising his baton to head-level and directing the crowd to "Get the fuck back" and "Back the fuck up." BAKER was suspended for just three days as a result.

262.    Despite a sustained finding of excessive force—in the context of a BLM protest no less—BAKER was outfitted with a PLS on September 3, 2020. Had the Department not changed its policy to expand officer access to the PLS in July 2020, BAKER would not have been eligible for the SWAT team and so would not have had access to the PepperBall System which, upon information and belief, he used to inflict illegal force on protesters.

263.    The City's practice of protecting RPD officers, like BAKER, rather than its citizens has directly contributed to the culture of insularity, acceptance, and callousness that permeates the Rochester Police Department.

## **"BUSINESS AS USUAL"**

264.    Although Mayor WARREN, Chief HERRIOTT-SULLIVAN, and other City officials are again "talking the talk" of police reform, while the eyes of the world are on them, the City and RPD have paid similar lip service over the past 40 years, while meaningful, lasting reform has never come. If anything, these last seven months have confirmed that the City's promise of change is yet again hollow: even with a new interim Chief and command staff, the Department either cannot or will not fix itself.

265.    On January 29, 2021, seven RPD officers responded to a call about a family dispute. When they arrived, a nine-year-old Black girl was crying and emotionally distraught.

Rather than comfort her, RPD officers chased her, threw her on the snow-covered ground, and handcuffed her—even though she was not under arrest. Officers including Defendants PASZKO and VANBREDERODE then forced her into the back of a patrol car, where the child was sobbing and begging officers to let her see her parent. One officer told her, "Stop acting like a child," to which the nine-year-old responded: "I am a child."

266.    Even though she was not under arrest, clearly in emotional distress, and restrained in the back of a police car, RPD Officer Alexander Lombard decided to pepper spray her at point-blank range. None of the other officers, including Defendants PASZKO and VANBREDERODE who were standing right there, intervened at any point to stop this excessive use of force against a young girl. She was taken to Rochester General for treatment.

267.    The next day, RPD issued a press release stating the officer was "required…to take the minor to the ground" and "required…to use an irritant on the minor" because she "refused" to place her feet in the patrol car.

268.    While Chief HERRIOTT-SULLIVAN acknowledged in a public hearing that the Department should not have used the word "required" about the officer's actions, she refused to answer written questions about the incident from the PAB—such as "What RPD policies, procedures, or written directives require an officer to use pepper spray…on someone refusing to place her feet in a patrol car?" and "Do you believe it can it ever be appropriate for an officer to pepper spray or mace a nine-year-old?"—specifically citing concerns that putting those answers in writing "would cause major risk for the city."

269.    Two months ago—54 years after the NAACP first sought a court order in 1967 to ban the RPD from using pepper spray because the organization feared officers would utilize it "disproportionately in the Black community of Rochester"—the NAACP condemned RPD

officers' use of pepper spray on the young Black girl and recognized that meaningful change has yet to occur: "After all the incidents, investigations and reforms in years past, the result is a nine-year-old child being pepper sprayed. We need serious police reform now or these types of police incidents will continue to occur."

270.    Notably, one year prior in May 2020, VANBREDERODE handcuffed a 10-year-old Black girl by the side of a highway while conducting a routine traffic stop with PASZKO. After the incident, the New York Civil Liberties Union issued a statement on the RPD's pattern of using force on Black youth, again calling out "systemic bias in the behavior of officers on the force…. [A] child was placed in handcuffs." And the need for reform: "We need answers, accountability, and change now." But neither officer was disciplined.



271.    Sadly, but predictably, less than a month after RPD officers sprayed the 9-year-old girl, Defendants VANBREDERODE and PASZKO were involved in another horrifying encounter during which they illegally pepper sprayed a Black mother with her three-year-old child present. The woman was stopped by Defendants, who suspected her of shoplifting. She willingly displayed the contents of her bag and was not placed under arrest. But when she left the

scene, Defendants pursued her— PASZKO wrestled her to the ground, while VANBREDERODE dragged away her sobbing toddler. When the woman got up to reach for her daughter, who was crying inconsolably, PASZKO pepper sprayed the mother and took her to the ground a second time. Her three-year-old daughter was only feet away when PASZKO sprayed.

272.    At a news conference the following day, Chief HERRIOTT-SULLIVAN stated: "We do have policies on the use of things such as pepper spray…if a person is physically resisting then you're safe on pepper spray usage." PASZKO was placed on administrative leave—but was not suspended—despite his involvement in both incidents.

273.    Less than a month before this lawsuit was filed, RPD also answered the heartbreaking but inescapable question posed by Joe Prude after his brother Daniel's death: "How many more brothers gotta die for society to understand that this needs to stop?" As an all-too foreseeable result of the RPD's entirely feckless system of supervision and discipline, the answer is: at least one more.

274.    On March 10, 2021, Defendant MATTHEW DRAKE responded to the Open Door Mission where he found Tyshon Jones, a 29-year-old Black man who was clearly in the midst of a mental health crisis. DRAKE shot Mr. Jones five times. If the RPD had a functioning system of supervision and discipline, DRAKE would not have been employed that night, let alone on the streets interacting with civilians—and Tyshon Jones may still be alive.

275.    In addition to his excessive use of force on protesters like Plaintiff MCINTYRE last fall, DRAKE has a history of serious abuses: In 2013, he drove his police vehicle into a crowd of 75 people and received a letter of reprimand. In 2015, he was involved in the brutal beating of David Vann which was captured on film; he was neither investigated nor disciplined for his involvement in the assault. Most recently, in 2019, he drove a 27-year-old woman home

in his personal vehicle at 2:30 a.m., against her will and without notifying his supervisor or recording the trip mileage. The PSS investigation concluded Drake "created unneeded stress and fear to the complainant." She testified in the investigation that she felt he intended on harming her.  Yet Drake received only a "slap on the wrist" for this: a 7-day suspension with 3 days taken from forfeited vacation—sending a clear message that these illegal actions were acceptable.

276.    In short, even with new leadership and increased scrutiny over the past year, the RPD is already back to "business as usual." RPD officers continue to engage in flagrant, excessive force against Black and brown citizens of Rochester because they know they can.

277.    Indeed, the 2017 report on the CRB's impact since its inception in 1992 observed the Board is nothing more than artifice designed to give the false impression that civilians have an avenue through which they can obtain justice when they have been mistreated by the RPD. The report concludes: "This system works for the bureaucratic institutions but not for the civilian complainants they purport to protect. **Regardless of which chief or mayor was in power, the system—and the results—remained essentially unchanged."**

278.    RPD's Body Worn Camera Policy and training instructs that officers must activate their cameras—no exceptions—to record all mandatory events including arrests, mental hygiene arrests, detentions and stops of persons, and field interviews. Footage of such incidents must be retained for 10 years. In other words, the City and RPD have access to video evidence of every arrest and use-of-force incident by RPD officers since they were outfitted with body worn cameras. Last fall, in light of the serious questions raised by Daniel Prude's murder and the misleading account of events given by RPD officers and then-Chief SINGLETARY, Deputy Mayor Smith called for a review of all past body worn camera and other video footage related to use-of-force incidents by RPD officers. Although the City has had the means, both before and

since Mr. Prude's murder, to audit this footage, they have not taken even this obvious and available step toward identifying officers who are using unconstitutional force.

279.    Absent external enforcement, the system will not change itself: to date, the Department has not fired or disciplined any of the officers known to have engaged in the use of excessive force against Daniel Prude or any of the officers who engaged in blatant displays of force during the September 2020 protests, including those captured on video. After the protests, in line with the Department's institutionalized code of silence, then-Chief SINGLETARY told City Council that no RPD officer had reported a colleague for misconduct in connection with the protests. And when asked about the Department's plan for addressing officers who directly targeted demonstrators with pepper balls, Chief HERRIOTT-SULLIVAN punted that responsibility to the citizens, responding that they may request body camera footage through FOIL and, if anyone believes that PLS was used in a manner that "did not adhere to policies and procedures," he or she may file a PSS complaint.

280.    Notably, the statements made to date by the Mayor and the Department about "changing the culture" of the RPD do not include any discussion about implementing an internal disciplinary mechanism that imposes meaningful disciplinary and remedial actions on officers who engage in excessive force. The City's proposed response to Governor Cuomo's Executive Order 203 on Police Reform also omits any commitment to such a mechanism. The City's proposals instead include aspirational or already-required goals like "exploring a pilot program for providing mindfulness-based de-escalation, anti-racism training," "advocating for NYS to institute a statewide police officer licensing or decertification program," or "releasing comprehensive statistics on the RPD's internal investigations, as required by law."

281.     In December 2020, the PAB submitted a comprehensive plan to Mayor WARREN and the City in response to Executive Order 203's mandate that the City "reimagine" policing. That proposal included a requirement that officers known to support white supremacist organizations be terminated—a central demand by community members. Months later, in February 2021, the City conducted two closed-door sessions—in contravention of Governor Cuomo's instruction that meetings be accessible to the public— to formulate an official plan. WARREN's proposed plan did not include any termination provision for officers known to support white supremacist organizations. The *Democrat & Chronicle* requested minutes from these meetings, which were not livestreamed. The City denied that request. In March 2021, the City Council edited the Mayor's proposed plan to include the termination provision, but the Mayor remains the top City officials in charge of the police department.

282.     As part of its purported "reform" efforts, the RPD recently promulgated two new policies. One bans its officers from using chokeholds except in "extreme circumstances where deadly physical force is authorized." But as an RPD spokesperson explained, officers have never been trained to do chokeholds and the policy is "really semantics." New York State also criminalized the use of a chokehold resulting in serious injury or death in June 2020.

283.     The RPD's second policy instructs that officers have an obligation to intervene to prevent the "unreasonable use of force or other misconduct" by fellow officers. But RPD officers have long been trained that "[a]n officer that does nothing to intervene in an excessive use of force event may be found just as culpable as the officer who loses control." Yet RPD officers have and continue to stand by while other officers beat citizens of color and then, in keeping with the Department's institutionalized code of silence, failed to report their fellow officers—often affirmatively covering for them instead.

284.     As recent events in Rochester have made clear, in keeping with the City's decades-long practice of paying lip service to change while continuing to abuse Black and brown citizens, token policies without disciplinary consequences will not change RPD's racist, violent pattern of policing. RPD officers have repeatedly and flagrantly flouted their constitutional obligations without consequence and continue to do so today.

## CLASS ACTION ALLEGATIONS

285.     Plaintiffs bring this action pursuant to Rule 23(a), (b)(2), and (b)(3) of the Federal Rules of Civil Procedure on behalf of a class, consisting of all persons who have been subjected to excessive force by law enforcement officials in the City of Rochester between April 5, 2018 and April 5, 2021 (the "Class Period") as a result of the same policies, practices, customs, and deliberate indifference of the Defendants described above (the "Plaintiff Class").

286.     The Plaintiff Class is so numerous that joinder of all members is impracticable. While the exact number of Plaintiff Class members is unknown to Plaintiffs at this time and can be ascertained only through appropriate discovery, Plaintiffs believe hundreds, if not thousands, of people are in the proposed Class.

287.     Class members may be identified by video from body-worn camera ("BWC") data maintained by Defendants and may be notified of the pendency of this action by mail using contact information maintained by the Defendants or through reasonable and appropriate publication.

288.     Plaintiffs' claims are typical of the claims of the members of the Plaintiff Class as all members of the Class are similarly affected by Defendants' unlawful conduct and resulted from the same policies, practices, customs, and deliberate indifference complained of herein.

289.     As a direct and proximate cause of the conduct described herein, the named individual Plaintiffs and the Plaintiff Class have been denied their constitutional, statutory, and

legal rights as stated herein, and have suffered general and special damages including but not limited to physical injuries and bodily harm, pain, fear, humiliation, embarrassment, discomfort, anxiety, mental and emotional distress, and other damages in an amount according to proof.

290.    Plaintiffs will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in civil rights and class action litigation, including Baker & Hostetler LLP, Neufeld Scheck & Brustin, LLP, Easton Thompson Kasperek Shiffrin LLP, Roth & Roth, LLP, and the Law Office of Joshua Moskovitz, P.C. Together, the undersigned have more than 100 years of combined litigation experience and have the resources to prosecute this action to its conclusion.

291.    Plaintiffs have no interests antagonistic to or in conflict with those of the Class.

292.    Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class.  Among the questions of law and fact common to the Class are:

      a.    Whether the CITY has maintained policies, practices, and/or customs of using excessive force in violation of the Fourth Amendment;

      b.    Whether the CITY has been deliberately indifferent to the violations of Fourteenth Amendment by its officers;

      c.    Whether the CITY has maintained policies, practices, and/or customs of violating the First Amendment rights of protesters;

      d.    Whether the CITY has been deliberately indifferent to the violations of First Amendment rights of protesters by its officers.

      e.    Whether the Defendants violated the Fourth Amendment rights of Plaintiffs and other individuals as described above;

      f.    Whether the Defendants violated the Fourteenth Amendment rights of Plaintiffs and other individuals as described above;

      g.    Whether the Defendants violated the First Amendment rights of Plaintiffs and other individuals as described above;

293.    These common issues of law and fact predominate any individual issues that any individual class member might raise.

294.    A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable.  Furthermore, the expense and burden of prosecuting a claim for vindication of civil rights make it impossible for members of the Class to individually redress the wrongs done to them.

295.    The entire Plaintiff Class will benefit from the injunctive relief sought herein.

296.    A damages class should be certified pursuant to Rule 23(b)(3) of the Federal Rules of Civil Procedure because questions of law or fact common to class members predominate over any questions affecting only individual members, and that a class action is superior to other available methods for fairly and efficiently adjudicating the controversy.

297.    An injunctive class should be certified pursuant to Rule 23(b)(2) of the Federal Rules of Civil Procedure because the Defendants have acted on grounds generally applicable to the class, in engaging in the aforementioned practices and failing to correct the aforementioned unconstitutional policies thereby making class-wide declaratory and injunctive relief appropriate.

**FIRST CLAIM FOR RELIEF**
**42 U.S.C. § 1983 (Fourth Amendment) Against All Defendants**

298.    Plaintiffs re-allege each and every allegation contained in the above paragraphs with the same force and effect as if fully set forth herein.

299.    In committing the acts and omissions complained of herein, Defendants acted under color of state law—individually, in concert, and through a conspiracy—to deprive Plaintiffs of the rights protected by the Fourth Amendment to the United States Constitution.

300.    As a result of the foregoing, Plaintiffs were deprived of liberty, suffered specific and serious bodily injury, emotional distress, costs, and expenses, and were otherwise damaged and injured.

301.    The unlawful conduct of the individual defendants was willful, malicious, oppressive, and/or reckless, and was of such a nature that punitive damages should be imposed against them.

## SECOND CLAIM FOR RELIEF
### 42 U.S.C. § 1983 (Fourteenth Amendment) Against All Defendants

302.    Plaintiffs re-allege each and every allegation contained in the above paragraphs with the same force and effect as if fully set forth herein.

303.    In committing the acts and omissions complained of herein, Defendants acted under color of state law—individually, in concert, and through a conspiracy—to deprive Plaintiffs of the rights protected by the Fourteenth Amendment to the United States Constitution.

304.    As a result of the foregoing, Plaintiffs were deprived of liberty, suffered specific and serious bodily injury, emotional distress, costs, and expenses, and were otherwise damaged and injured.

305.    The unlawful conduct of the individual defendants was willful, malicious, oppressive, and/or reckless, and was of such a nature that punitive damages should be imposed against them.

## THIRD CAUSE OF ACTION
### 42 U.S.C. § 1983 (First Amendment) Against All Defendants

306.    Plaintiffs re-allege each and every allegation contained in the above paragraphs with the same force and effect as if fully set forth herein.

307.    In committing the acts and omissions complained of herein, Defendants acted under color of state law—individually, in concert, and through a conspiracy—to deprive Plaintiffs of the rights protected by the First Amendment to the United States Constitution.

308.    As a result of the foregoing, Plaintiffs were deprived of liberty, suffered specific and serious bodily injury, emotional distress, costs, and expenses, and were otherwise damaged and injured.

309.    The unlawful conduct of the individual defendants was willful, malicious, oppressive, and/or reckless, and was of such a nature that punitive damages should be imposed against them.

### FOURTH CAUSE OF ACTION
**42 U.S.C. § 1985 (Civil Rights Conspiracy) Against All Defendants**

310.    Plaintiffs re-allege each and every allegation contained in the above paragraphs with the same force and effect as if fully set forth herein.

311.    Defendants agreed among themselves and with other individuals to act in concert in order to deprive Plaintiffs of their constitutional rights, including but not limited to their right to be free from excessive force, their right to equal protection of the law, and their right to free speech.

312.    In furtherance of the conspiracy Defendants engaged in and facilitated numerous overt acts as described above.

313.    As a direct and proximate result of the deprivation of their constitutional rights, Plaintiffs suffered the injuries and damages set forth above.

314.    The individual defendants' actions were willful, malicious, oppressive, and/or reckless, and was of such a nature that punitive damages should be imposed.

**FIFTH CAUSE OF ACTION**
**42 U.S.C. § 1986 (Failure to Prevent Civil Rights Conspiracy) Against All Defendants**

315.    Plaintiffs re-allege each and every allegation contained in the above paragraphs with the same force and effect as if fully set forth herein.

316.    Defendants knew that acts previously mentioned would violate Plaintiffs' constitutional rights and were about to be committed, and they had the power to prevent or aid in preventing the commission of the same, but they neglected or refused to do so.

317.    As a direct and proximate result of the deprivation of their constitutional rights, Plaintiffs suffered the injuries and damages set forth above.

318.    Defendants' actions were willful, malicious, oppressive, and/or reckless, and was of such a nature that punitive damages should be imposed.

**WHEREFORE**, Plaintiffs, on behalf of themselves and members of the class they seek to represent, respectfully request that this Court:

       a.      Certify this class action pursuant to Rule 23 of the Federal Rules of Civil Procedure;

       b.      Declare Defendants' aforementioned conduct, policies and practices to be unconstitutional;

       c.      Permanently enjoin the City of Rochester and its officers, employees, and agents from using excessive force in violation of the Fourth and Fourteenth Amendments;

       d.      Permanently enjoin the City of Rochester and its officers, employees, and agents from using engaging in racially-biased policing in violation of the Fourteenth Amendment;

       e.      Permanently enjoin the City of Rochester and its officers, employees, and agents from unlawfully suppressing the First Amendment rights of peaceful protesters;

       f.      Appoint an independent monitor to reform the City of Rochester's policies and practices with regard to the use of force, racially-biased policing, and policing demonstrations;

       g.      Retain jurisdiction in this case until the unlawful conditions, policies, and practices complained of herein no longer exist and this Court is satisfied that they will not recur;

       h.      Award such compensatory and punitive damages to Plaintiffs and the members of the class they seek to represent, as will fully compensate them for their injuries owing to Defendants' conduct;

       i.      Award Plaintiffs, and the members of the class they seek to represent, reasonable attorney's fees and costs, and interest; and

       j.      Grant such other and further relief as this Court may deem appropriate and equitable, including declaratory and injunctive relief as may be required in the interests of justice.

Dated: New York, New York
April 5, 2021

ROTH & ROTH, LLP

By:  /s/ Elliot Shields
     Elliot D. Shields
     David A. Roth
     192 Lexington Avenue, Suite 802
     New York, New York 10016
     Ph: (212) 425-1020
     eshields@rothandrothlaw.com

NEUFELD SCHECK & BRUSTIN, LLP

By:  
     Nick Brustin
     Katie McCarthy
     99 Hudson Street
     New York, New York 10013
     Ph: (212) 965-9081
     katie@nsbcivilrights.com

THE LAW OFFICE OF JOSHUA
MOSKOVITZ, P.C.

By:  
     Joshua S. Moskovitz
     14 Wall Street, Suite 1603
     New York, New York
     Ph: (212) 380-7040
     josh@moskovitzlaw.com

EASTON THOMPSON KASPEREK
SHIFFRIN LLP

By:  
     Donald Thompson
     The Powers Building
     16 West Main Street, Suite 243
     Rochester, New York 14614
     Ph: (585) 423-8290
     dmthompson@etksdefense.com

BAKER & HOSTETLER, LLP

By:  /s/Ivory L. Bishop
     Jeffrey D. Martino*
     Ivory L. Bishop*
     45 Rockefeller Plaza
     New York, New York 10111
     Ph: (212) 589-4200
     ibishop@bakerlaw.com

     *pro hac vice applications
     forthcoming