**UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF NEW YORK**

---

ANTHONY HALL, STANLEY MARTIN, NICHOLAS
ROBERTSON, DEVORAH CHATMAN, REYNALDO
DEGUZMAN, EMILY GOOD, WINONA MILLER,
DYNASTY BUGGS, LORE MCSPADDEN-WALKER,
EMILY MCINTYRE, FREE THE PEOPLE ROC, and
NATIONAL LAWYERS GUILD ROCHESTER, INC., on
behalf of themselves and other people similarly situated,

                                      Plaintiffs,

       -against-

LOVELY ANN WARREN, LA'RON SINGLETARY,
HENRY C. FAVOR, RAYMOND W. DEARCOP, RALPH
MONTINARELLI, SAMUEL LUCYSHYN, RANDY
POTUCK, WILLIAM BAKER, ALEXANDER ELMORE,
JOHN CLINKHAMMER, DOMENIC BORRELLI,
MATTHEW DRAKE, DAKOTA VANBREDERODE,
ETHAN PASZKO, STEPHEN BOILY, TODD BAXTER,
STEPHEN A. DELLASALA, THE CITY OF
ROCHESTER, COUNTY OF MONROE, MONROE
COUNTY SHERIFF'S OFFICE, "JOHN DOE"
ROCHESTER POLICE DEPARTMENT OFFICERS 1–200
(the names and numbers of which are currently unknown),
and "RICHARD ROE" MONROE COUNTY SHERIFF'S
DEPUTIES 1–200 (the names and numbers of which are
currently unknown),

                                  Defendants.

21-cv-6296 (FPG)

---

**MEMORANDUM OF LAW IN OPPOSITION**
**TO DEFENDANTS' PARTIAL MOTIONS TO DISMISS**

## <u>TABLE OF CONTENTS</u>

Page

TABLE OF CONTENTS ............................................................................................................. i

PRELIMINARY STATEMENT ................................................................................................. 1

STATEMENT OF FACTS .......................................................................................................... 3

    I.   RPD's Deeply-Embedded Culture of Racism and Decades-Long Practice of
         Using Disproportionate Force Against Black and Brown People. ............................. 3

    II.  The RPD's Policy, Practice and Custom of Failing to Supervise and
         Discipline Officers Who Use Excessive Force ......................................................... 5

    III. The Summer and Fall 2020 Protests ........................................................................ 7

    IV. The Plaintiffs' Experiences ...................................................................................... 9

LEGAL STANDARDS ............................................................................................................. 10

    I.   Motion to Dismiss ................................................................................................... 10

    II.  *Monell* Liability .................................................................................................... 11

ARGUMENT ............................................................................................................................. 13

    I.   PLAINTIFFS' FIRST AND SECOND CLAIMS FOR RELIEF—TWO OF
         THE THREE MUNICIPAL LIABILITY CLAIMS BROUGHT AGAINST
         THE CITY—ARE WELL PLED AND SHOULD PROCEED TO
         DISCOVERY ........................................................................................................... 13

        A.  The First Claim for Relief: Municipal Liability Against the City Arising
            from the RPD's Practice of Disproportionately Using More Force More
            Often Against People of Color in Violation of the Fourteenth
            Amendment ....................................................................................................... 13

            i.   The RPD's own data, admissions by City policymakers, decades of
               investigative findings, and significant anecdotal evidence support a
               Monell custom and practice claim for the RPD's disproportionate
               use of more force used more often against Black and brownpeople. .......... 13

            ii.  The FAC includes substantial allegations that show the City has
               acted with deliberate indifference to the RPD's widespread,
               disproportionate use of more force used more often against people
               of color. ...................................................................................................... 15

  B. The City Has Not Moved to Dismiss Plaintiffs' Second Claim for Relief, Alleging Municipal Liability for the City's Deliberate Indifference to RPD Officers Using Excessive Force in Violation of the Fourth and Fourteenth Amendments ................................................................................ 19

II. THE THIRD THROUGH NINTH CLAIMS FOR RELIEF—WHICH SEEK DAMAGES AND INJUNCTIVE RELIEF AGAINST THE CITY AND COUNTY DEFENDANTS FOR VIOLATIONS OF PLAINTIFFS' FIRST, FOURTH, AND FOURTEENTH AMENDMENT RIGHTS—ARE WELL PLED ................................................................................................................ 20

  A. The Third and Fourth Claims for Relief: Municipal Liability Against the City and County Defendants: Violations of Plaintiffs' First, Fourth and Fourteenth Amendment Rights During the Summer and Fall 2020 Racial Justice Protests ................................................................................................ 20

    i. The City Did Not Move to Dismiss the Third Claim for Relief. ............... 22

    ii. The County's Motion to Dismiss the Fourth Claim for Relief Ignores the Allegations in the FAC. ........................................................... 23

  B. Fifth Claim for Relief: First Amendment Infringements, Including First Amendment Retaliation, Against City and County Defendants ........................ 25

    i. The FAC pleads a First Amendment Retaliation Claim. ........................... 26

      1. The City's argument that Plaintiffs' First Amendment rights were not violated because they were protesting in public streets is meritless. ........................................................... 26

      2. The County's First Amendment arguments fare no better. .................. 28

      3. Both the City and the County ignore the FAC's allegations that Defendants targeted journalists and legal observers and intentionally interfered with their First Amendment rights to record and document police activities. ................................................... 29

    ii. The FAC Pleads That Defendants' Response to the Protests Was More Violent Because of the Message They Were Expressing and Thus States First Amendment Viewpoint Discrimination Claims against the City and County. .................................................................... 31

  C. Sixth Claim for Relief: Equal Protection Violations Against the City and County Defendants For Their Differential Treatment of Plaintiffs From Other Similarly Situated Individuals Because Of The Message They Were Expressing ................................................................................................ 32

    i. The City Did Not Move to Dismiss the Sixth Claim for Relief. ................. 32

      ii.   The County's Arguments that a Discriminatory Motive Cannot Be Shown Because both Black and White Protesters Were Injured by Defendants' Practices is Meritless (Responding to Point III(C) of the County's Brief)............................................................................. 32

   D.   Seventh Claim for Relief: Excessive Force Against All Defendants (Except Dellasala) Arising From the Indiscriminate Use of "Less Lethal" Force Against Protesters ...................................................................... 35

      i.   The Seventh Claim for Relief is Properly Pled Under the Fourth Amendment Because Defendants Seized Plaintiffs and The Other Protesters. ................................................................................... 35

      ii.   Even if the Fourteenth Amendment Standard Applies, the FAC Adequately Pleads Excessive Force. ........................................... 37

   E.   Eighth and Ninth Claims for Relief: Civil Rights Conspiracy (§ 1985) and Failure to Prevent Civil Rights Conspiracy (§ 1986) .................. 38

III.  THE FIFTH THROUGH NINTH CLAIMS FOR RELIEF ARE ADEQUATELY PLED AGAINST THE COUNTY DEFENDANTS .................... 39

   A.   The County Is Not Immune under Federal Law for the Policies and Practices of the County Sheriff's Office (Responding to Point III of the County's Brief) ...................................................................................... 39

   B.   The Claims Against the "Richard Roe" Defendants Should Not Be Dismissed (Responding to Point IV in the County's Brief) .............................. 41

   C.   The NLG and FTP ROC Plaintiffs' Claims Against the County Should Not Be Dismissed (Responding to Point V of the County's Brief)................... 43

   D.   The Plaintiffs Have Standing To Seek Declaratory Relief Against the County Defendants (Responding to Point IV in the County's brief) ................ 47

IV.  TENTH, TWELFTH, FOURTEENTH, AND FIFTEENTH CLAIMS FOR RELIEF: EXCESSIVE FORCE CLAIMS OF CERTAIN INDIVIDUAL PLAINTIFFS AGAINST NAMED DEFENDANTS................................................. 48

V.  TENTH, ELEVENTH, THIRTEENTH, SIXTEENTH CLAIMS FOR RELIEF: FALSE ARREST CLAIMS OF CERTAIN INDIVIDUAL PLAINTIFFS AGAINST NAMED DEFENDANTS................................................. 48

VI.  SEVENTEENTH CLAIMS FOR RELIEF: FALSE ARREST AND EXCESSIVE FORCE AGAINST TROOPER DELLASALA. ................................ 49

VII. THE CLASS ACTION ALLEGATIONS ARE SUFFICIENTLY PLED,
AND RESOLUTION OF WHETHER THE FACTORS FOR CLASS
CERTIFICATION HAVE BEEN MET IS PREMATURE ..................................... 49

    A.   Defendants' Motion Is Premature ...................................................... 50

    B.   Defendants Cannot Establish That Certification Is Impossible......................... 52

    C.   Plaintiffs Have Sufficiently Alleged Each of the Elements Required
Under Rule 23........................................................................................ 54


CONCLUSION ................................................................................. 61

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Abay v. City of Denver,*
445 F. Supp. 3d 1286 (D. Colo. 2020)........................................................................21, 36, 37

*Acquah* v. *City of Syracuse,*
No. 18-CV-1378, 2019 WL 3975463 (N.D.N.Y. Aug. 22, 2019) ..........................................20

*Adams v. Smith,*
No. 07-CV-0452, 2007 WL 2323435 (N.D.N.Y. Aug. 9, 2007) ...........................................40

*Allen v. City of New York,*
480 F.Supp.2d 689 (S.D.N.Y. 2007)....................................................................................19

*Alsaada* v. *City of Columbus,*
536 F. Supp. 3d 216 (S.D. Ohio 2021), *modified sub nom. Alsaada* v. *City of Columbus, Ohio,* No. 2:20-CV-3431, 2021 WL 3375834 (S.D. Ohio June 25, 2021) ..................................................................................................................................21, 36

*Am. Civil Liberties Union of Ill. v. Alvarez,*
679 F.3d 583 (7th Cir. 2012) ...............................................................................................31

*Amchem Prods., Inc.* v. *Windsor,*
521 U.S. 591 (1997)..............................................................................................................61

*An v. City of N.Y.,*
No. 16 Civ. 5381 (LGS), 2017 U.S. Dist. LEXIS 84364 (S.D.N.Y. June 1, 2017) ..................................................................................................................................49

*Anderson News, LLC* v. *Am. Media, Inc.,*
680 F.3d 162 (2d Cir. 2012)..................................................................................................11

*Anderson* v. *Garner,*
22 F. Supp. 2d 1379 (N.D. Ga. 1997) ..................................................................................56

*Anti Police-Terror Project v. City of Oakland,*
477 F.Supp.3d 1066 (N.D. Cal. 2020) .............................................................................21, 36

*Anti Police-Terror Project v. City of Oakland,*
No. 20-CV-03866-JCS, 2021 WL 4846958 (N.D. Cal. Oct. 18, 2021)..................................56

*Arista Records, LLC* v. *Doe 3,*
604 F.3d 110 (2d Cir. 2010)..................................................................................................11

*Arlington Heights v. Metro. Hous. Dev. Corp.*,
  429 U.S. 252 (1977)...................................................................................35

*Asociacion de Periodistas de Puerto Rico v. Mueller*,
  529 F.3d 52 (1st Cir. 2008)........................................................................37

*Babbitt v. United Farm Workers Nat'l Union*,
  442 U.S. 289 (1979)...................................................................................31

*Babi-Ali v. City of N.Y.*,
  979 F. Supp. 268 (S.D.N.Y. 1997) ............................................................20

*Bd. of Cnty. Comm'rs v. Brown*,
  520 U.S. 397 (1997)..............................................................................23, 60

*Bell Atlantic Corp.* v. *Twombly*,
  550 U.S. 544 (2007)...................................................................................11

*Bertuglia v. City of N.Y.*,
  839 F. Supp. 2d 703 (S.D.N.Y. 2012).......................................................20

*Black Lives Matter Seattle-King Cnty.* v. *City of Seattle, Seattle Police Dep't*,
  466 F. Supp. 3d 1206 (W.D. Wash. 2020)...........................................21, 36

*Black Lives Matter Seattle-King Cty. v. City of Seattle*,
  2020 WL 3128299 (W.D. Wash. June 12, 2020)  ..................................32, 37

*Boos* v. *Barry*,
  485 U.S. 312 (1988)...................................................................................27

*Brindley v. City of Memphis*,
  934 F.3d 461 (6th Cir. 2019) .....................................................................28

*Buck* v. *City of Albuquerque*,
  549 F.3d 1269 (10th Cir. 2008) .................................................................37

*Cantwell v. Connecticut*,
  310 U.S. 296 (1940)...................................................................................28

*Cash v. County of Erie*,
  654 F.3d 324 (2d Cir. 2011).......................................................................17

*Chen–Oster v. Goldman, Sachs & Co.*,
  877 F. Supp. 2d 113 (S.D.N.Y. 2012).................................................52, 59

*Chua v. City of L.A.*,
  No. LA CV16-00237 JAK (GJSx), 2017 U.S. Dist. LEXIS 224221 (C.D. Cal.
  May 25, 2017)............................................................................................47

*City of Canton* v. *Harris*,
    489 U.S. 378 (1989)...................................................................................23

*City of Houston v. Hill*,
    482 U.S. 451 (1987)...................................................................................31

*Colon v. City of Rochester*,
    419 F. Supp. 3d 586 (W.D.N.Y. 2019) ...............................20, 30, 31, 50

*Connick* v. *Myers*,
    461 U.S. 138 (1983)...................................................................................28

*Connick v. Thompson*,
    563 U.S. 51 (2011)....................................................................................13

*Cordes & Co. Fin. Servs., Inc.* v. *A.G. Edwards & Sons, Inc.*,
    502 F.3d 91 (2d Cir. 2007).......................................................................61

*Cox v. Louisiana*,
    379 U.S. 536 (1965)..................................................................................29

*Curley v. Suffern*,
    268 F.3d 65 (2d Cir. 2001).......................................................................29

*Darrah* v. *City of Oak Park*,
    255 F.3d 301 (6th Cir. 2001) ...................................................................37

*Denney v. Deutsche Bank AG*,
    443 F.3d 253 (2d Cir. 2006).....................................................................46

*DiPippo v. Cty of Putnam*,
    2019 WL 1004152 (S.D.N.Y. Feb. 28, 2019) .........................................14

*Don't Shoot Portland* v. *City of Portland*,
    465 F.Supp.3d 1150 (D. Or. 2020) ............................................21, 32, 36

*Dorsett v. Cnty. of Nassau*,
    732 F.3d 157 (2d Cir. 2013)..............................................................27, 30

*Dougherty v. Town of N. Hempstead Bd. of Zoning Appeals*,
    282 F.3d 83 (2d Cir. 2002).......................................................................11

*Downes-Covington* v. *Las Vegas Metro. Police Dep't*,
    No. 220CV01790GMNDJA, 2020 WL 7408725 (D. Nev. Dec. 17, 2020)...................21, 36

*Duran* v. *Sirgedas*,
    240 Fed.Appx. 104 (7th Cir. 2007)..........................................................37

*Edrei* v. *Maguire*,
892 F.3d 525 (2d Cir. 2018), *cert. denied*, 139 S.Ct. 2614 (2019)
......................................................................................36, 37, 38, 39

*Fields v. City of Philadelphia*,
862 F.3d 353 (3d Cir. 2017)..........................................................31

*Floyd v. City of New York*,
283 F.R.D. 153 (S.D.N.Y. 2012) ...................................................54

*Floyd v. City of New York*,
959 F. Supp. 2d 540 (S.D.N.Y. 2013)............................................15

*Fordyce v. City of Seattle*,
55 F.3d 436 (9th Cir. 1995) ...........................................................31

*Frisby* v. *Schultz*,
487 U.S. 474 (1988).......................................................................27

*Gardner v. W. Beef Properties, Inc.*,
No. 07-CV-2345, 2008 WL 2446681 (E.D.N.Y**.** June 17, 2008) ...........................................53

*Gericke v. Begin*,
753 F.3d 1 (1st Cir. 2014)..............................................................31

*Gerskovich v. Iocco*,
2017 WL 3236445 (S.D.N.Y. 2017)..............................................31

*Glik v. Cunniffe*,
655 F.3d 78 (1st Cir. 2011)............................................................31

*Goldberg* v. *Rocky Hill*,
973 F.2d 70 (2d Cir. 1992).............................................................41

*Graham* v. *Connor*,
490 U.S. 386 (1989).......................................................................36

*Grant v. City of Syracuse*,
No. 15-CV-445, 2017 WL 5564605 (N.D.N.Y. No*v*. 17, 2017) (Kahn, J.) ............................39

*Henderson v. Williams*,
No. 3:10-CV-1621 JCH, 2013 WL 1984545 (D. Conn. May 13, 2013) .................................19

*Hernandez v. United States*,
939 F.3d 191 (2d Cir. 2019)...........................................................50

*Higginbotham v. City of N.Y.*,
105 F. Supp. 3d 369 (S.D.N.Y. 2015).............................................31

*Hines v. Albany Police Dep't*,
    520 Fed.Appx. 5 (2d Cir. 2013) .................................................................12

*Hunter v. City of N.Y.*,
    35 F. Supp.3 d 310, 324-25 (E.D.N.Y. 2014) (Brodie, J.) ........................14

*Indergrit v. Rite Aid Corp*,
    No. 08 CIV. 9361 (PGG), 2009 WL 1269250 (S.D.N.Y. May 4, 2009) .........................53, 57

*Ingles* v. *City of N.Y.*,
    No. 01 CIV. 8279(DC), 2003 WL 402565 (S.D.N.Y. Feb. 20, 2003)...................56

*Ironforge.com v. Paychex, Inc.*,
    747 F. Supp. 2d 384 (W.D.N.Y. 2010) (J. Larimer) ...............................52

*Jeffes* v. *Barnes*,
    208 F.3d 49 (2d Cir. 2000)........................................................42

*Jenkins v. City of N.Y.*,
    478 F.3d 76 (2d Cir. 2007).................................................13, 26

*Keene v. City of Rochester*,
    No. 17-cv-6708, 2018 WL 1697486 (W.D.N.Y. Apr. 4, 2017).................20

*Keiler v. Harlequin Enters. Ltd.*,
    751 F.3d 64 (2d Cir. 2014).......................................................11

*Kingsley v. Hendrickson*,
    135 S. Ct. 2466 (2015)........................................................38, 39

*Knox v. Union Twp. Bd. of Educ.*,
    2015 WL 769930 (D.N.J. Feb. 23, 2015) .......................................14

*LaTrieste Rest. & Cabaret Inc. v. Vill. of Port Chester*,
    40 F.3d 587 (2d Cir. 1994)......................................................34

*Leather* v. *Ten Eyck*,
    2 Fed. App'x 145 (2d Cir. 2001)...............................................42

*Leatherman* v. *Tarrant Cnty. Narcotics Intelligence & Coordination Unit*,
    507 U.S. 163 (1993)...........................................................41

*Ligon* v. *City of N.Y.*,
    288 F.R.D. 72 (S.D.N.Y. 2013) .................................................49

*Lozman v. City of Riviera Beach*,
    138 S. Ct. 1945 (2018).......................................................27, 30

*Lynch* v. *City of N.Y.*,
   952 F.3d 67 (2d Cir. 2020)...................................................................14

*Make the Rd. by Walking, Inc.* v. *Turner*,
   378 F.3d 133 (2d Cir. 2004)..............................................................32

*Matal* v. *Tam*,
   137 S. Ct. 1744 (2017) (Kennedy, J. concurring) ................................32

*Matusick v. Erie Cnty. Water Auth.*,
   757 F.3d 31 (2d Cir. 2014)................................................................12

*Mayfield v. Asta Funding*,
   95 F. Supp. 3d 685 (S.D.N.Y. 2015)...................................................54

*Mazzo v. County. of Monroe*,
   58 A.D.2d 1017 (4th Dep't 1977) .......................................................42

*Mazzola* v. *Roomster Corp.*,
   849 F. Supp. 2d 395 (S.D.N.Y. 2012)..................................................53

*McCullen* v. *Coakley*,
   573 U.S. 464 (2014)...........................................................................27

*McCutcheon* v. *Fed. Election Com'n*,
   572 U.S. 185 (2014)...........................................................................28

*McIntyre* v. *Ohio Elections Comm'n*,
   514 U.S. 334 (1995)...........................................................................28

*McMillian* v. *Monroe Cty.*,
   520 U.S. 781 (1997)...........................................................................12

*Mian v. Donaldson, Lufkin & Jenrette Sec. Corp.*,
   7 F.3d 1085 (2d Cir. 1993)................................................................39

*Miller v. City of Cincinnati*,
   622 F.3d 524 (6th Cir. 2010) ............................................................28

*Missel v. County of Monroe*,
   351 Fed.Appx. 543 (2d Cir. 2009).....................................................12

*Monell* v. *Dep't of Soc. Servs.*,
   436 U.S. 658 (1978).................................................................. *passim*

*Moore* v. *Paine Webber. Inc.*,
   306 F.3d 1247 (2d Cir. 2002)............................................................62

*Myers* v. *Hertz Corp.*,
   624 F.3d 537 (2d Cir. 2010)................................................................57, 61

*Myles v. Phillips*,
   87 A.D.2d 614 (2d Dep't 1982) ....................................................................42

*In re N.Y.C. Policing During Summer 2020 Demonstrations*,
   No. 20-cv-8924 (CM)(GWG), 2021 U.S. Dist. LEXIS 128437 (S.D.N.Y. July
   9, 2021) ............................................................................................. *passim*

*NAACP* v. *Alabama*,
   357 U.S. 449 (1958)...................................................................................28

*NAACP* v. *Claiborne Hardware Co.*,
   458 U.S. 886 (1982)...................................................................................28

*Nelson* v. *City of Davis*,
   685 F.3d 867 (9th Cir. 2012) ......................................................................37

*Nicholas v. Bratton*,
   376 F. Supp. 3d 232 (S.D.N.Y. 2019)...........................................................34

*Nicholas v. City of N.Y.*,
   No. 15 Ci*v.* 9592, 2017 U.S. Dist. LEXIS 26995 (S.D.N.Y. Feb. 27, 2017) ........49

*Nnebe v. Daus*,
   644 F.3d 147 (2d Cir. 2011)..........................................................46, 47, 48

*Orantes-Hernandez* v. *Smith*,
   541 F. Supp. 351 (C.D. Cal. 1982) ..............................................................58

*Otero v. Wood*,
   316 F. Supp. 2d 612 (S.D. Ohio 2004) ........................................................37

*Owens* v. *Cnty. of Monroe*,
   No. 21-CV-06445-FPG, 2021 U.S. Dist. LEXIS 245924 (W.D.N.Y. Dec. 27,
   2001) ....................................................................................................42

*Owens v. Cnty. of Monroe*,
   No. 21-CV-6445-FPG, 2021 WL 6113950 (W.D.N.Y. Dec. 27, 2021) (Geraci,
   J.)..........................................................................................................20

*Parker v. Blackerby*,
   368 F. Supp. 3d 611 (W.D.N.Y. 2019) ..........................................................50

*Parker v. City of Long Beach*,
   563 Fed.Appx. 39 (2d Cir. 2014), *as amended* (Apr. 21, 2014)........................12

*Parker* v. *Time Warner Ent. Co. L.P.*,
  331 F.3d 13 (2d Cir. 2003).................................................................52

*Pembaur v. City of Cincinnati*,
  475 U.S. 469 (1986)..............................................................21, 22

*Philip Morris Inc. v. Nat'l Asbestos Workers Med. Fund*,
  214 F.3d 132 (2d Cir. 2000)..................................................52

*Piper* v. *City of Elmira*,
  12 F. Supp. 3d 577 (W.D.N.Y. 2014) ..................................37

*Puente v. City of Phoenix*,
  No. CV-18-02778-PHX-JJT, 2019 WL 4849613 (D. Ariz. Sept. 30, 2019)
  .............................................................................54, 55, 56, 60

*Reynolds v. Giuliani*,
  506 F.3d 183 (2d Cir. 2007)..................................................17

*Richardson v. Goord*,
  347 F.3d 431 (2d Cir. 2003)..................................................19

*Romer v. Morgenthau*,
  119 F. Supp. 2d 346 (S.D.N.Y. 2000)..................................39

*Rosenberger* v. *Rector & Visitors of Univ. of Va.*,
  515 U.S. 819 (1995)..............................................................32

*Ruggles v. Wellpoint, Inc.*,
  253 F.R.D. 61 (N.D.N.Y. 2008)...........................................53

*Safepath Sys. LLC v. N.Y.C. Dep't of Educ.*,
  563 F. App'x 851 (2d Cir. 2014) .........................................11

*Schaefer v. Gen. Elec. Co.*,
  No. 307-CV-0858PCD, 2008 WL 649189 (D. Conn. Jan. 22, 2008)....................53

*Schnitter v. City of Rochester*,
  556 Fed.Appx. 5, 2014 WL 494893 (2d Cir. 2014)..............12

*Schulik* v. *County of Monroe*,
  202 A.D.2d 960 (4th Dep't 1994).........................................42

*Smelts v. Meloni*,
  306 A.D.2d 872 (4th Dep't 2003).........................................42

*Smith v. City of Cumming*,
  212 F.3d 1332 (11th Cir. 2000) ...........................................31

*Steffel v. Thompson*,
  415 U.S. 452 (1974)..............................................................................................31

*Sullivan v. Little Hunting Park, Inc.*,
  396 U.S. 229 (1969)........................................................................................35, 36

*Summers v. Earth Island Inst.*,
  555 U.S. 488 (2009)..............................................................................................48

*Thomas v. Roach*,
  165 F.3d 137 (2d Cir. 1999)..................................................................................39

*Torraco* v. *Port Auth. of N.Y. & N.J.*,
  615 F.3d 129 (2d Cir. 2010)..................................................................................12

*Torres v. Madrid*,
  141 S. Ct. 989 (2021)............................................................................................36

*Trisvan v. Cnty. of Monroe*,
  26 A.D.3d 875 (4th Dep't 2006)............................................................................42

*United Bhd. of Carpenters, Local 610 v. Scott*,
  463 U.S. 825 (1983)..............................................................................................39

*Vann* v. *City of Rochester*,
  2019 WL 1331572 ..........................................................................................18, 20

*Ventura v. New York City Health & Hosps. Corp.*,
  125 F.R.D. 595 (S.D.N.Y. 1989)...........................................................................59

*Vertical Broad., Inc. v. Town of Southampton*,
  84 F. Supp. 2d 379 (E.D.N.Y. 2000) .....................................................................39

*Vives* v. *City of N.Y.*,
  524 F.3d 346 (2d Cir. 2008)..................................................................................22

*Vodak v. City of Chicago*,
  639 F.3d 738 (7th Cir. 2011) ................................................................................29

*Wagner v. CLC Resorts & Devs., Inc.*,
  32 F. Supp. 3d 1193 (M.D. Fla. 2014)...................................................................54

*Wal-Mart Stores, Inc.* v. *Dukes*,
  564 U.S. 338 (2011)..............................................................................................59

*Walker v. City of N.Y.*,
  974 F.2d 293 (2d Cir. 1992)............................................................................13, 26

*Wandering Dago, Inc. v. Destito*,
    879 F.3d 20 (2d Cir. 2018)........................................................................................33

*Warth v. Seldin*,
    422 U.S. 490 (1975)..............................................................................................48

*Washington v. Davis*,
    426 U.S. 229 (1976)..............................................................................................35

*Webb v. Goord*,
    340 F.3d 105 (2d Cir. 2003)...................................................................................39

*Weyant* v. *Okst*,
    101 F.3d 845 (2d Cir. 1996)...................................................................................50

*Zalaski v. City of Hartford*,
    704 F. Supp. 2d 159 (D. Conn. 2010)....................................................................30

## Statutes

42 U.S.C. § 1982....................................................................................................35

42 U.S.C. § 1983.........................................................................................12, 41, 42, 48

42 U.S.C. § 1985.........................................................................................39, 40, 48

42 U.S.C. § 1985(3)...............................................................................................39

42 U.S.C. § 1986.........................................................................................40, 48

N.Y. Civ. Rights § 79-P.........................................................................................31

## Rules

Fed. R. Civ. P. 8(d)(2).........................................................................................14

Rule 12(b)(6).........................................................................................1, 11, 57

Fed. R. Civ. P. 23.........................................................................................*passim*

Fed. R. Civ. P. 23(a)(1).........................................................................................58

Rule 23(a).........................................................................................56

Rule 23(b)(2).........................................................................................57, 58, 62

Rule 23(b)(3).........................................................................................57, 58, 61

**Constitutions**

U.S. Const. amend. I ................................................................................................ *passim*

U.S. Const. amend. IV ........................................................................................21, 29, 36, 39

U.S. Const. amend. XIV ........................................................................................ *passim*

## PRELIMINARY STATEMENT

This case presents important constitutional questions about policing in the City of Rochester and the response to last summer's racial justice protests, which grew out of opposition to the police killing of Daniel Prude and other incidents of police abuse against people of color. The First Amended Complaint ("FAC") includes hundreds of detailed allegations about unconstitutional policing practices that have been carried out unchecked in Rochester for decades. As the FAC describes, people of color have been overwhelmingly the target of these policies and when a social movement—referred to globally as the **Black Lives Matter** movement—called for the end to those practices, the police response in Rochester and elsewhere was brutal.   In addition to individual claims of the ten natural Plaintiffs, the FAC seeks two categories of class-wide relief: (1) injunctive relief to end the decades-long unconstitutional policing practices of the City of Rochester ("the City") and the Rochester Police Department ("RPD"), and (2) injunctive relief and damages for the class of people injured by the RPD and Monroe County Sherriff's deputies working with the RPD during last summer's racial justice protests.

Plaintiffs submit this Memorandum of Law in opposition to the Defendants' motions to dismiss (ECF 69, 70, 71). The Defendants' motions largely overlook the allegations in the FAC and instead, make arguments based on a contrary view of the relevant events. This is not the proper standard on a Rule 12(b)(6) motion and therefore, the Defendants' motions should be denied.

The First Claim for Relief addresses the RPD's decades-long practice of subjecting people of color to more frequent and greater levels of force during police encounters. The RPD's disproportionate use of force against people of color is supported by the RPD's own statistics that show RPD officers "use force more often and at more severe levels only when interacting with citizens in neighborhoods with higher percentages of Black and Hispanic residents." FAC ¶ 265.

The FAC explains that this practice has persisted for decades and the City has failed to stop it. There is no question that these allegations state a violation of the Fourteenth Amendment.

Similarly, the Second Claim for Relief addresses the RPD's persistent failure to discipline RPD officers who use excessive force. The FAC's detailed allegations describe how the RPD has fostered a culture that encourages the use of excessive force by rewarding and promoting the most violent and abusive officers. **The City Defendants do not move to dismiss this claim**.

The Third through Ninth Claims for Relief address constitutional violations by the City and County Defendants during last summer's racial justice protests. The City has not moved to dismiss the Third Claim for Relief—because there is no question the FAC plausibly alleges that the City maintained unlawful policies, practices and/or customs of responding to the racial justice protests with extreme violence. The County Defendants' motion to dismiss the Fourth Claim for Relief should be denied because the County Defendants worked with the City Defendants and helped plan and carry out their joint response to the racial justice protests. The Fifth through Ninth Claims for Relief similarly rest on substantial allegations of unconstitutional actions by the City and County Defendants during the summer 2020 racial justice protests.

Finally, while none of the other individual defendants move to dismiss the natural Plaintiffs' individual claims in the Tenth through Eighteenth Claims for Relief, State Trooper Dellasala alone asks to sever the claims against him (he also mistakenly asks to dismiss the "class claims" against him, but no such claims were brought). There is no reason, and no expediency, to severing Plaintiff Chatman's claim against Mr. Dellasalla (Eighteenth Claim for Relief). That incident is bound up with the other relevant events and facts of this case.

**STATEMENT OF FACTS**

I.    **RPD's Deeply-Embedded Culture of Racism and Decades-Long Practice of Using Disproportionate Force Against Black and Brown People.**

The FAC pleads a decades-long practice of RPD officers using excessive force against Black and brown residents of the City of Rochester—caused by a culture of racism within the Department—and the City's failure to reform the RPD. In support of this claim, the FAC details data from 3,368 "Subject Resistance Reports" ("SRRs") spanning five years, as analyzed in the doctoral dissertation of a former RPD Investigator, Dr. Charles LoFaso. FAC ¶ 264. This data reveals that the RPD's use of force is overwhelmingly against people of color: 66.8% against Black people and 11.5% against Hispanic people. Dr. LoFaso found that "as the percentage of Black and Hispanic residents [in a neighborhood] increases, uses of force significantly increase" even after controlling for factors such as crime rates. *Id.* ¶ 266. The data also revealed that the RPD used more extreme force against people of color: again, after controlling for factors like crime rates, "the odds of being subjected to high force," meaning the force involved the use of a TASER, baton, canine, bean bag gun, or gun, "relative to low force, increase by 17.1% on average, as neighborhood percentage of Black residents increases, and by 17.7% on average, as neighborhood percentage of Hispanic residents increases." *Id.* ¶ 265. In other words, "*officers use force more often and at more severe levels only when interacting with citizens in neighborhoods with higher percentages of Black and Hispanic residents.*" *Id.* (emphasis added).   And because SRRs rely on self-reported data, Dr. LoFaso concluded that, "Frequency and severity of force may be higher in minority neighborhoods than the results suggest." *Id.* ¶ 266.

Dr. LoFaso's findings that the RPD uses more force and more severe force against people in Black and Hispanicneighborhoods tracks the voluminous allegations in the FAC:

- More than fifty incidents of excessive force against people of color, many of whom suffered devastating injuries and others who died, including Ronald Frazier, Denise

Hawkins, Alecia McCuller, Kenneth Jackson, Louis Davila, Calvin Greene, Vandre Davis, Willie Carter, Craig Heard, Lawrence Rogers, Patricia Thompson, Shawn Dukes, Hayden Blackman, Israel Andino, Richard Davis, Daniel Prude, and Tyshon Jones. *Id*. ¶¶ 9, 47–48, 49–50, 51, 63, 59, 321, 62, 65, 276, 299, 45, 380.

- In 1984, RPD officer Ronald Evangelista, then-President of the Locust Club, told the *Democrat and Chronicle*: "Minorities, not just Blacks, are not popular with police, who are mostly white, middle-class people," and rejected calls for civilian oversight as unnecessary "public appeasement" for Black people. Evangelista was elected by RPD officers as their union president from 1981 through 2008. *Id.* ¶ 326.

- In April 1991, the front page of the *Times-Union* declared: "*Police Use of Force Soars. 852 People Were Injured in Encounters with City Officers Last Year—Up 136%.*" The paper's multi-part series detailed the disproportionate use of force against Black and Hispanic people in the City. *Id.* ¶ 51.

- A 2014 study of the Department's arrest records concluded that RPD officers arrested Black people at a rate 2.7 times higher than non-Black people; that is, 66% of RPD arrests were of Black people, though Black people made up only 42% of the City's population at the time. *Id*. 271. In 1997, Black people were arrested 2.6 times as often as white people, and Hispanic people were arrested 1.4 times as often. *Id*. ¶ 272.

- The *Democrat & Chronicle* reported in 1999: "Racism—as evidenced by allegations of racial profiling—has woven its way into [Rochester] law enforcement." *Id*.

The FAC also details numerous instances of racist acts by RPD officers, which were condoned by the City and the RPD. For example:

- In 2002, RPD Officer Brian Sexstone and several other RPD officers created a memo entitled "Ghetto Lingo" that listed over 70 street slang terms and definitions—like "sammich" for "sandwich" or "reap what you soap" for "reap what you sow"—which Sexstone said he wrote as a "joke." After the memo came to light, Sexstone was terminated by the RPD—but only for a few years. *Id*. ¶ 337. Sexstone was rehired in 2006, and within two years, he was accused of making racist remarks to two Black citizens, including calling a Black woman the "n-word" while arresting her and asking when she would "learn white people don't care about Black people." A spokesperson for the RPD at the time said Sexstone was on active duty and no internal investigation was being done. Sexstone has never been disciplined and remains an RPD officer. *Id*. ¶ 338.

- In 2011, the Professional Standards Section ("PSS")—RPD's internal affairs investigation bureau—investigated Officer Braddon Elliott's involvement in an all-white motorcycle club of which he was a co-founder and club Treasurer. When questioned about a graphic of "two fists and an 88" featured on T-shirts "for people to buy and show their support for the club," Elliott responded the number "88" represents the phrase "Heil Hitler," because H is the eighth letter in the alphabet. The number "88" features prominently in white

supremacist ideology. *Id*. ¶ 350. Despite Elliott's status as a leader of a club that supported white supremacy and that he wore a white supremacist symbol, the Department did not discipline him. Instead, years later, Elliott was only suspended for five days for "neglecting his duties as a sworn police officer by attending meetings [] of the motorcycle club while on duty." *Id*. ¶ 352.

- In 2013, Officer Andrew Klein drove his marked Rochester police vehicle around predominately Black neighborhoods in the City with a black stuffed-toy monkey hanging from its spotlight. Klein received only 10 days suspension, with 3 days taken from paid leave. *Id*. ¶ 346.

The RPD's longstanding permissive attitude toward officers who have expressed racist views and engaged in egregious displays of racism or force has fostered a culture of impunity that has led RPD officers to understand they can beat people of color without consequence. *Id*. ¶ 354.

## II. The RPD's Policy, Practice and Custom of Failing to Supervise and Discipline Officers Who Use Excessive Force

The FAC pleads overwhelming facts that demonstrate the City has been deliberately indifferent and failed to supervise and discipline officers who use excessive force, particularly against people of color. The RPD has a sham internal disciplinary system that consistently and deliberately fails to discipline substantial numbers of officers who are known to have engaged in racist policing and unlawful use of force. *Id*. ¶ 298. For example:

- In 2011, City Councilmember Adam McFadden wrote a letter to the Mayor, Police Chief, and Council President charging that the City had "lost control of its police force" and exclaimed "[o]f the hundreds and hundreds of phone calls I have received regarding police complaints [most of which were from Black and Latinx individuals], I have never been informed by the Rochester Police Department of any disciplinary procedure brought against a police officer for any of these complaints." *Id*. ¶ 66.

- From 2008 to 2013, the PSS did not sustain a single civilian complaint for unnecessary use of force. *Id*. ¶ 299.

- Based on the most recent data available, the PSS investigated 65 officers for 144 complaints of misconduct in 2019. Of the 61 use of force complaints, PSS's overall "sustained" rate was less than 1% (with a single sustained allegation). *Id*. ¶ 300.

- A 2017 report on the impact of the Civilian Review Board (CRB) since its inception in 1992 found that the Board is nothing more than a front used to promote the false impression

that civilians that have been mistreated by the RPD have an avenue to obtain justice. The report concludes: "This system works for the bureaucratic institutions but not for the civilian complainants they purport to protect. Regardless of which chief or mayor was in power, the system—and the results—remained essentially unchanged." *Id*. ¶ 383.

- RPD's disciplinary process is controlled by the Chief of Police; any outcome, including recommended discipline, is completely at his or her discretion. From 2001 to 2016, of 923 civilian-generated allegations of force, the Chief sustained only 16—or 1.7%. One former CRB member recognized the futility of the process: "I remember one case when our panel and the investigating officers separately concluded that unreasonable, abusive force had been used by the arresting officers. The chief overruled all of us—we had no authority or power. I quit after that." *Id*. ¶ 302.

- In the rare case where RPD officer misconduct is caught on video or court proceedings leading the Chief to sustain an allegation, RPD has not meaningfully disciplined the offending officer. From 2001 to 2015, the harshest penalty given out for the 16 sustained use of force complaints were 6 suspensions, ranging from 1 to 20 days. *Id*. ¶ 303.

Thus, the RPD sends a clear message to its officers concerning the degree of discipline (if any) meted out for excessive force against people of color compared to other internal departmental violations. That message is that RPD tolerates or condones violence against Black and brown people. *Id*. ¶ 305.

Instead of disciplining officers known to engage in racist, violent policing, the RPD has a practice of commending and promoting officers who have credible (or even sustained) allegations of excessive force against them. For example:

- The RPD awarded Officer Patrick Giancursio its "Officer of the Year" Award in May 2017 while he was suspended pending an investigation into his use of force against Alexander Grassies in an incident that was caught on surveillance tape. Giancursio was promoted to Investigator three years later. *Id*. ¶ 318.

- In 2011, a PSS investigation determined that Officer Gary Wegman used "inappropriate force" on a Latino man when he punched him in the face without justification. That same year, Wegman received a "Chief's Letter of Recognition." The next year, Wegman pled guilty to inappropriate use of force; he received a letter of reprimand in his file but was nevertheless honored with both an "Excellent Police Service Award" and a "Chief's Letter of Recognition." He has since been promoted to Sergeant. *Id*. ¶ 319.

The Department has retained officers with a demonstrated history of using unnecessary and excessive force against people of color. *Id*. ¶ 320. The FAC details numerous examples of officers who have repeatedly shown such propensities, including but not limited to: Michael Stephens, *id*. ¶¶ 276, 307–08; Matthew Drake, *id.* ¶¶ 227, 276, 310, 380; Thomas Rodriguez, *id*. ¶ 321; Mario "Cowboy" Masic, *id.* ¶¶ 286–87, 322; Joseph Ferrigno, *id.* ¶¶ 299, 276 n. 8, 323–24; and William Baker, *id.* ¶¶ 137, 367. And since 2011, the City has been a defendant in at least forty federal lawsuits alleging the use of excessive force, often by the same RPD officers. *Id*. ¶ 275.

These interrelated policies of racialized violence and failure to supervise and discipline officers who use unjustified force have fostered a culture that emboldened RPD officers to use more extreme force on people of color, as in the case of Daniel Prude; and to use extreme and unjustified force when responding to racial justice protests demanding an end to these practices.

## III.    The Summer and Fall 2020 Protests

On May 30, 2020, five days after George Floyd's murder, a racial justice protest took place in front of Rochester's Public Safety Building ("PSB"):

- RPD officers and Sheriff's deputies closed off Exchange Boulevard in the vicinity of the PSB to vehicular traffic and permitted protesters to peacefully demonstrate for a short period of time. *Id*. ¶ 75.

- Acting according to RPD and MCSO policy and custom, RPD Officers and Sheriff's deputies assigned to police the protest subjected protesters to extreme violence, including indiscriminately pepper spraying and shooting pepper balls into the crowd, physically pushing protesters and striking them with batons. *Id*. ¶¶ 74–77.

- RPD officers and Sheriff's deputies targeted and shot at journalists, legal observers, and people who were recording officers, *id*. ¶ 78, including Plaintiff DEGUZMAN, who while present at the protest in his capacity as a professional photojournalist, was targeted and shot with pepper balls while standing on the sidewalk in the vicinity of the steps in front of the Hall of Justice, along with other members of the press. *Id*. ¶ 79.

Following the May 30, 2020 protest, the City and RPD prepared to respond to further racial justice protests with even more extreme violence after the video of RPD officers killing Daniel

Prude was finally released. *Id*. ¶¶ 84–86. The RPD coordinated with the Monroe County Sheriff's Office ("MCSO") and State Police to create a "multi-agency response" to the protests "managed under a unified command system." *Id*. ¶¶ 94-119. When the video of Mr. Prude's killing was made public on September 2, 2020, it sparked nationwide outrage. In Rochester, thousands of people gathered to mourn the loss of Black lives, demanded that the City end its racist and brutal policing practices, and called for a new vision of public safety that values Black lives. *Id*. ¶ 83.

Over three nights, from September 2–5, 2020, RPD officers and MCSO deputies responded to peaceful protests with extreme and unjustified violence:

- The City and County Defendants coordinated the protest response to create an intimidating, militarized, multi-agency response under a unified command system. *Id*. ¶ 94–107. Under the response plan, the City and County Defendants trained and instructed RPD officers and Sheriff's deputies to use force against "groups" of protesters, without first having made an individualized determination that there was a lawful basis to use force against any individual in the group based on their own individual conduct, as opposed to the perceived "group conduct." *Id*.   ¶ 108.

- RPD officers fired tear gas canisters 77 times into groups of protesters expressly gathered to support Black lives, at journalists and legal observers attempting to report on and record the abuse, and at medics there to provide care and safety to the protesters—often after they blocked off all escape routes to get away from the chemical clouds. One protester struck in the face by a canister required stitches inside and outside of her mouth and has permanent facial scarring. *Id*. ¶ 90.

- Over those three nights, RPD officers discharged 6,100 pepper balls at people protesting the Departments' aggressive and racist practices. *Id*. ¶ 91. RPD officers shot protesters with 40mm direct-impact foam bullets—kinetic impact projectiles ("KIPS")—which can cause a range of injuries including death. RPD officers fired CTS 40 mm munitions during the protest. Use of force reports by RPD officers detail deploying 40mm munitions at individuals' abdomens at the September 5 demonstration. *Id*. ¶ 92. RPD officers also used flash bang grenades, deployed sonic weapons, and struck protesters with batons. *Id*. ¶ 93.

As discussed more fully below, all of the constitutional deprivations that Plaintiffs suffered at Defendants' hands were caused by de facto policies or widespread practices and/or the deliberate indifference of Defendants City of Rochester and County of Monroe in the face of the obvious and demonstrated need to train and supervise subordinate RPD officers and Sheriff's deputies.

Notably, the City admits that the FAC adequately pleads that Plaintiffs' constitutional deprivations were caused by its unlawful municipal policies, practices, and customs of responding to the protests with extreme violence; it did not move to dismiss the Third Claim for Relief. In contrast, the County Defendants move to dismiss the Fourth Claim for Relief, which similarly challenges their unlawful policies of responding to the 2020 racial justice protests with extreme and unlawful violence.

## IV.    The Plaintiffs' Experiences

Plaintiffs participated in the protests on May 30, 2020 and between September 2–October 13, 2020, wearing masks and other face coverings for protection in light of the pandemic. While the exact details of each individual Plaintiff's experiences vary, all of them were injured by RPD and MCSO members in similar ways, based on multiple, overlapping, unconstitutional policies and practices of the City and County, described in the FAC. For example:

- As part of and consistent with Defendants' policies and practices regarding indiscriminately shooting pepper balls into crowds of protesters, *id*. ¶¶ 77, 88, 107, 109–13, virtually all of the Plaintiffs were shot multiple times with pepper balls, and several were shot in the face and/or upper body, s*ee, e.g., id*. ¶¶ 162, 175, 184, 209.

- Consistent with Defendants' policies and practices regarding targeting and retaliating against individuals who were recording and/or documenting the law enforcement response to the protests, Plaintiff ANTHONY HALL was targeted and shot in the hand with a pepper ball when he was recording police officers with his cell phone, knocking his phone out of his hand, *id*. ¶ 140; Plaintiff EMILY GOOD was targeted and shot while acting in her capacity as an NLG Rochester Legal Observer, *id*. ¶ 182; and Plaintiff REYNALDO DEGUZMAN was targeted and shot at nearly every protest while acting in his capacity as a professional photojournalist, *id*. ¶¶ 79, 141, 155–56, 184, 209, 217.

- Defendants also subjected Plaintiffs to unnecessary and excessive force, consistent with Defendants' policies and practices of using excessive force against protesters. Defendants struck Plaintiffs ANTHONY HALL and EMILY MCINTYRE with batons, *id*. ¶¶ 162, 217, 228. Defendants kneed 52-year-old Plaintiff WINONA MILLER in the stomach when she complained that her handcuffs were too tight, *id*. ¶ 222. Defendants ran at Plaintiff LORE MCSPADDEN-WALKER, violently seized them and threw them to the ground, slammed their shoulder into the ground and arrested them, *id*. 205. Defendants pepper-sprayed

Plaintiffs EMILY MCINTYRE and ANTHONY HALL directly in the face from close range *id*. ¶ 141, 162, 217.

The FAC also pleads that outside of the protests and pursuant to policy, RPD officers retaliated against Plaintiffs EMILY MCINTYRE and DYNASTY BUGGS for filming officers performing their duties in public. *See, e.g., Id.* ¶ 290 (explaining how RPD officers unlawfully seized and arrested Plaintiff McIntyre for filming the arrest of a Black man); *Id.* ¶¶ 293–294 (describing how RPD officers subjected Plaintiff Buggs to excessive force and prevented her from recording her abuse by police by pepper spraying her and throwing her phone).

The organizational Plaintiffs Free The People ROC and National Lawyers Guild Rochester, Inc., have been chilled and deterred from engaging in further protest activities as a result of the extreme and excessively violent law enforcement response to the racial justice protests:

- FTP's members have been chilled and deterred from engaging in further protest activities for fear of facing further physical, emotional and psychological violence and trauma. *Id.* ¶ 132.

- Throughout the protests, NLG Rochester Legal Observers were targeted by law enforcement and shot with pepper balls, often while standing alone, in retaliation for observing and documenting law enforcement actions. *Id.* ¶ 182.

As a result of Defendants' misconduct, all Plaintiffs have suffered lasting physical and emotional injuries, as well as other damages. *See e.g., id.* ¶¶ 132, 139, 198, 401, 418, 419, 465, 474, 490, 495, 499, 505, 515, 528, 549, 565.

## LEGAL STANDARDS

### I.    Motion to Dismiss

A Rule 12(b)(6) motion must be denied if the complaint includes "enough facts to state a claim to relief that is plausible on its face;" that is, enough factual allegations, taken as true, "to raise a right to relief above the speculative level." *Bell Atlantic Corp.* v. *Twombly*, 550 U.S. 544, 555, 570 (2007); *see also Arista Records, LLC* v. *Doe 3*, 604 F.3d 110, 120 (2d Cir. 2010). "[I]n

determining whether a complaint states a claim that is plausible, the court is required to proceed '*on the assumption that all the [factual] allegations in the complaint are true*,' [e]ven if their truth seems doubtful." *Anderson News, LLC* v. *Am. Media, Inc.*, 680 F.3d 162, 185 (2d Cir. 2012) (quoting *Twombly*, 550 U.S. at 555). "Given that the plausibility requirement '*does not* impose a *probability* requirement at the pleading stage . . . a well-pleaded complaint may proceed even if it strikes a savvy judge that actual proof of the facts alleged is improbable, and that a recovery is very remote and unlikely.'" *Id.* (quoting *Twombly*, 550 U.S. at 556).

The Court must construe the complaint liberally and accept all facts alleged on information and belief when they are "peculiarly within the possession and control of the defendant, or where the belief is based on factual information that makes the inference of culpability plausible." *Arista*, 604 F.3d at 120 (citations omitted); *see also Keiler v. Harlequin Enters. Ltd.*, 751 F.3d 64, 71 (2d Cir. 2014). Direct evidence of a defendant's intent, motive, or knowledge is rarely available to plaintiffs before discovery, and "[i]t is sufficient to allege facts from which [the relevant mental state] on the part of the defendants reasonably may be inferred." *Safepath Sys. LLC v. N.Y.C. Dep't of Educ.*, 563 F. App'x 851, 857 (2d Cir. 2014) (internal quotation marks omitted) (quoting *Dougherty v. Town of N. Hempstead Bd. of Zoning Appeals*, 282 F.3d 83, 91 (2d Cir. 2002)).

## II. *Monell* Liability

"[A] local government is liable under § 1983 for its policies that cause constitutional torts." *McMillian* v. *Monroe Cty.*, 520 U.S. 781, 784 (1997); *see Monell* v. *Dep't of Soc. Servs.*, 436 U.S. 658, 693 (1978). "To hold a city liable under § 1983 for the unconstitutional actions of its employees, a plaintiff is required to plead and prove three elements: (1) an official policy or custom that (2) causes the plaintiff to be subjected to (3) a denial of a constitutional right." *Torraco* v. *Port Auth. of N.Y. & N.J.,* 615 F.3d 129, 140 (2d Cir. 2010) (internal quotation marks omitted).

A plaintiff may satisfy the "policy or custom" requirement by alleging (1) a formal policy officially endorsed by the municipality; (2) actions taken by government officials responsible for establishing the municipal policies that caused the particular deprivation in question; (3) a practice so consistent and widespread that, although not expressly authorized, constitutes a custom or usage of which a supervising policy-maker must have been aware; or (4) a failure by policymakers to provide adequate training or supervision to subordinates to such an extent that it amounts to deliberate indifference to the rights of those who come into contact with the municipal employees. *See Parker v. City of Long Beach*, 563 Fed.Appx. 39, 41 (2d Cir. 2014), *as amended,* (Apr. 21, 2014) (failure to train); *Matusick v. Erie Cnty. Water Auth.*, 757 F.3d 31, 61–62 (2d Cir. 2014) (persistent and widespread practice); *Hines v. Albany Police Dep't*, 520 Fed.Appx. 5, 7 (2d Cir. 2013) (actions of policymakers); *Schnitter v. City of Rochester*, 556 Fed.Appx. 5, 8, 2014 WL 494893, at *2 (2d Cir. 2014) (failure to train or supervise); *Missel v. County of Monroe*, 351 Fed.Appx. 543, 545 (2d Cir. 2009) (formal policy and act of a person with policymaking authority for the municipality).

 "[A] complaint alleging deliberate indifference must plead some facts that, if proven, would tend to show that (1) a policymaker knows to a moral certainty that employees will confront a given situation; (2) the situation either presents the employee with a difficult choice of the sort that training or supervision will make less difficult or that there is a history of employees mishandling the situation and (3) the wrong choice will frequently cause the deprivation of citizens' constitutional rights."  *In re N.Y.C. Policing During Summer 2020 Demonstrations*, No. 20-cv-8924 (CM)(GWG), 2021 U.S. Dist. LEXIS 128437 at *33-34 (S.D.N.Y. July 9, 2021); (quotations omitted) (quoting *Jenkins v. City of N.Y.*, 478 F.3d 76, 94 (2d Cir. 2007) quoting *Walker v. City of N.Y.*, 974 F.2d 293, 297 (2d Cir. 1992)).

12

# ARGUMENT

## I.  PLAINTIFFS' FIRST AND SECOND CLAIMS FOR RELIEF—TWO OF THE THREE MUNICIPAL LIABILITY CLAIMS BROUGHT AGAINST THE CITY— ARE WELL PLED AND SHOULD PROCEED TO DISCOVERY

### A.  The First Claim for Relief: Municipal Liability Against the City Arising from the RPD's Practice of Disproportionately Using More Force More Often Against People of Color in Violation of the Fourteenth Amendment

The FAC easily meets the plausibility standard at this stage **for Plaintiffs First Claim for Relief**, as Plaintiffs have numerous well-pled allegations which, if taken as true—as they must— demonstrate that RPD officers engaged in practice of using disproportionate force against people of color.

      i.      The RPD's own data, admissions by City policymakers, decades of investigative findings, and significant anecdotal evidence support a Monell custom and practice claim for the RPD's disproportionate use of more force used more often against Black and brown people.

The FAC adequately pleads allegations that far exceed what is required to establish *Monell* liability based on a custom and practice "so persistent and widespread as to practically have the force of law." *Connick v. Thompson*, 563 U.S. 51, 61 (2011).[1] As described above, the RPD's own data shows that RPD officers "use force more often and at more severe levels only when interacting with citizens in neighborhoods with higher percentages of Black and Hispanic residents." FAC ¶ 267. Mayor WARREN, speaking as a City policymaker, acknowledged that "institutional structural racism led to Daniel Prude's death" and conceded that "we have a pervasive problem in

---

[1] Because the City has not challenged the Second Claim for Relief, the Court need not even reach the City's arguments on Plaintiffs' alternate theories under the First Claim for Relief. See, e.g., DiPippo v. Cty of Putnam, 2019 WL 1004152, at *12 (S.D.NY. Feb. 28, 2019) ("Since the Court need only sustain Plaintiff's Monell claim on a single theory of liability, it need not ad-dress the merits [of] alternative theories...such as failure to train/supervise"); Knox v. Union Twp. Bd. of Educ., 2015 WL 769930, at *11 (D.N.J. Feb. 23, 2015) (declining to rule on "alternate theories" supporting claim at motion-to-dismiss stage as "discovery will not vary substantially depending on whether they are in or out of the case" and they may "be addressed on summary judgment"); cf. Fed. R. Civ. P. 8(d)(2) (If a party alleges alternate theories, "the pleading is sufficient if any one of them is sufficient."). Nevertheless, as detailed below, the allegations in Plain-tiffs' FAC more than amply make out municipal liability under the First and Second Claims for Relief.").

the Rochester Police Department." *Id*. ¶ 2. And reports going back more than a decade have reflected the fact that, "[r]acism . . . has woven its way into [Rochester] law enforcement." *Id.* ¶ 272.

The FAC also includes aa substantial number of allegations of racially-charged use-of-force incidents, including at least 40 civil rights lawsuits in the last ten years alleging the use of violent excessive force by RPD officers, primarily against people of color. FAC ¶¶ 275–276. Contrary to the City's argument that "presenting a litany of lawsuits and misconduct cases as proof of a policy or custom is legally insufficient to establish a custom or policy" (City MOL at 13), it is well-settled that a pattern of similar incidents, as revealed in other lawsuits (including lawsuits that end with settlements) can establish the existence of a custom or practice, *and* can support municipal "deliberate indifference." *See, e.g.*, *Lynch* v. *City of N.Y.*, 952 F.3d 67, 81–82 (2d Cir. 2020); *Hunter v. City of N.Y.*, , 35 F. Supp.3 d 310, 324-25 (E.D.N.Y. 2014) (Brodie, J.) (finding allegation of a newspaper article was "sufficient, perhaps just barely, to plausibly state a claim of municipal liability"). In *Lynch,* the Second Circuit squarely held that plaintiff may rely on "'numerous litigations as evidence of the 'official policy' element' of municipal liability claims.'" *Lynch*, 952 F.3d at 81–82. The Second Circuit distinguished cases that reached a contrary conclusion because those cases, like the cases the City relies on here, "dealt with motions for summary judgment and proffers of proof, not with motions" to dismiss.   *Id.*

Courts in this Circuit have found allegations like those included in the FAC, particularly statistical evidence supported by substantial anecdotal evidence, are sufficient to *prove*, not just *plead*, a *Monell* custom and practice claim. Following a bench trial in *Floyd v. City of New York*, the Court found that the NYPD's stop-and-frisk practices were sufficiently widespread to have the

force of a municipal policy and statistical disparities in the race of people stopped supported the inference of the City's discriminatory intent in applying its facially neutral policy:

> [P]laintiffs' statistical evidence of racial disparities in stops is sufficient to show a discriminatory effect. In particular, plaintiffs showed that: (1) the NYPD carries out more stops where there are more [B]lack and Hispanic residents, even when other relevant variables are held constant; (2) NYPD officers are more likely to stop [B]lacks and Hispanics than whites within precincts and census tracts, even after controlling for other relevant variables; (3) NYPD officers are more likely to use force against [B]lacks and Hispanics than whites, after controlling for other relevant variables; and (4) NYPD officers stop [B]lacks and Hispanics with less justification than whites. In addition to their statistical evidence of a racially disproportionate impact, plaintiffs provided significant anecdotal evidence.

959 F. Supp. 2d 540, 662 (S.D.N.Y. 2013). Thus, the statistical and significant anecdotal evidence alleged in the FAC is more than sufficient to *plead* a Fourteenth Amendment claim regarding the RPD's widespread practice of using more force more often against Black and brown people, as pled in Plaintiffs' First Claim for Relief.

> ii.  The FAC includes substantial allegations that show the City has acted with deliberate indifference to the RPD's widespread, disproportionate use of more force used more often against people of color.

Based on the allegations in the FAC (as opposed to the alternative facts offered in the City's motion), the City has known for more than a decade that the RPD maintains a widespread custom and practice of using more force more often against people of color, and the City has taken no meaningful steps to end or even curb that unconstitutional *de facto* City policy. First, Dr. LoFaso's analysis of RPD's use-of-force data shows what the RPD has long known about its use-of-force practices: that RPD officers "**use force more often and at more severe levels only when interacting with citizens in neighborhoods with higher percentages of Black and Hispanic residents**." *Id.* ¶ 264-67, 425. That data, which came from the RPD itself, *see id.* ¶ 264, also shows that RPD officers use more severe force more often in Black and brown neighborhoods, *id.* ¶ 267.

And the "frequency and severity of force may be higher in minority neighborhoods than the results suggest" because the use-of-force data is self-reported.   *Id.* ¶ 425.[2]

Moreover, the FAC is replete with well-pled allegations of public reports and direct statements acknowledging that brutality and racism are endemic in the RPD and the RPD has taken no meaningful steps to root it out. For instance, in 1984, Ron Evangelista, an RPD officer and the President of RPD's police union, the Locust Club,[3] told the *Democrat and Chronicle*: "Minorities, not just Blacks, are not popular with police, who are mostly white, middle-class people." *Id.* ¶ 326. Evangelista was reelected by RPD officers as the union president for nearly three decades, until 2008, and the current Locust Club President has acknowledged there is some level of systemic racism in the RPD. *Id.* ¶¶ 326-27.

A multi-part series appeared in the *Times-Union* in 1991 "detail[ing] the disproportionate use of force against Black and Hispanic people in the City." *Id.* ¶ 52. The following year, RPD's former Police Chief, Gordon Urlacher, pled guilty in federal court to civil rights conspiracy for condoning violence by the RPD's Highway Interdiction Team or "HIT" squad. *Id.* ¶¶ 53-54. The HIT squad patrolled almost exclusively in the City's communities of color and all of the officers indicted alongside Urlacher were white. *Id.* ¶ 53. Even though federal authorities found the HIT squad had terrorized more than thirty victims—kicking, punching, throwing them against walls or down stairs while restrained, and beating them with unauthorized weapons including blackjacks, a cattle prod, and lead-filled leather gloves—and the allegations included that HIT officers had shouted racial slurs, kept a wooden stick that squad members referred to as their "n----- stick,"

---

[2] It is unclear what the City means when it argues that Dr. LoFaso's "conclusions are mischaracterized and misapplied" (City MOL at 14). The FAC does not "mischaracterize" or even "characterize" Dr. LoFaso's dissertation; rather, it quotes the dissertation directly and at length. The City cannot escape the fact that the *data* reported in Dr. LoFaso's dissertation came from the RPD, and that data speaks for itself: 80% of the recorded incidents of force involved people of color, and more force and more severe force is used in Black and brown neighborhoods.

[3] The Locust Club's name itself is synonymous with brutal force: the union is named for "the kind of wood that all Rochester police nightsticks were once made from." FAC ¶ 93.

wrote "illegal alien" in pen on the forehead of a young man, cut a dreadlock from the head of another man, and dumped a "flour-like, powdery substance" on yet another, RPD officials took no meaningful action to address these obvious constitutional issues. *Id.* ¶¶ 55-56. Instead, the RPD Police Chief defended the RPD and its internal review process: "The system is fine. There's nothing wrong with the system." *Id.* ¶ 56.

In 2017, a report on the Department observed that "structures of white supremacy…may exist in the RPD's culture and practices." *Id.* ¶ 349. The City's Mayor acknowledged more recently, and with more certainty: "Institutional structural racism led to Daniel Prude's death. I won't deny it. I stand before it and I call for justice upon it." *Id.* ¶¶ 2, 355.

Thus, the City has long known of the grave problems within the Department that frequently cause violations of the constitutional rights of City residents, and thus, the need for better supervision, monitoring, training, and discipline of RPD officers to end or even mitigate these issues, but City officials "'fail[ed] to make meaningful efforts to address the risk of harm to plaintiffs.'" *Cash*, 654 F.3d at 334 (quoting *Reynolds*, 506 F.3d at 192). Eschewing these allegations (as it has done for all these many years), the City makes the wholly irrelevant argument that Dr. LoFaso's dissertation reported that "[t]he RPD has attempted to recruit female police candidates and as well as candidates of color." City MOL at 14. If this is the most the City can say it has done in the face of a widely reported culture of racism within the RPD and data establishing racially disproportionate uses of force, then the City's deliberate indifference is clear.

The City's other argument—that the First Claim for Relief is improperly pled because it cites to "newspaper blurbs and cartoons spanning decades," City MOL at 12, and that such allegations should be stricken, *id.* at 28-29—is frivolous. In rejecting a near-identical argument by the City in *Vann v. City of Rochester*, Judge Telesca reasoned that:

> The Second Circuit has explained that "[e]videntiary questions ... should especially be avoided at such a preliminary stage of the proceedings[,]" and "ordinarily neither a district court nor an appellate court should decide to strike a portion of the complaint on the grounds that the material could not possibly be relevant on the sterile field of the pleadings alone." Lipsky, 551 F.2d at 893. Since the City Defendants have not attempted to show that the matter sought to be stricken "could not possibly be relevant," id., they have not justified their demand for relief under Rule 12(f). Therefore, the Court declines to strike any portion of the Amended Complaint under Rule 12(f).

No. 6:18-CV-06464(MAT), 2019 WL 1331572, at *11 (W.D.N.Y. Mar. 25, 2019). Here, just like in *Vann*, the City has not attempted to show that the matter sought to be stricken "could not possibly be relevant." Its motion to strike must therefore be denied.

Moreover, the newspaper articles and cartoons *are* relevant. Among other things, they support the fact that City officials knew about and remained deliberately indifferent to the RPD's decades-long practice of using disproportionate force against Black and brown people. One cartoon addresses the RPD's culture of racist, violent policing that was a major topic in the 1992 federal trial of RPD's HIT squad officers. FAC ¶¶ 329–30. This cartoon supports Plaintiffs' allegations that for decades, the City and RPD created, condoned, and encouraged a culture of impunity for racist, violent policing of Black and brown people. As discussed above, the cases cited by the City arguing that newspaper articles are insufficient to support a *Monell* claim involve motions for summary judgment or other motions, not motions to dismiss. *See* City MOL at 12.[2]

The City's motion to strike further demonstrates that the City fails to comprehend the FAC's well-pled claims. The City contends that "all paragraphs alleging 'racist policing' by [the] RPD" should be stricken because "plaintiffs have not asserted an equal protection claim." City MOL at 28. This argument is plainly wrong. The First Claim for Relief is explicitly brought under

---

[2] *Henderson v. Williams*, No. 3:10-CV-1621 JCH, 2013 WL 1984545, at *1 (D. Conn. May 13, 2013) (cross motions for summary judgment); *Richardson v. Goord*, 347 F.3d 431 (2d Cir. 2003) (reviewing summary judgment motions); *Allen v. City of New York*, 480 F.Supp.2d 689 (S.D.N.Y. 2007) (motion for summary judgment).

the Fourteenth Amendment and states that, "[t]he force Defendants used against Black and brown individuals was motivated by a discriminatory purpose to deprive them of the equal protection of the law, equal privileges and immunities under the law, and due process in violation of the Fourteenth Amendment to the U.S. Constitution." FAC ¶ 431. And the Sixth Claim for Relief, pled against the City and other defendants, is captioned, "Equal Protection."

In short, the City may disagree with the allegations of "racist policing" by the RPD, but the allegations cannot be ignored and they amply support Plaintiffs' First Claim for Relief.

**B.    The City Has Not Moved to Dismiss Plaintiffs' Second Claim for Relief, Alleging Municipal Liability for the City's Deliberate Indifference to RPD Officers Using Excessive Force in Violation of the Fourth and Fourteenth Amendments**

The City has not moved to dismiss Plaintiffs' Second Claim for Relief, which alleges the City is liable for its failure to properly supervise and discipline RPD officers despite knowing of their widespread practices of using unlawful, excessive force. Thus, the City has waived its right to move to dismiss this claim and cannot raise new arguments regarding this claim in reply. Nonetheless, the FAC adequately pleads that an obvious consequence of the RPD's decision to not discipline but instead reward officers accused of excessive force is that other officers would similarly use excessive force. FAC ¶ 317. Courts in this district have repeatedly denied motions to dismiss municipal liability claims where the complaints included far fewer allegations.[4]

---

[4] *See Colon v. City of Rochester,* 419 F. Supp. 3d 586 (W.D.N.Y. 2019) (denying motion to dismiss *Monell* claim where <u>twelve</u> prior excessive force incidents described, and the complaint alleged City of Rochester and RPD failed to investigate or discipline the officers involved); *Vann* v. *City of Rochester*, 2019 WL 1331572 at *8 (allowing *Monell* claim to proceed based on allegations of sixteen prior incidents); *Keene v. City of Rochester*, No. 17-cv-6708, 2018 WL 1697486 (W.D.N.Y. Apr. 4, 2017) (denying motion to dismiss *Monell* claim where eight excessive force incidents described, and complaint alleged City failed to adequately investigate or discipline the officers involved); *accord Acquah* v. *City of Syracuse*, No. 18-CV-1378, 2019 WL 3975463, at *5 (N.D.N.Y. Aug. 22, 2019) (denying motion to dismiss *Monell* claim based on five instances of excessive force); *Bertuglia v. City of N.Y.*, 839 F. Supp. 2d 703 (S.D.N.Y. 2012) (denying motion to dismiss *Monell* claim based on fifteen cases of similar constitutional violations by prosecutors); *Babi-Ali v. City of N.Y.,* 979 F. Supp. 268, 274 (S.D.N.Y. 1997) (denying motion to dismiss *Monell* claim against Queens DA where just nine other *Brady* violations alleged, many of which postdated plaintiff's claim); *see also*, *Owens v. Cnty. of Monroe*, No. 21-CV-6445-FPG, 2021 WL 6113950, at *5-6 (W.D.N.Y. Dec. 27,

## II.   THE THIRD THROUGH NINTH CLAIMS FOR RELIEF—WHICH SEEK DAMAGES AND INJUNCTIVE RELIEF AGAINST THE CITY AND COUNTY DEFENDANTS FOR VIOLATIONS OF PLAINTIFFS' FIRST, FOURTH, AND FOURTEENTH AMENDMENT RIGHTS—ARE WELL PLED

### A.   The Third and Fourth Claims for Relief: Municipal Liability Against the City and County Defendants: Violations of Plaintiffs' First, Fourth and Fourteenth Amendment Rights During the Summer and Fall 2020 Racial Justice Protests

In case after case about police violence during the nationwide protests in the wake of George Floyd's murder, courts have repeatedly held that the indiscriminate use of chemical agents and other "less lethal" crowd control tactics—like those used against Plaintiffs and other protesters as alleged in the FAC—violated the First, Fourth and Fourteenth Amendments.[5] Like those cases, the FAC details that the RPD and Monroe County Sheriff's Office ("MCSO") jointly implemented a plan to use chemical and other "less lethal" weapons indiscriminately against protesters. The entire thrust of these claims is that the vicious treatment of the protest Plaintiffs was motivated by animus to the protesters' message and efforts to secure equal rights for Black and brown people.

The FAC satisfies the standard for alleging the existence of an affirmative municipal policy. "[W]here action is directed by those who establish governmental policy, the municipality is equally responsible whether that action is to be taken only once or to be taken repeatedly;" and municipal liability "attaches where—and only where—a deliberate choice to follow a course of action is made from among various alternatives by the official or officials responsible for establishing final policy with respect to the subject matter in question." *Pembaur v. City of*

---

2021) (Geraci, J.) (noting "there is no bright-line rule for how many complaints there must be, or how recent the complaints must be, to put a municipality on notice of potential liability").

[5] *See, e.g.*, *2020 Demonstrations*, 2021 U.S. Dist. LEXIS 128437; *Alsaada* v. *City of Columbus*, 536 F. Supp. 3d 216 (S.D. Ohio 2021), *modified sub nom. Alsaada* v. *City of Columbus, Ohio*, No. 2:20-CV-3431, 2021 WL 3375834 (S.D. Ohio June 25, 2021); *Downes-Covington* v. *Las Vegas Metro. Police Dep't*, No. 220CV01790GMNDJA, 2020 WL 7408725 (D. Nev. Dec. 17, 2020); *Anti Police-Terror Project* v. *City of Oakland*, 477 F.Supp.3d 1066, 1086 (N.D. Cal. 2020); *Black Lives Matter Seattle-King Cnty.* v. *City of Seattle, Seattle Police Dep't*, 466 F. Supp. 3d 1206, 1214–15 (W.D. Wash. 2020); *Abay v. City of Denver*, 445 F. Supp. 3d 1286, 1291–92 (D. Colo. 2020); *Don't Shoot Portland* v. *City of Portland*, 465 F.Supp.3d 1150 (D. Or. 2020).

*Cincinnati,* 475 U.S. 469, 483 (1986); *see also Vives* v. *City of N.Y.,* 524 F.3d 346, 350 (2d Cir. 2008).

Here, the FAC pleads that both RPD officers and MCSO deputies were ordered to suppress the protests, and those orders came from the official policymakers for the City and the County. FAC ¶¶ 94–131. RPD officers and MCSO deputies were given military-grade equipment and authority to spray and gas indiscriminately, aim high with pepper balls and KIPS, and inflict pain as a deterrent. *See, e.g., id.* ¶¶ 88–93, 200, 215. The widespread use of pepper spray, pepper-balls, tear gas, and other types of "less lethal" weapons belies any claim that individual officers were acting on their own rather than implementing a preconceived municipal plan.

As the FAC alleges, final policymakers on police practices with respect to the protests for the City, the RPD, the County, and the MCSO were responsible for designing and orchestrating this "joint law enforcement protest response strategy." *See* FAC ¶¶ 100–14. Under *Pembaur,* when a "government's authorized decisionmakers" make "the decision to adopt [a] particular course of action," "it surely represents an act of official government 'policy'" and "where action is directed by those who establish governmental policy, the municipality is equally responsible whether that action is to be taken only once or to be taken repeatedly." 475 U.S. at 483. Thus, the City and County are liable for the unlawful policies adopted by the RPD and County policymakers.

The natural, inevitable result of the City and County policies is exactly what transpired: officers complying with official policies on the use of the "less lethal" force caused serious injuries to peaceful protestors who at most engaged in a misdemeanor by obstructing public sidewalks and streets, and in many cases, were doing nothing illegal whatsoever. Plaintiffs have therefore shown a "direct causal link" between the offending policies and the constitutional deprivations they

suffered; in other words, their particular injuries were incurred *because* of the execution of the unlawful City and County policies. *See City of Canton* v. *Harris*, 489 U.S. 378, 385 (1989).

Moreover, the FAC pleads that City officials effectively ratified the RPD's violent response. While hundreds of peaceful protesters, many of them Black and brown, were injured by RPD's violent response to the demonstrations, the Department condoned its officers' actions. Former RPD Chief SINGLETARY praised RPD officers, saying publicly that they "showed restraint" when many peaceful demonstrators, including elected officials, were shot in the head with pepper balls, pepper sprayed, and worse. RPD Deputy Chief Mark Mura declared that the tactics RPD officers used were "tactful, *per policy and training*, and appropriate for the situation at hand." FAC ¶ 128 (emphasis added). Mayor WARREN also praised RPD officers: "[Y]ou made us very, very proud." *Id.*

"[P]roof that a municipality's . . . authorized decisionmaker has intentionally deprived a plaintiff of a federally protected right necessarily establishes that the municipality acted culpably." *Bd. of Cnty. Comm'rs v. Brown,* 520 U.S. 397, 405 (1997). "Similarly, the conclusion that the action taken or directed by the [municipality's] authorized decisionmaker itself violates federal law will also determine that the municipal action was the moving force behind the injury of which the plaintiff complains." *Id.*

i. The City Did Not Move to Dismiss the Third Claim for Relief.

Because the City's partial motion to dismiss does not to challenge the Third Claim for Relief, any argument against it has been forfeited, and it may not raise new arguments in reply. In any event, drawing all reasonable inferences in Plaintiffs' favor—as required in a motion on the pleadings—the detailed allegations in the FAC clearly plead overwhelming evidence of municipal liability against the City for its excessively violent response to the Summer and Fall 2020 racial justice protests and that said policy was motivated by animus to the Plaintiffs' efforts to secure

equal rights for Black and brown people. Thus, because the City chose not to challenge the Third

Claim for Relief, it must proceed to discovery.

        ii.    The County's Motion to Dismiss the Fourth Claim for Relief Ignores the Allegations in the FAC.

In moving to dismiss the Fourth Claim for Relief, the County defendants ignore the

allegations pled against them. Instead, the County focuses on a straw man argument about its

Hazard Mitigation Plan. County MTD at 5–7. While that plan illustrates the County's ill-conceived

policy toward free speech activity—by conflating peaceful protests with violent riots, *see* FAC ¶¶

251-54—the gravamen of Plaintiffs' case against the County is that BAXTER and Sheriff's

deputies coordinated with the RPD to violently suppress peaceful demonstrations meant to secure

the equal rights of Black and brown people. Over 137 paragraphs of the FAC allege in painstaking

detail how County officials coordinated with RPD officials to orchestrate a plan to violently

suppress peaceful *Black Lives Matter* demonstrations. *See* FAC ¶¶ 94-231. Among other things,

the FAC alleges that:

- "The multi-agency response" to the 2020 Black Lives Matter protests "was managed under a unified command system between the CITY and the RPD; the COUNTY, MCSO and [Sheriff] BAXTER," *id.* ¶ 96;

- BAXTER "oversaw the unified command system for the COUNTY and MCSO," *id.* ¶ 98; *see also id.* ¶ 166;

- On the nights of protests, BAXTER "and other commanding officers of the MCSO and County were present in the MCSO Command Post and were overseeing and directing Defendant Richard Roe Sheriff's deputies' response to the protesters, and coordinating with the RPD protest policymakers about the response to protesters, including the use of specific tactics and weapons," *id.* ¶ 102.

- BAXTER "and other COUNTY policymakers created a joint law enforcement protest response strategy that instructed RPD officers and Sheriff's deputies to respond to protesters with unconstitutional and unnecessary force," *id.* ¶ 105;

- BAXTER "and other COUNTY policymakers created a joint law enforcement protest response strategy that instructed their law enforcement officers to use excessive and

unconstitutional levels of force against the protesters in retaliation for the protesters' message," *id.* ¶ 106;

- The County Sheriff's Office "contributed personnel and resources to create a massive police presence to confront those assembled in peaceful protest to call the RPD to account for its widespread use of violence against people of color," *id.* ¶ 119;

- In response to a peaceful demonstration on May 30, 2020, "RPD officers and Sheriff's deputies pepper sprayed protesters, indiscriminately shot pepper balls into the crowd, physically pushed protesters and struck them with batons," and shot Plaintiff Reynaldo Deguzman "several times with pepper balls as he was filming the police interaction with protesters," *id.* ¶¶ 77, 79;

- The night of September 3/4, 2020, the County Sheriff's Office "deployed two surveillance drones to fly over the protesters" and "[u]sing the video footage," RPD officials coordinated with BAXTER "and other commanding officers of the MCSO and COUNTY to direct" the response by RPD officers and Sheriff's deputies "to protesters on the ground, including the use of specific tactics and weapons," *id.* ¶¶ 145-47; *see also id.* ¶¶ 168-169 (same for the night of September 4/5, 2020); *see also id.* ¶¶ 188, 190-91 (again on September 5/6, 2020); and

- County Sheriff's deputies participated in the widespread use of excessive force against peaceful protesters on September 3, 4, 5, 6, 12, and 13, 2020, *id.* ¶¶ 138-39, 141, 152-54, 157, 161-164, 184-185, 187, 192, 209-10, 214, 217-18.

Nowhere in its brief does the County address these detailed allegations. Instead, the County assiduously ignores them and argues that a municipal policy cannot be inferred from "a single incident involving an employee below the policymaking level." County MTD at 7. In the face of the many allegations about the County's actions—which spanned several weeks and involved the highest-level County officials—the County's motion lacks credibility. The allegations in the FAC sufficiently allege an official municipal policy under any established formulation. *See*, *e.g.*, *Summer 2020 Demonstrations*, 2021 U.S. Dist. LEXIS 128437, at *27.

Likewise, the County overlooks the many allegations that it failed to appropriately train its officers in the proper handling of First Amendment assemblies and had notice that such training was necessary to prevent constitutional violations. *See, e.g.*, FAC. ¶¶ 112–14; 234-35, 249-50, 252, 255-56. Specifically, the FAC alleges that County Sheriff's deputies are not trained to respect

the constitutional rights of peaceful demonstrators; instead, they are trained "exclusively on deterring, dispersing, and demoralizing protests and peaceful demonstrations" and taught "to police peaceful demonstrations in the same manner as they would a violent mob."   *Id.* ¶¶ 257-58. The FAC also alleges that in June 2020—prior to the widespread unconstitutional acts of County Sheriff's deputies during the *Black Lives Matter* racial justice protests—"several Monroe County Legislators called on [the County Sheriff] to implement new protest training to ensure the safety of protesters at Black Lives Matter demonstrations." *Id.* ¶ 259. Those legislators specifically called on the Sheriff and County Executive to "***be sure that a plan is in place to ensure the mutual safety of all involved***" in the summer demonstrations. *Id.* ¶ 260. Again, the County's claim that the Complaint does not plead facts to support the County's deliberate indifference is contradicted by the allegations in the FAC. *See*, *e.g.*, *Summer 2020 Demonstrations*, 2021 U.S. Dist. LEXIS 128437, at *33-34 (quoting *Jenkins v. City of N.Y.*, 478 F.3d 76, 94 (2d Cir. 2007), in turn quoting *Walker*, 974 F.2d at 297).

### B. Fifth Claim for Relief: First Amendment Infringements, Including First Amendment Retaliation, Against City and County Defendants

The FAC pleads First Amendment violations against the City and County Defendants under several theories, including First Amendment retaliation; viewpoint discrimination, and the targeted and retaliatory use of force against journalists, legal observers and others who were documenting and recording the police response to the protests. The City and County do not address these theories. Instead, the City merely argues that Plaintiffs did not have a First Amendment right to protest in the streets, sidewalks, and parks of downtown Rochester—quintessential public fora. And the County mistakenly argues that the FAC fails to allege that County officials deprived Plaintiffs of any First Amendment rights. Because the First Amendment claims are adequately pled in both respects, the City and County's motions must be denied.

      i.    The FAC pleads a First Amendment Retaliation Claim**.**

"To plead a First Amendment retaliation claim a plaintiff must show: (1) he has a right protected by the First Amendment; (2) the defendant's actions were motivated or substantially caused by his exercise of that right; and (3) the defendant's actions caused him some injury." *Dorsett v. Cnty. of Nassau,* 732 F.3d 157, 160 (2d Cir. 2013). In *Dorsette*, the Circuit clarified that "[c]hilled speech is not the *sine qua non* of a First Amendment claim"; rather, Plaintiffs may show *"either* that [their] speech has been adversely affected by the government retaliation or that [they] ha[ve] suffered some other concrete harm." *Id.* (emphasis in original). Also, contrary to the City's argument, (City MOL p. 27), where, as here, certain Plaintiffs allege that they were arrested pursuant to an official policy motivated by retaliation, a First Amendment retaliatory arrest claim may be brought, even without showing an absence of probable cause. *Lozman v. City of Riviera Beach*, 138 S. Ct. 1945 (2018).

      *1.    The City's argument that Plaintiffs' First Amendment rights were not violated because they were protesting in public streets is meritless.*

In its motion, the City only argues that the Plaintiffs did not have a right protected by the First Amendment to protest in the streets of downtown Rochester. City MOL at 18–21. There is no merit to this argument.

The Supreme Court has "repeatedly referred to public streets as the archetype of a traditional public forum." *Frisby* v. *Schultz*, 487 U.S. 474, 480 (1988). Indeed,

> [P]ublic ways and sidewalks … occupy a special position in terms of First Amendment protection because of their historic role as sites for discussion and debate. These places—which we have labeled 'traditional public fora'—have immemorially been held in trust for the use of the public and, time out of mind, have been used for purposes of assembly, communicating thoughts between citizens, and discussing public questions.

*McCullen* v. *Coakley*, 573 U.S. 464, 501 (2014) (internal citations and quotations omitted).

Plaintiffs were protesting an issue of pressing public concern: police killings of unarmed Black citizens. Organized political protest is a form of "classically political speech." *Boos* v. *Barry*, 485 U.S. 312, 318 (1988). "[T]he First Amendment safeguards an individual's right to participate in the public debate through political expression and political association." *McCutcheon* v. *Fed. Election Com'n*, 572 U.S. 185, 203 (2014). That safeguard "reflects a profound national commitment to the principle that debate on public issues should be uninhibited, robust, and wide-open." *Id.* (internal citations omitted).

For that reason, "speech on public issues occupies the 'highest rung of the hierarchy of First Amendment values,' and is entitled to special protection." *Connick* v. *Myers*, 461 U.S. 138, 145 (1983) (quoting *NAACP* v. *Claiborne Hardware Co.*, 458 U.S. 886, 913 (1982) (internal quotations and citation omitted)). Political speech, especially that involving controversial issues, is "the essence of First Amendment expression." *McIntyre* v. *Ohio Elections Comm'n*, 514 U.S. 334, 347 (1995). That protection extends to assembly. "Effective advocacy of both public and private points of view, particularly controversial ones, is undeniably enhanced by group association." *NAACP* v. *Alabama*, 357 U.S. 449, 460 (1958).

"Restrictions on speech in traditional or designated public fora receive strict scrutiny, which means they must be 'necessary to serve a compelling state interest' and 'narrowly drawn to achieve that interest.'" *Brindley*, 934 F.3d at 467 (quoting *Miller*, 622 F.3d at 534) (citations and internal quotation marks omitted). As Plaintiffs pled in the FAC, Plaintiffs exercised their right on public fora: Rochester streets, often right outside the PSB, City Hall and the courthouse.

The City cites *Cantwell v. Connecticut* for the proposition that police may disperse protesters "[w]hen clear and present danger of … interference with traffic upon the public streets, or other immediate threat to public safety, peace, or order, appears." 310 U.S. 296, 308 (1940).

27

But *Cantwell* is inapposite because here, Defendants closed the intersections and streets to vehicular traffic for the protests. *See* FAC ¶¶ 75, 139, 187, 195. <u>Defendants</u>, not Plaintiffs, stopped traffic from passing through the area and thus, there was no need "clear and present danger" posed by protesters interfering with traffic to justify assaulting them *en masse*. Also, no clear dispersal orders were issued before officers commenced with assaulting protesters with "less lethal," but still potentially deadly, force. *Id*. ¶¶ 171–73, 195, 215. Thus, there is no support in the FAC for the City's argument that RPD officers acted properly in trying to keep the streets and sidewalks open.

In cordoning off traffic to permit the demonstrators to protests, Defendants decided to honor the public forums of the streets and sidewalks where the peaceful protests occurred. Defendants cannot turn around and claim they had the right to brutally assault everyone who was in the roadway protesting, especially when no clear dispersal orders were issued.  *See Vodak v. City of Chicago*, 639 F.3d 738, 746-47 (7th Cir. 2011) ("the Fourth Amendment does not permit the police to say to a person go ahead and march and then, five minutes later, having revoked the permission for the march without notice to anyone, arrest the person for having marched without police permission. This would be 'an indefensible sort of entrapment by the State'" (quoting *Cox v. Louisiana*, 379 U.S. 536, 571 (1965)).

### 2.     *The County's First Amendment arguments fare no better.*

The County's argument that "Plaintiffs have failed to allege . . . that any actions taken by the Sheriff deprived them of their rights under the First Amendment," County MTD at 11, rests on the incorrect assumption that a First Amendment retaliation claim requires an act of physical interference that prevents any future First Amendment activity, which is legally incorrect. As the County concedes, a First Amendment retaliation claim depends on a showing that a plaintiff's freedom of speech was "chilled." *See Curley v. Suffern*, 268 F.3d 65, 73 (2d Cir. 2001). And, as noted above, the Second Circuit has held that a First Amendment claim will lie when the plaintiff

"suffered some other concrete harm" as a result of the government's adverse response to the plaintiff's speech. *See Dorsett,* 732 F.3d at 160.

The FAC alleges that the Plaintiffs were viciously assaulted, and some were arrested during their First Amendment activity. It is axiomatic that the Plaintiffs' First Amendment rights were curtailed by the Defendants' conduct, which also caused the plaintiffs to suffer a concrete harm. In *Zalaski v. City of Hartford*, 704 F. Supp. 2d 159 (D. Conn. 2010), the court rejected a nearly identical argument and denied the city's motion for summary judgment on the First Amendment retaliation claim because, "it is undisputed that the Plaintiffs were unable to continue their demonstration . . . as a result of their arrests." *Id*. at 169. The County's argument is also inconsistent with the Supreme Court's decision in *Lozman v. City of Riviera Beach*, 138 S. Ct. 1945 (2018), which allowed a First Amendment retaliatory arrest claim to proceed to discovery.

> 3.    *Both the City and the County ignore the FAC's allegations that Defendants targeted journalists and legal observers and intentionally interfered with their First Amendment rights to record and document police activities.*

The FAC documents that, throughout the protests, Defendants targeted and retaliated against Plaintiffs and other journalists and legal observers who were exercising their First Amendment right to record and document law enforcement officers performing their official duties in public. FAC ¶¶ 15, 78–81, 90, 140–42, 151, 154–61, 182, 184, 209, 217, 293. And outside of the context of the protests, Plaintiffs EMILY MCINTYRE and DYNASTY BUGGS were falsely arrested, assaulted and battered in retaliation for exercising their First Amendment rights to record police officers in public. *Id*. ¶¶ 290–93.

As Judge Larimer held in *Colon v. City of Rochester*, allegations that police officers arrested and/or used force against Plaintiffs to retaliate against them and/or to stop or prevent them

from recording police activity is sufficient to make out a First Amendment retaliation claim. *Colon*, 419 F. Supp. 3d at 602.[7]

The City has explicitly acknowledged the right of individuals to "observe and record police activity" on "sidewalks, streets, parks, [and] locations of public protest." *See* RPD General Order # 365, "Observation and Recording of Police Activity; and Seizure of Recording Devices," *available at* https://data-rpdny.opendata.arcgis.com/ datasets/go-365-observation-and-recording-of-police-activity. General Order 365 states that as long as the individual is lawfully present and not interfering with police activity, RPD officers may not prevent the individual from observing or recording the activity and may not detain the person for observing or recording the police activity. Additionally, on July 14, 2020, New York State enacted Civil Rights Law § 79-P, the New Yorker's Right to Monitor Act, which codified the First Amendment right to record law enforcement activity and to maintain custody and control over the notes and recordings.

Thus, Defendants' targeting of journalists and NLG legal observers violated Plaintiffs' clearly established rights to observe and record police performing their official duties in public. This targeted and retaliatory use of force was easily enough to chill a reasonable person's speech. *City of Houston v. Hill*, 482 U.S. 451, 459, n.7 (1987); *Steffel v. Thompson*, 415 U.S. 452, 462 (1974); *Babbitt v. United Farm Workers Nat'l Union*, 442 U.S. 289, 298 (1979).

---

[7] Moreover, every circuit that has considered the issue has concluded that the First Amendment protects the right to observe and record police officers conducting their official police activity in public areas. *See Fields v. City of Philadelphia*, 862 F.3d 353 (3d Cir. 2017); *Gericke v. Begin*, 753 F.3d 1, 8 (1st Cir. 2014); *Am. Civil Liberties Union of Ill. v. Alvarez*, 679 F.3d 583, 608 (7th Cir. 2012); *Glik v. Cunniffe*, 655 F.3d 78, 85 (1st Cir. 2011); *Smith v. City of Cumming*, 212 F.3d 1332, 1333 (11th Cir. 2000); *Fordyce v. City of Seattle*, 55 F.3d 436, 439 (9th Cir. 1995); *accord Gerskovich v. Iocco*, 2017 WL 3236445, at *6 (S.D.N.Y. 2017); *Higginbotham v. City of N.Y.*, 105 F. Supp. 3d 369, 379 (S.D.N.Y. 2015).

ii.   The FAC Pleads That Defendants' Response to the Protests Was More Violent Because of the Message They Were Expressing and Thus States First Amendment Viewpoint Discrimination Claims against the City and County.

Government "[d]iscrimination against speech because of its message is presumed to be unconstitutional." *Rosenberger* v. *Rector & Visitors of Univ. of Va.*, 515 U.S. 819, 828 (1995). "Viewpoint discrimination is a 'subset or particular instance of the more general phenomenon of content discrimination,' in which 'the government targets not subject matter but particular views taken by speakers on a subject.'" *Make the Rd. by Walking, Inc.* v. *Turner*, 378 F.3d 133, 150 (2d Cir. 2004) (citation omitted) (quoting *Rosenberger*, 515 U.S. at 829, 831). The government discriminates against viewpoints when it disfavors certain speech because of "the specific motivating ideology or the opinion or perspective of the speaker." *Rosenberger*, 515 U.S. at 829. "[T]he Government's disapproval of a subset of messages it finds offensive … is the essence of viewpoint discrimination." *Matal* v. *Tam*, 137 S. Ct. 1744, 1766 (2017) (Kennedy, J. concurring).

The FAC clearly pleads that a motivating factor for law enforcement's extreme and excessive use of force was the message and tone of the peaceful protestors against sincerely and reasonably perceived systemic racism in the police force. FAC ¶¶ 6, 73, 83, 87, 94, 104–06, 117, 473, 460–61. For example, the FAC explicitly pleads that Defendants used force against Plaintiffs and other protesters because they viewed protesters chants that called for an end to racist policing as "anti-police rhetoric." *Id*. ¶¶ 106, 215.

Defendants' response to the protesters cannot be explained by any other motivation. As in *Black Lives Matter Seattle-King Cty.*, "[t]he use of indiscriminate weapons against all protesters—not just the violent ones—supports the inference that SPD's actions were substantially motivated by Plaintiffs' protected First Amendment activity." 2020 WL 3128299, at *4; *see also Don't Shoot Portland*, 2020 WL 3078329, at *3 ("These incidents demonstrate that preventing criminal activity

near the Justice Center was not the sole purpose of PPB's use of force. Instead, officers may have been substantially motivated by an intent to interfere with Plaintiffs' constitutionally protected expression.").

      **C.**      **Sixth Claim for Relief: Equal Protection Violations Against the City and County Defendants For Their Differential Treatment of Plaintiffs From Other Similarly Situated Individuals Because Of The Message They Were Expressing**

            i.      The City Did Not Move to Dismiss the Sixth Claim for Relief.

The City did not move to dismiss the Sixth Claim for Relief, which is entitled "Equal Protection." Instead, the City incorrectly asserts that, "plaintiffs have not asserted an equal protection claim." City MOL at 28. But as the title of the Sixth Claim for Relief should have made clear to the City, Plaintiffs have brought a claim for the violation of their right to equal protection. Thus, the City has waived its right to move to dismiss this claim, and cannot raise new arguments regarding this claim in reply.

            ii.     The County's Arguments that a Discriminatory Motive Cannot Be Shown Because both Black and White Protesters Were Injured by Defendants' Practices is Meritless (Responding to Point III(C) of the County's Brief).

The FAC adequately pleads an equal protection claim under a selective enforcement theory. To state such a claim, Plaintiffs must plead: (1) that they were treated differently from other similarly situated individuals, and (2) "that such differential treatment was based on impermissible considerations such as race, religion, intent to inhibit or punish the exercise of constitutional rights, or malicious or bad faith intent to injure a person." *Wandering Dago, Inc. v. Destito*, 879 F.3d 20, 40 (2d Cir. 2018) (internal quotations and citations omitted).

As to the first factor, Plaintiffs have alleged they were treated differently from "other protesters expressing 'Blue Lives Matter' or other, similar, pro-police messages who were similarly situated to Plaintiffs in terms of their conduct and/or its potential public ramifications to

the conduct, policies, practices, and/or customs complained of herein," FAC ¶ 461; "the RPD and MCSO has responded to other protests (including, in particular, "Blue Lives Matter" and other pro-police protests), where protesters were similarly situated to Plaintiffs, with virtually no use-of-force, let alone such brutality," *id*. ¶ 471; and that "Plaintiffs and other Black Lives Matter protesters were treated differently by Defendants than other similarly situated protesters (such as "Blue Lives Matter" protesters) based on the content of their message." *Id*. ¶ 472.

As to the second factor, Plaintiffs and other protesters were treated differently based on impermissible considerations; to punish them for exercising their First Amendment right to "mourn the loss of Black lives, demand the City finally end its racist and brutal policing practices, and call for new visions of public safety that value Black lives." *Id*. ¶ 83.

The County concedes that "with respect to the Sheriff" the FAC alleges "that protestors were targeted because of the 'message they were expressing.'" This type of viewpoint or content-based discrimination violates the Equal Protection Clause, and courts have allowed claims to proceed under the Fourteenth Amendment alongside First Amendment claims. *See Nicholas v. Bratton*, 376 F. Supp. 3d 232, 288 (S.D.N.Y. 2019) ("The same record evidence that was sufficient to defeat the Individual Defendants' motion for summary judgment on [plaintiff's] claim of content-based discrimination is sufficient to defeat their motion for summary judgment on his claim of selective enforcement in violation of the Equal Protection Clause."); *see also LaTrieste Rest. & Cabaret Inc. v. Vill. of Port Chester*, 40 F.3d 587, 590 & 592 (2d Cir. 1994) (reinstating an equal protection claim because of the plaintiffs could prove "defendants are impermissibly engaging in . . . selective discriminatory enforcement of the laws, designed to prevent [plaintiff's] exercise of First Amendment rights").

Moreover, the entire thrust of the Complaint is that the Defendants' vicious treatment of the Plaintiffs was motivated by animus to the Plaintiffs' efforts to secure equal rights for Black and brown people. The County contends that a discriminatory motive cannot be shown because both Black and white protesters were injured by Defendants' practices.[9] But Defendants cite no case that supports this claim. As the County concedes, the legal question on an equal protection claim is not whether the race of the victim is Black or white, but whether the intention of the government action was discriminatory. *See Washington v. Davis*, 426 U.S. 229, 239-41 (1976); *see also Arlington Heights v. Metro. Hous. Dev. Corp*., 429 U.S. 252, 264-65 (1977) (applying Equal Protection Clause to discriminatory application of a facially-neutral policy).

The Supreme Court has never upheld a discriminatory government practice because that practice injured white people while they were supporting Black allies. Instead, the Court has applied anti-discrimination laws to white victims of intentional government discrimination, as it did in *Sullivan v. Little Hunting Park, Inc*., 396 U.S. 229 (1969). There, a white homeowner was expelled from a community association because he advocated for a Black family who rented his house to be allowed to use the community park. In reviewing the homeowner's claim under 42 U.S.C. § 1982, which demands equal property rights for all citizens, the Court held:

> We turn to [the white homeowner's] expulsion for the advocacy of [his Black tenant's] cause. If that sanction, backed by a state court judgment, can be imposed, then [the white homeowner] is punished for trying to vindicate the rights of minorities protected by § 1982. Such a sanction would give impetus to the perpetuation of racial restrictions on property. . . . [T]here can be no question but that Sullivan has standing to maintain this action.

*Id*. at 237.

---

[9] The City advances this same argument but does not move to dismiss the Sixth Claim for Relief.

The County's argument—that even an intentionally discriminatory response to the racial justice protests survives equal protection scrutiny because white allies were injured alongside Black and brown people—runs contrary to *Sullivan*, and common sense.

    **D.**    **Seventh Claim for Relief: Excessive Force Against All Defendants (Except Dellasala) Arising From the Indiscriminate Use of "Less Lethal" Force Against Protesters**

        i.    The Seventh Claim for Relief is Properly Pled Under the Fourth Amendment Because Defendants Seized Plaintiffs and The Other Protesters.

The Supreme Court has made clear that "[t]he application of physical force to the body of a person with the intent to restrain is a seizure, even if the force does not succeed in subduing the person." *Torres v. Madrid*, 141 S. Ct. 989, 993 (2021). Courts have repeatedly held that the use of chemical and "less lethal" weapons against protesters constitutes a seizure for Fourth Amendment purposes. [6] A Fourth Amendment seizure is judged based on objective reasonableness. *See Graham* v. *Connor*, 490 U.S. 386, 395 (1989). This requires balancing the "nature and quality of the intrusion on the individual's Fourth Amendment interests against the countervailing governmental interests at stake," considering the severity of the crime, the potential threat from the individual, and any attempt to resist or evade arrest. *Id.* at 396.

A crowd of protestors does not change this analysis. The Second Circuit "has repeatedly emphasized that officers engaging with protesters must comply with the same principles of proportionality attendant to any other use of force." *Edrei* v. *Maguire*, 892 F.3d 525, 540–42 (2d Cir. 2018), *cert. denied*, 139 S.Ct. 2614 (2019). "Our sister circuits and district courts in this Circuit have routinely applied excessive force principles to crowd control situations." *Id.* (citing *Nelson*

---

[6] *See Alsaada*, 536 F. Supp. 3d at 261 ("[T]he use of a chemical agent or other less-lethal crowd control tactics over a demonstrating crowd constitutes a seizure within the meaning of the Fourth Amendment."); *Downes-Covington*, 2020 WL 7408725, at *10 (same); *Anti Police-Terror Project*, 477 F. Supp.3 d at 1086 (same); *Black Lives Matter Seattle-King Cnty.*, 466 F. Supp. 3d at 1214–15 (same); *Abay*, 445 F. Supp. 3d at 1291–92 (same); *Don't Shoot Portland*, 465 F. Supp. 3d at 1155 (same).

v. *City of Davis*, 685 F.3d 867, 882–83 (9th Cir. 2012); *Buck* v. *City of Albuquerque*, 549 F.3d 1269, 1289–90 (10th Cir. 2008); *Asociacion de Periodistas de Puerto Rico v. Mueller*, 529 F.3d 52, 59–62 (1st Cir. 2008); *Darrah* v. *City of Oak Park*, 255 F.3d 301, 306–08 (6th Cir. 2001); *Duran* v. *Sirgedas*, 240 Fed.Appx. 104, 112–13 (7th Cir. 2007) (summary order); *Piper* v. *City of Elmira*, 12 F. Supp. 3d 577, 589–96 (W.D.N.Y. 2014)).

"[I]t is unreasonable to use pepper spray, projectile bean bags, and pepper ball projectiles against individuals 'who were suspected of only minor criminal activity, offered only passive resistance, and posed little to no threat of harm to others.'" *Black Lives Matter Seattle-King Cty.*, 2020 WL 3128299, at *4 (quoting *Nelson*, 685 F.3d at 885). Plaintiffs were not rioting, they were protesting. *Abay*, 445 F. Supp. 3d at 1292 ("These are peaceful demonstrators, journalists, and medics who have been targeted with extreme tactics meant to suppress riots, not to suppress demonstrations."). Not only were "inadequate warnings" of the use of non-lethal force given, but "people present in the area were [also] not warned that they had been declared to be part of a riot or that force would be used against them if they failed to disperse." *Otero*, 316 F. Supp. 2d at 624.

Pepper balls in particular were used unreasonably by Defendants. In just three nights, RPD officers fired more than 6,100 rounds into crowds of protesters. FAC ¶ 91. Similarly, in just three nights, RPD officers fired tear gas cannisters into crowds 77 times. *Id*. ¶ 90. The indiscriminate use of pepper spray was equally unreasonable. The use of pepper spray and tear gas, and the shooting of pepper balls, KIPS or rubber bullets in a way that hit peaceful protesters directly, rather than after bouncing off pavement, was punitive under the circumstances. Shooting pepper balls, KIPS or rubber bullets against peaceful protestors itself posed an unjustified and disproportionate risk of injury in light of the absence of violence by the Plaintiffs.

36

Moreover, none of the Plaintiffs were engaged in any violent or criminal behavior when they were attacked by the police. Some were attacked as they were leaving protests, or as they were peacefully documenting and/or recording officers. ***Others were assaulted while attempting to take refuge in a church.*** FAC ¶¶ 206-08. Yet they were sprayed, gassed, struck with pepper balls, tear gas canisters, and batons or other weapons, tackled and/or otherwise assaulted by the Defendants—all pursuant to policy.

        ii.      Even if the Fourteenth Amendment Standard Applies, the FAC Adequately Pleads Excessive Force.

It is clearly established in this Circuit that when police purposefully, knowingly and/or recklessly use an objectively unreasonable degree of force against protesters, that constitutes excessive force under the Fourteenth Amendment. *Edrei*, 892 F.3d at 536. In analyzing protesters' claims that the NYPD's use of a Long Range Acoustic Device constituted excessive force in *Edrei*, the Second Circuit explained that *Kingsley v. Hendrickson*, 135 S. Ct. 2466 (2015), "held that excessiveness is measured objectively, then identified various considerations that inform the ultimate Fourteenth Amendment inquiry: whether the governmental action was rationally related to a legitimate governmental objective." 892 F.3d at 536. Applying that standard and the relevant *Kingsley* factors, the Circuit held that plaintiffs' complaint stated a claim for excessive force under the Fourteenth Amendment because:

> "[1]the security threat posed by the protest was low [even though] … someone may have thrown a glass bottle … [2] [t]he most significant problem confronting law enforcement appears to have been traffic disruption caused by protesters walking in the street [but] … this is the sort of public safety risk common to large public demonstrations, not necessarily an imminent threat warranting a significant use of force … [3] there is no indication that plaintiffs were 'actively resisting' … [4] the disparity between the threat posed by the protest and the degree of force is stark" … [and nothing in the complaint suggests that] the officers tried to temper or to limit the amount of force."

*Id*. at 537–38 (internal citations and quotations omitted).

Here, for the reasons outlined in the prior section regarding the Fourth Amendment excessive force analysis, the FAC clearly also pleads a viable Fourteenth Amendment excessive force claim under *Kingsley* and *Edrei*.

### E.  Eighth and Ninth Claims for Relief: Civil Rights Conspiracy (§ 1985) and Failure to Prevent Civil Rights Conspiracy (§ 1986)

42 U.S.C. § 1985 provides a statutory remedy where a plaintiff can prove a conspiracy to violate his civil rights. *Vertical Broad., Inc. v. Town of Southampton*, 84 F. Supp. 2d 379, 389 (E.D.N.Y. 2000). To state a claim under § 1985(3), a plaintiff must allege:

> "(1) a conspiracy; (2) for the purpose of depriving a person or class of persons of the equal protection of the laws, or the equal privileges and immunities under the laws; (3) an overt act in furtherance of the conspiracy; and (4) an injury to the plaintiff's person or property, or a deprivation of a right or privilege of a citizen of the United States."

*Grant v. City of Syracuse*, No. 15-CV-445, 2017 WL 5564605, at *9 (N.D.N.Y. Nov. 17, 2017) (Kahn, J.).[7]

The first element is met by the exhaustive allegations of a "coordinated" and "joint" operation between the RPD (and RPD Defendant Policymakers) and the County (and Defendant County Sheriff BAXTER). *E.g.*, FAC ¶ 105 ("RPD protest policymakers and BAXTER and other COUNTY policymakers created a joint law enforcement protest response strategy"); *id.* ¶¶ 106-108, 117, 138, 146, 166, 169, 188, 191. The second element is satisfied as well. *Id.* ¶ 106 ("[t]he purpose of this conspiracy," which was formed *because* protesters were advocating equal protection for people of color, "was to deprive the protesters of the equal protection of the laws").

---

[7] A plaintiff must provide "some factual basis supporting a meeting of the minds, such that defendants entered into an agreement, express or tacit, to achieve the unlawful end." *Webb v. Goord*, 340 F.3d 105, 110–11 (2d Cir. 2003) (quoting *Romer v. Morgenthau*, 119 F. Supp. 2d 346, 363 (S.D.N.Y. 2000)). In addition, a plaintiff "must allege, with at least some degree of particularity, overt acts which defendants engaged in which were reasonably related to the promotion of the claimed conspiracy." *Thomas v. Roach*, 165 F.3d 137, 147 (2d Cir. 1999). Finally, a plaintiff must show that the conspiracy was motivated by "some racial or perhaps otherwise class-based, invidious discriminatory animus behind the conspirators' action." *Mian v. Donaldson, Lufkin & Jenrette Sec. Corp.*, 7 F.3d 1085, 1088 (2d Cir. 1993) (quoting *United Bhd. of Carpenters, Local 610 v. Scott*, 463 U.S. 825, 829 (1983)).

As to the third and fourth elements, the FAC pleads substantial allegations that the City and County defendants carried out their plan by responding to the protests with extreme and unnecessary violence, causing Plaintiffs and other protesters to sustain severe injuries. *See generally id.* ¶¶ 139–219. Thus, the FAC clearly pleads a § 1985 conspiracy claim.

42 U.S.C. § 1986 "provides a cause of action against anyone who 'having knowledge that any of the wrongs conspired to be done and mentioned in section 1985 are about to be committed and having power to prevent or aid, neglects to do so.'" *Adams v. Smith*, No. 07-CV-0452, 2007 WL 2323435, at *2 (N.D.N.Y. Aug. 9, 2007). The allegations in the FAC satisfy all elements of this claim. First, the FAC alleges that, the City and County "failed to take any steps to cure their unlawful policies, practices and training to ensure that [their officers] stopped using grossly excessive and unconstitutional levels of force against protesters" seen during the September 2 and 3, 2020, protests. FAC ¶¶ 115–16. Moreover, the FAC alleges that the City and County, "purposefully failed to remedy the unconstitutional protest response policies, practices and training because they shared the joint goal of silencing the message of the protesters." *Id.* ¶ 117. Thus, the FAC clearly pleads sufficient facts to make out claims under 42 U.S.C. §§ 1985 and 1986.

## III.    THE FIFTH THROUGH NINTH CLAIMS FOR RELIEF ARE ADEQUATELY PLED AGAINST THE COUNTY DEFENDANTS

### A.    The County Is Not Immune under Federal Law for the Policies and Practices of the County Sheriff's Office (Responding to Point III of the County's Brief)

The County argues that the Fourth, Fifth, Sixth, and Seventh Claims for Relief Claim should be dismissed because "the Amended Complaint fails to sufficiently allege the existence any policy or informal custom." County MTD p. 9. As explained above, this argument overlooks dozens of material allegations in the FAC. Plaintiffs have alleged the existence of an official policy and widespread practice of the County and MCSO.

The County also makes the argument that it is "absolutely immune" from Plaintiffs' § 1983 claims for the unconstitutional practices of the MCSO because, the County contends, it "does not have any *respondeat superior* liability for the conduct of Monroe County Sheriff's deputies" (although the County concedes that it "pays the salary of Sheriff's deputies, insures them, and agrees to defend and indemnify them under local law"). *See* County MTD at 8-10.

There is no merit to the County's contention that it has "absolute immunity from liability" for Plaintiffs' § 1983 claims. The Supreme Court has long held that "unlike various government officials, municipalities do not enjoy immunity from suit — either absolute or qualified — under § 1983." *Leatherman* v. *Tarrant Cnty. Narcotics Intelligence & Coordination Unit*, 507 U.S. 163, 166 (1993); *see also Monell* v. *Dep't of Soc. Servs.*, 436 U.S. at 701 ("municipal bodies sued under § 1983 cannot be entitled to an absolute immunity"); *accord Goldberg* v. *Rocky Hill*, 973 F.2d 70, 74 (2d Cir. 1992) ("there is no immunity defense, either qualified or absolute, available to a municipality sought to be held liable under 42 U.S.C. § 1983").

Plaintiffs have not brought state law *respondeat superior* claims against the County; instead, Plaintiffs only bring federal claims, which fall squarely within the long-established principle of municipal liability established in *Monell*. In *Jeffes* v. *Barnes*, 208 F.3d 49 (2d Cir. 2000), the Second Circuit upheld a *Monell* claim against Schenectady County based on a practice/custom of the county sheriff, finding that the sheriff was "the County's final policymaking official" as to the "existence or enforcement of a code of silence" among his staff overseeing the county jail. *Jeffes*, 208 F.3d at 61. Similarly, in *Leather* v. *Ten Eyck*, 2 Fed. App'x 145 (2d Cir. 2001), the Circuit held that the county sheriff was "sufficiently a policy-maker for the County for it to be liable for his practices" under § 1983 arising from a claim of "selective prosecution in retaliation for the exercise of [plaintiff's] right to free speech guaranteed under the First and

40

Fourteenth Amendments." 2 Fed. App'x at 149. And just last month, this Court upheld a *Monell* deliberate indifference claim against Monroe County arising from "a widespread practice" of the County District Attorney's Office. *Owens* v. *Cnty. of Monroe*, No. 21-CV-06445-FPG, 2021 U.S. Dist. LEXIS 245924, at *16 (W.D.N.Y. Dec. 27, 2001).

The County cites no case addressing a county's liability under *federal law* for the widespread practices of a county sheriff's office.[11] And one of the cases that the County cites, *Schulik* v. *County of Monroe*, 202 A.D.2d 960 (4th Dep't 1994), suggests just the opposite of the County's argument. *See* 202 A.D.2d at 962 (concluding that the County was not liable under § 1983 "for the acts of either the Sheriff or his deputies . . . because the allegedly unconstitutional action did not implement or execute an official decision, regulation, ordinance or policy statement of that governmental entity"). That is precisely what has been alleged here.

**B.    The Claims Against the "Richard Roe" Defendants Should Not Be Dismissed (Responding to Point IV in the County's Brief)**

The County has not demonstrated a valid basis to dismiss the "Richard Roe" defendants. Contrary to the County's argument that the FAC "lump[s] all the defendants together" and "fail[s] to allege Sheriff's deputies' personal involvement in any alleged constitutional violations," County MOL at 14-15, the FAC pleads that the Richard Roe defendants engaged in specific, and unconstitutional, conduct on specific dates:

- FAC ¶ 141 (alleging <u>four</u> specific instances, on specific dates, at specific times, and at specific locations, when named Plaintiffs "were subjected to unconstitutional force by Defendant John Doe RPD Officers and Richard Roe Sheriff's deputies");

- *id.* ¶ 152 (alleging how Richard Roe Sheriff's deputies on September 3-4, 2020, outside of the PSB "used their batons and physical force to push the peaceful

---

[11] *Myles v. Phillips*, 87 A.D.2d 614 (2d Dep't 1982), and *Mazzo v. County. of Monroe*, 58 A.D.2d 1017 (4th Dep't 1977), address a state law residency requirement for police officers.  *Trisvan v. Cnty. of Monroe*, 26 A.D.3d 875 (4th Dep't 2006), and *Smelts v. Meloni*, 306 A.D.2d 872 (4th Dep't 2003), address *respondeat superior* liability in the context of state law negligence claims.   None of these cases address a county's liability under federal law for the policies/practices of a county sheriff's office.

protesters across the street into a parking lot" and after separating the protesters into two groups, the Richard Roe Defendants "used their batons to push the first group south on Exchange Street towards Corn Hill");

- *id.* ¶ 153 (describing how, during that same incident on September 3-4, "Richard Roe Sheriff's deputies began shooting the peaceful protesters in the face and body with pepper balls," causing "serious injuries including being shot in the face, neck, and upper body" and blinding one young man permanently, "and sheriff's deputies also shot intentionally at volunteer street medics—wearing helmets and jackets with large red crosses prominently identifying them as medics—who rushed to aid the young man and others injured by the assault");

- *id.* ¶ 154 (alleging that again on September 3-4, in "a parking lot and towards the Court Street Bridge," "several Defendant MSCO 'Richard Roe' Sheriff's deputies chased [Jamia] McCuller, tackled her to the ground, placed a knee on her neck, and violently arrested her," and linking a video of the incident that shows at least one of the Richard Roe Sheriff's deputies in a dark uniform with a yellow arm patch);

- *id.* ¶ 157 (alleging that while Plaintiff CHATMAN "tried to record Ms. McCuller being held on the ground by RPD officers," she "was shot approximately six times with pepper balls from close range by Defendant 'John Doe' RPD officers, Defendant 'Richard Roe' Sheriff's deputies, and NYS Troopers" and that "[t]wo of the shots hit CHATMAN in her left shoulder, causing her to lose feeling in her arm");

- *id.* ¶ 161 (alleging that along with other defendants, "the 'Richard Roe' Sheriff's deputies arrested and used force against CHATMAN in retaliation for her filming officers violently arrest Ms. McCuller");

- *id.* ¶ 162 (alleging <u>four</u> specific incidents on specific dates, at specific times, and at specific locations, where Richard Roe Sheriff's deputies brutally attacked named Plaintiffs);

- *id.* ¶ 184 (alleging <u>six</u> specific incidents on specific dates, at specific times, and at specific locations, where Richard Roe Sheriff's deputies brutally attacked named Plaintiffs);

- *id.* ¶ 192 (alleging that "Richard Roe Sheriff's deputies, along with other law enforcement officers, unleashed a torrent of violence on the peaceful protesters— causing many protesters serious injury" and incorporating a video of one such incident);

- *id.* ¶ 209 (alleging <u>six</u> specific incidents on specific dates, at specific times, and at specific locations, where Richard Roe Sheriff's deputies brutally attacked named Plaintiffs); and

- *id.* ¶ 217 (alleging <u>four</u> specific incidents on specific dates, at specific times, and at specific locations, where Richard Roe Sheriff's deputies brutally attacked named Plaintiffs).

The County ignores these allegations. *See* County MOL at 15 ("Specific individualized allegations, however, are still nonexistent with respect to Sheriff's deputies.").[8] Since there are, in fact, specific and detailed allegations against the Richard Roe Defendants, the County's motion on this point should be denied.

### C.       The NLG and FTP ROC Plaintiffs' Claims Against the County Should Not Be Dismissed (Responding to Point V of the County's Brief).

There is no merit to the County's arguments for dismissing the claims of Plaintiffs NLG Rochester and FTP ROC ("the Institutional Plaintiffs").   Contrary to the County's contention that the Institutional Plaintiffs' claims, "lack any specific allegations of wrongdoing on the part of any County Defendant," County MOL at 19, the FAC is replete with specific allegations of wrongdoing by the County Defendants. *See supra* Section II(A)(ii).

The entire thrust of the claims arising from the Defendants' "joint" response to the protests starts with an event organized by FTP ROC and centers around the joint response by the RPD, County Sheriff's Office, and State Police to suppress the message of the protests that followed. *See* FAC ¶¶ 94 *et seq.* This section of the FAC is captioned, "The CITY and RPD Coordinated with the COUNTY, BAXTER, MCSO and State Police to Suppress Peaceful Demonstrations." FAC at p.27. The FAC alleges a "coordinated strategy" between the RPD and County Sheriff's

---

[8] The County's arguments about what the FAC purportedly does not allege have almost no connection to the allegations that are indeed pled in the FAC. For instance, the County contends that the FAC describes "two occasions . . . that Sheriff's deputies were involved in an arrest, but . . . in neither instance it is asserted that Sheriff's deputies committed any alleged acts of excessive force." County MOL at 17. The County then discusses the arrest of Jamia McCuller. *Id.* at 17-18 (citing FAC ¶ 154). But the County omits that at paragraph 157, the FAC alleges that while Plaintiff CHATMAN "tried to record Ms. McCuller being held on the ground by RPD officers," CHATMAN "was shot approximately six times with pepper balls from close range by Defendant 'John Doe' RPD officers, *Defendant 'Richard Roe' Sheriff's deputies*" (emphasis added). *See also* FAC ¶ 161 (alleging that "the 'Richard Roe' Sheriff's deputies arrested and used force against CHATMAN in retaliation for her filming officers violently arrest Ms. McCuller"). Thus, the County's argument has no merit.

office that "encouraged the use of intimidation, excessive force, and illegal arrests by RPD officers during the protests." *Id.* ¶ 138. The County's conclusory arguments notwithstanding, there are *numerous* allegations in the FAC of specific wrongdoing by County Sheriff's deputies during the protests. *E.g.*, *id.* ¶¶ 141, 152-54, 157, 161-62, 184, 192, 209, 217.

Likewise, the FAC is replete with allegations that County Sheriff's deputies "targeted and shot at journalists, *legal observers*, and people who were recording officers," pursuant to the RPD's and the County Sheriff's "coordinated strategy." *Id.* ¶ 78 (emphasis added); *see also id.* ¶¶ 90, 140, 142, 182. In one of the <u>six</u> specific incidents alleged in paragraph 209 during which County Sheriff's deputies brutally attacked named Plaintiffs, one of those incidents described County Sheriff's deputies targeting and attacking Plaintiff EMILY GOOD while she was volunteering as an NLG Legal Observer during the September 5-6 protests. *Id.* ¶ 209(c).

The County's narrow view of the FAC misapprehends that the County Sheriff's deputies' actions during the protests were not separate from the RPD's response; they were part of a unified and coordinated strategy. *See, e.g.*, *id.* ¶ 146 (RPD policymakers "coordinated with [County Sheriff] BAXTER and other commanding officers of the MCSO and COUNTY to direct the John Doe RPD Officers and Richard Roe Sheriff's deputies' response to protesters on the ground, including the use of specific tactics and weapons"). Thus, there is no merit to the County's argument that the Institutional Plaintiffs fail to state a claim against the County Defendants.

The County's arguments that NLG Rochester lacks standing fares no better. The County's contention that NLG Rochester "failed to allege that it suffered a 'distinct and palpable' injury in contrast to injuries alleged by individual members," County MOL at 20-21, again overlooks the simple and plain allegations in the case. With regard to NLG Rochester, the FAC alleges:

> NLG Rochester trains Legal Observers, who document police behavior during protests, including the most recent protests opposing police violence. NLG

> Rochester also helps coordinate legal representation for protesters who are arrested. Individual members of NLG Rochester regularly attend protests as Legal Observers, attended the recent Daniel Prude protests in Rochester—at which many were injured—and they are likely to be subjected again to the unconstitutional policies and practices described herein.

FAC ¶ 22. As noted above, the FAC alleges at length that the County Sheriff's Office coordinated with the RPD to target and injure NLG Rochester Legal Observers. *E.g.*, *id.* ¶ 78, 90, 140, 142, 182, 209. Thus, the NLG Rochester *itself* has suffered "an 'injury in fact' that is 'distinct and palpable,' fairly traceable to the challenged action, and likely redressable by a favorable decision." *Nnebe v. Daus*, 644 F.3d 147, 158 (2d Cir. 2011) (cleaned up) (quoting *Denney v. Deutsche Bank AG*, 443 F.3d 253, 263 (2d Cir. 2006)).

This case is similar to *Nnebe*, in which the Second Circuit held that the New York Taxi Workers Alliance had standing to sue—on its own behalf and not just in an associational capacity—to challenge the City of New York's process of suspending the licenses of taxi drivers who have been arrested without providing a pre-deprivation hearing:

> This case . . . is not an instance of 'manufactured' litigation. The Alliance, far from trolling for grounds to litigate, has allocated resources to assist drivers only when another party—the City—has initiated proceedings against one of its members. And if NYTWA's suit proves successful, it will have secured a permanent benefit for itself, avoiding the need for further lawsuits on the claims presented here . . . . The Alliance brings this suit so that when it expends resources to assist drivers who face suspension, it can expend those resources on hearings that represent bona fide process. That is an interest specific to NYTWA, independent of the interest of individual drivers in their licenses.

644 F.3d at 157-58. Similar to the NYWTA, NLG Rochester expends resources "help[ing] coordinate legal representation for protesters who are arrested" and trains Legal Observers to attend protest events. FAC ¶ 22. Those resources have been diverted by the law enforcement practices alleged in this case; and the NLG's ability to staff Legal Observers is unquestionably

hurt by the RPD's and County's joint strategy to target and injure Legal Observers.[9]

Thus, the County is wrong that NLG Rochester has not alleged a distinct and palpable injury. And there is no merit whatsoever to the County's conclusory assertion that "NLG's allegations still fail to show that such alleged injury is 'fairly traceable' to any County Defendants' alleged conduct." County MOL at 21. The County simply ignores the FAC's allegations that the County Defendants targeted and injured NLG Rochester Legal Observers.

In terms of NLG Rochester's associational standing, the County *again* simply ignores the relevant allegations.[10] The County concedes that, "[w]ith respect to the §§ 1985 and 1986 claims alleging civil conspiracy," an organization can establish associational standing if it "name[s] at least one of its members affected by the challenged conduct." County MOL at 22 (citing *Summers v. Earth Island Inst.*, 555 U.S. 488, 498-99 (2009)). Indeed, NLG Rochester did that with Plaintiff Emily Good. *See* FAC § 209(c). The County acknowledges this but makes the unsupportable argument that "plaintiff Emily Good . . . was allegedly a 'victim' of the alleged conduct by the RPD." County MOL at 22. Of course, paragraph 209 of the FAC says something different:

> Other named plaintiffs were subjected to unconstitutional force by Defendant John Doe RPD Officers *and Richard Roe Sheriff's deputies* on the night of September 5-6 . . . (c) Emily Good: while volunteering as an NLG LO, and wearing a bright green "NLG" hat . . . Ms. Good was targeted and attacked with various chemical weapons at various locations in downtown Rochester.

---

[9] Other district courts have upheld the standing of NLG chapters like NLG Rochester under similar circumstances. *See, e.g.*, *Chua v. City of L.A.*, No. LA CV16-00237 JAK (GJSx), 2017 U.S. Dist. LEXIS 224221, at *45-48 (C.D. Cal. May 25, 2017) ("[Plaintiffs] argue that the NLG 'expends money conducting work to protect the right to lawfully demonstrate without police interference in Los Angeles.' This alleged diversion of resources is also sufficient to establish standing." (citation omitted)).

[10] The Institutional Plaintiffs are aware of the Second Circuit precedent "that an organization does not have standing to assert the rights of its members in a case brought under 42 U.S.C. § 1983," *Nnebe*, 644 F.3d at 156, and preserve their § 1983 associational claim insofar as this Circuit precedent may later be overruled as inconsistent with Supreme Court precedent, including *Warth v. Seldin*, 422 U.S. 490 (1975). *See Nnebe*, 644 F.3d at 156 n.6 ("we are bound by the implicit determination of prior panels that the rule survives *Warth* until such time as our prior decisions are overruled either by an *en banc* panel of our Court or by the Supreme Court" (cleaned up)).

FAC ¶ 209. The County is mistaken in arguing that NLG Rochester "seeks 'compensatory and punitive damages,'" and therefore, NLG Rochester cannot pursue an associational claim. County MOL at 22-23. NLG Rochester only seeks injunctive relief. Thus, there is no merit to the County's claim that NLG Rochester has not established associational standing with regard to its §§ 1985 and 1986 claims.

### D.     The Plaintiffs Have Standing To Seek Declaratory Relief Against the County Defendants (Responding to Point IV in the County's brief)

The County is incorrect that Plaintiffs lack standing to seek declaratory relief. "An individual plaintiff may demonstrate standing to seek injunctive and declaratory relief, by plausibly alleging the existence of an official policy or custom and a likelihood of future harm from that policy or custom." *Summer 2020 Demonstrations*, 2021 U.S. Dist. LEXIS 128437, at *17 (citing *An v. City of N.Y.*, No. 16 Civ. 5381 (LGS), 2017 U.S. Dist. LEXIS 84364, at *14-16 (S.D.N.Y. June 1, 2017)); *see also Nicholas v. City of N.Y.*, No. 15 Civ. 9592, 2017 U.S. Dist. LEXIS 26995, at *26-27 (S.D.N.Y. Feb. 27, 2017).

Plaintiffs have adequately alleged an official policy or custom, as discussed above; and the likelihood of future injury from that policy or custom is not speculative where, as here, repeated incidents of actual harm are documented. *See Ligon* v. *City of N.Y.*, 288 F.R.D. 72, 81 (S.D.N.Y. 2013) ("The possibility of recurring injury ceases to be speculative when actual repeated incidents are documented."). In rejecting a nearly identical argument by the City of New York in the consolidated litigation surrounding the NYPD's policing of the Summer 2020 protests, Judge McMahon explained:

> Many of the individual plaintiffs have attended multiple protests where unconstitutional policing is alleged to have occurred, and at least two were arrested twice. Those allegations of repeated unlawful conduct, combined with the sheer volume of violations alleged by Plaintiffs, are sufficient for the Court to conclude that the possibility of an encounter with the NYPD, and with NYPD policies, is far from speculative.

*See Summer 2020 Demonstrations*, 2021 U.S. Dist. LEXIS 128437, at *18. The same is true here. *See* Compl. ¶¶ 12-16, 19-20 (seven plaintiffs were injured on multiple occasions). Judge McMahon also noted that certain plaintiffs had standing to seek "a declaration that past conduct was unlawful" because "[t]hey allege that they were victims of that past conduct." *Id.* at *19. Again, the same is true in this case.

## IV. TENTH, TWELFTH, FOURTEENTH, AND FIFTEENTH CLAIMS FOR RELIEF: EXCESSIVE FORCE CLAIMS OF CERTAIN INDIVIDUAL PLAINTIFFS AGAINST NAMED DEFENDANTS

Plaintiffs Dynasty Buggs, Winona Miller, and Stanley Martin bring separate excessive force claims against individual Defendant RPD officers who used excessive force against them during their arrests. Defendants have not moved to dismiss these claims. *See* City MOL at 17.

## V. TENTH, ELEVENTH, THIRTEENTH, SIXTEENTH CLAIMS FOR RELIEF: FALSE ARREST CLAIMS OF CERTAIN INDIVIDUAL PLAINTIFFS AGAINST NAMED DEFENDANTS

Arguing on behalf of the defendant RPD officers named in these claims, the City contends that the false arrest claims fail because they do not allege a "favorable termination." As the City well knows, favorable termination is not an element of a claim for false arrest. *Colon,* 419 F. Supp. 3d at 596 (Larimer, J.); *see also Weyant* v. *Okst*, 101 F.3d 845, 853 (2d Cir. 1996) ("while the favorable termination of judicial proceedings is an element of a claim for malicious prosecution, it is not an element of a claim for false arrest"). Because this is the only argument the City makes, and Plaintiffs have alleged sufficient facts otherwise to support these claims,[11] these claims should not be dismissed.

---

[11] A false arrest claim requires sufficient allegations that: (1) the defendant intended to confine the plaintiff; (2) the plaintiff was conscious of the confinement; (3) the plaintiff did not consent to the confinement; and (4) the confinement was not otherwise privileged. *See Hernandez v. United States*, 939 F.3d 191, 199 (2d Cir. 2019); *Parker v. Blackerby*, 368 F. Supp. 3d 611, 621 (W.D.N.Y. 2019).

## VI.   SEVENTEENTH CLAIMS FOR RELIEF: FALSE ARREST AND EXCESSIVE FORCE AGAINST TROOPER DELLASALA.

DELLASALA's motion to sever should be denied because CHATMAN's claims against him are inexorably intertwined with claims against the other defendants. CHATMAN alleges that "John Doe" RPD officers, "Richard Roe" Sheriff's deputies, and Trooper DELLASALA retaliated against her for filming the arrest of a Black woman during the September 3, 2020 protest by first shooting her with pepper balls from close range, FAC ¶ 157, then forcibly seizing her, throwing her phone to the ground, and arresting her, *id*. ¶ 158. DELLASALA, the RPD Officers, and Sheriff's Deputies lacked probable cause or any lawful justification for arresting and using force against her. *Id*. ¶¶ 159–61. Moreover, CHATMAN alleges that DELLASALA, along with the RPD officers and Sheriff's deputies who assisted him, were acting pursuant to the City and County's joint protest response plan. *Id*. ¶ 96. Thus, CHATMAN's claims against DELLASALA are entwined with the other claims in this case and severing only CHATMAN's claims against DELLASALA would be inefficient (because substantially similar discovery will be necessary in both cases) and could produce contrary results.

Contrary to DELLASALA's argument that CHATMAN only brings claims against him, she also brings *Monell* claims against the City and County Defendants under the First through Seventh Claims for Relief. Thus, if her case against DELLASALA were severed, her case against the City and County defendants would still proceed in this action. Thus, no judicial resources will be saved if CHATMAN's claims against DELLASALA are severed.

## VII.   THE CLASS ACTION ALLEGATIONS ARE SUFFICIENTLY PLED, AND RESOLUTION OF WHETHER THE FACTORS FOR CLASS CERTIFICATION HAVE BEEN MET IS PREMATURE

Defendants argue that the allegations in the FAC fail to establish the elements required by Rule 23 to sustain class certification. Defendants' arguments (1) are procedurally premature

because there has been no class discovery and Plaintiffs have not sought to certify any class as of yet; (2) are based on the mistaken premise that class actions cannot be used to litigate unconstitutional policies, practices, and customs concerning the use of excessive force that systemically causes wide-spread and common injury; and (3) are substantively incorrect as Plaintiffs have plausibly pleaded each element required under Rule 23—which is all that is required at this stage.

### A.      Defendants' Motion Is Premature

Despite the presumption of truth afforded Plaintiffs' allegations on a motion to dismiss, Defendants demand the type of proof that would only arise from class discovery, which has not yet occurred. This Circuit's caselaw is unequivocal: courts must wait until the plaintiff has moved for class certification or had the benefit of class discovery before undertaking the type of vigorous inquiry required to determine the viability and propriety of a class action. *See Parker* v. *Time Warner Ent. Co. L.P.*, 331 F.3d 13, 22 (2d Cir. 2003) (reversing the denial of class certification as premature where the district court did not have the benefit of the plaintiff's motion to certify or class related discovery).

Courts in this Circuit decline to take the extreme step that Defendants advocate—dismissing or striking class allegations where a plaintiff has yet to move to certify a class or engage in any class discovery. *See, e.g.*, *Chen–Oster v. Goldman, Sachs & Co.*, 877 F. Supp. 2d 113, 117 (S.D.N.Y. 2012) ("Generally speaking ... motions of this kind are deemed procedurally premature."); *see also* Fed. R. Civ. P. 23 advisory committee's note to 2003 amendments ("Time may be needed to gather information necessary to make the certification decision. Although an evaluation of the probable outcome on the merits is not properly part of the certification decision,

discovery in aid of the certification decision often includes information required to identify the nature of the issues that actually will be presented at trial.").[13]

*Indergrit v. Rite Aid Corp*, No. 08 CIV. 9361 (PGG), 2009 WL 1269250 (S.D.N.Y. May 4, 2009), is instructive. Faced with a challenge to class allegations at the motion to dismiss stage, the court stated that:

> [T]he issue of whether a named plaintiff can assert claims on behalf of absent class members is determined at the class certification stage of the litigation. Numerous cases illustrate this basic principle…. In many other Rule 23 class action cases, courts have held that a named plaintiff—prior to a motion for class certification—need only establish individual standing.

*Id.* at *4 (collecting cases).

Rule 23 no longer requires a decision on class status "as soon as practicable after commencement of an action," which was how the rule read prior to 2003. The rule was amended to say, "at an early practicable time," precisely so that the Rule 23 analysis produces "an informed certification determination." FED. R. CIV. P. 23 advisory committee's note to 2003 amendments. Deferring a Rule 23 determination until after preliminary discovery permits the plaintiff an opportunity to refine the contours of the proposed class or classes, perhaps even subdividing classes to narrow the issues, and to provide the court with the benefit of a more robust factual

---

[13] *See also Philip Morris Inc. v. Nat'l Asbestos Workers Med. Fund*, 214 F.3d 132, 135 (2d Cir. 2000) ("it is proper for a district court to allow discovery and to conduct hearings to determine whether the prerequisites of Rule 23 are satisfied"); *Ironforge.com v. Paychex, Inc.*, 747 F. Supp. 2d 384, 404 (W.D.N.Y. 2010) (J. Larimer) (finding "no reason to depart from the usual practice by deciding now, on a motion to strike, whether Ironforge's claims are typical of those of the proposed class"); *Ruggles v. Wellpoint, Inc.*, 253 F.R.D. 61, 66–67 (N.D.N.Y. 2008) ("a court should delay a certification ruling until information necessary to reach an informed decision is available."); *Schaefer v. Gen. Elec. Co.*, No. 307-CV-0858PCD, 2008 WL 649189, at *4 (D. Conn. Jan. 22, 2008) ("Most importantly, it would be drastic and improper to strike the Complaint's class action allegations now, before Plaintiff moves for class certification pursuant to Rule 23, and thereby flatly deny the assertion of Ms. Schaefer and her 1000 female colleagues' rights without discovery as to these factual issues.") *Gardner v. W. Beef Properties, Inc.*, No. 07-CV-2345, 2008 WL 2446681, at *4 (E.D.N.Y. June 17, 2008) ("Because this is decided as a motion to dismiss or strike and no motion for certification by plaintiff is pending, the Court need not reach defendant's arguments addressed to the particular requirements of Rule 23.").

record to aid its determination of whether a class action would suit judicial economy and efficiently resolve the matter. *See Mazzola* v. *Roomster Corp.*, 849 F. Supp. 2d 395, 410 (S.D.N.Y. 2012).

Here, Plaintiffs have not moved for class certification and the parties have not engaged in any class discovery. Thus, it would be procedurally premature to decide issues concerning class certification without the benefit of a sufficient record to aid the Court in determining whether and to what extent class certification would be useful in the matter at hand.

### B. Defendants Cannot Establish That Certification Is Impossible

The only exception to this general rule, not present here, is when Defendants can establish "from the face of the Complaint that it would be *impossible* to certify the alleged class regardless of the facts Plaintiffs may be able to obtain during discovery." *Mayfield v. Asta Funding*, 95 F. Supp. 3d 685, 696 (S.D.N.Y. 2015) (emphasis added); *see also Wagner v. CLC Resorts & Devs., Inc.*, 32 F. Supp. 3d 1193, 1198 (M.D. Fla. 2014) ("Dismissal at this stage is an extreme remedy appropriate only where a defendant demonstrates from the face of the complaint that it will be impossible to certify the classes alleged by the plaintiffs regardless of the facts the plaintiffs may be able to prove."). Defendants plainly cannot meet this high burden. Courts in this Circuit have certified classwide injunctive claims alleging unconstitutional widespread police practices. *See, e.g.*, *Floyd v. City of New York*, 283 F.R.D. 153 (S.D.N.Y. 2012).

In their attempt to shoehorn this case within that exception, Defendants assert a new rule barring the use of Rule 23 classes altogether for cases concerning excessive force. No such rule exists. Courts have granted class certification based on similar allegations of excessive force during protests. *See e.g.*, *Puente v. City of Phoenix*, No. CV-18-02778-PHX-JJT, 2019 WL 4849613, at *8 (D. Ariz. Sept. 30, 2019) (certifying a damages class based on allegations of excessive force in deployment of chemical agents during protests).

In *Puente*, the plaintiffs asserted a putative class action against the Phoenix Police Department for its deployment of chemical weapons during a protest of about 6,000 demonstrators gathered outside the Phoenix Convention Center. *Id*. at *1. Plaintiffs proposed two damages subclasses: "[a]ll persons who were unlawfully dispersed by the use of gas, pepper spray, pepper bullets, or other chemical agents," and "[a]ll persons who were unlawfully dispersed by PPD by being struck with projectiles of any type." *Id*. at *3. As to the first class, the court's review of video and other evidence revealed that over 40 individuals were exposed to gas or chemical agents which, without more, was enough to satisfy the numerosity. *Id*. at *6.

As to commonality, the court noted that it need not find that all questions of fact and law be common to the individual class members; rather, "the existence of shared legal issues with divergent factual predicates is sufficient as is a common core of salient facts coupled with disparate legal remedies within the class." *Id*. The defendants argued that the use of gas and chemical agents was by different grenadiers exercising individual judgment created factual questions too individualized on the issue of whether the use of those agents constituted excessive force, an argument rejected by the court, because the very nature of the gas and chemical agents is that they are not contained in a small area or limited to a few individuals. *Id*. The court also found that the PPD's actions were likely command decisions subject to treatment as a policy or practice authorized by the PPD chief. *Id*. at *7.

Thus, in *Puente*, the plaintiffs established both factual and legal questions regarding the propriety of using gas and chemical agents that were common among the proposed class members and predominated over any individual questions. *Id*. ("Plaintiffs have satisfactorily shown that any class-wide damages will arise from common proof regarding Defendants' liability to satisfy the requirements at the class certification stage."). The *Puente* court also held that typicality and

adequacy were present since the named plaintiffs all claimed to have been exposed to the gas/chemical agents and there was no claim that the plaintiffs had any conflict of interest or that counsel for the plaintiffs were not competent. *Id*. at *8. Thus, the court certified the class.

Defendants argue that categorically and as a matter of law a class cannot be certified where it is premised on excessive force claims, an argument contrary to the holdings of courts in this Circuit and across the country that agree with *Puente*.  *See Ingles* v. *City of N.Y.*, No. 01 CIV. 8279(DC), 2003 WL 402565, at *9 (S.D.N.Y. Feb. 20, 2003) (granting class certification where claims alleged policy of use of excessive force at department of corrections facilities); *Anderson* v. *Garner*, 22 F. Supp. 2d 1379, 1389 (N.D. Ga. 1997) (granting class certification based on claims of excessive force by correctional officers at Georgia prisons); *see also Anti Police-Terror Project v. City of Oakland*, No. 20-CV-03866-JCS, 2021 WL 4846958, at *5 (N.D. Cal. Oct. 18, 2021) (denying class certification of excessive force claims but stating that "it is likely Plaintiffs will be able to cure this deficiency by narrowing the class definition and/or creating sub-classes.").

Defendants cannot establish at this stage that, as a matter of law, class allegations premised on excessive force cannot satisfy the requirements of Rule 23(a) and plaintiffs have done all that is required to sustain their claims at this stage by plausibly pleading their class allegations.

**C.    Plaintiffs Have Sufficiently Alleged Each of the Elements Required Under Rule 23**

Even if this Court were to break with the holdings of courts in this district and other courts in this Circuit to assess the certifiability of the proposed classes without class discovery and in the absence of a motion to certify any class, Plaintiffs have sufficiently and plausibly pleaded each of the elements required to certify a class under Rule 23. To survive a motion to dismiss, Plaintiffs need only allege that the proposed class (1) is sufficiently numerous to make joinder of all plaintiffs impractical, (2) involves questions of law or fact common to the class, (3) involves class plaintiffs

whose claims are typical of those of the class, and (4) involves a class representative or representatives who adequately represent the interests of the class." *Myers* v. *Hertz Corp.*, 624 F.3d 537, 547 (2d Cir. 2010). The party seeking certification also must "show that questions of law or fact common to class members predominate over any questions affecting only individual members and that class treatment would be superior to individual litigation." *Id.*

Neither defendant challenges the fourth prong—adequacy. Each limits their arguments to commonality, typicality, numerosity, and predominance. Defendants' conflation of the requirements of a Rule 23(b)(2) class with those of a Rule 23(b)(3) class are fatal to its challenges against the classes alleged.[12]

Plaintiffs have alleged two classes. The first class, under Rule 23(b)(2) (the "First Plaintiff Class") seeks injunctive relief as a result of the policies, practices, customs, and deliberate indifference thereof that led to the use of more frequent and greater levels of force by Defendants against people of color because of their race. FAC ¶ 392. Plaintiffs allege "Defendants have acted on grounds generally applicable to the First Plaintiff Class, in engaging in the aforementioned practices and failing to correct the unconstitutional policies thereby making class-wide declaratory and injunctive relief appropriate." *Id.* ¶ 394.

Substantively, Plaintiffs allege that the First Plaintiff Class was subjected to more frequent and greater levels of force than their white counterparts during police interactions throughout Rochester during the class period as a result of unconstitutional policies, practices, and customs and deliberate indifference. *Id.* ¶ 395. Plaintiffs allege that this disparate treatment can be established by statistical analysis—some of which was pleaded in the FAC—body-worn camera

---

[12] Defendants also impliedly dispute Plaintiffs' allegations, but on a Rule 12(b)(6) motion, the court must accept all allegations in the complaint as true and draw all inferences in the light most favorable to the plaintiff, including class allegations. *See Indergit*, 2009 WL 1269250, at *2 (holding that the court must assume that the named plaintiff is in fact similarly situated to the proposed class members).

data, use of force reports, and drone and other footage in the possession of the parties. *Id*. ¶ 396. Each class representative within the First Plaintiff Class is a Black or brown individual subjected to the more frequent and greater levels of force than their white counterparts during police interactions in Rochester.

The second proposed class is brought under Rule 23(b)(2) *and* (b)(3) (the "Second Plaintiff Class") and includes an injunctive relief class and damages class as a result of the excessive force that class members endured at the hands of law enforcement during the racial justice protests between May 30, 2020 and April 6, 2021.   *Id*. ¶ 406. Plaintiffs alleged that this excessive force, specifically, close range use of chemical weapons, close range shots with tear gas canisters (the canister itself, in addition to the subsequent spread of the tear gas); and/or close-range pepper ball shots fired into crowds and intentionally fired at vulnerable body parts, among other types of blatantly excessive force.   *Id*. ¶ 414. Plaintiffs provided a plethora of examples with vivid images showing the use of the chemical weapons on crowds larger than 40 people. *Id*. ¶¶ 139, 148, 177, 195, 199, 203, 214. Plaintiffs have further alleged that said excessive force was the result of unconstitutional policies, practices, and customs, and the deliberate indifference of Defendants. *Id*. ¶ 406. As with the First Plaintiff Class, the Second Plaintiff Class can be established by the hundreds of hours of video from body worn police cameras, the hundreds of use-of-force reports generated after the protests, and drone and other footage capturing police-civilian use-of-force encounters throughout the protests. *Id*. ¶ 413.

For numerosity, the class must be "so numerous that joinder of all members is impracticable." Fed. R. Civ. P. 23(a)(1). Where the exact size of the class is unknown but general knowledge and common sense indicate it is large, the numerosity requirement is satisfied. *Orantes-Hernandez* v. *Smith*, 541 F. Supp. 351, 370 (C.D. Cal. 1982). Courts in this Circuit have held that

where the plaintiff's lack knowledge of the exact number of individuals affected but the defendants have the means of identifying such persons, numerosity is also satisfied. *Ventura v. New York City Health & Hosps. Corp.*, 125 F.R.D. 595, 599 (S.D.N.Y. 1989). Plaintiffs have easily satisfied this requirement.

In Paragraphs 109, 112, 113, and 128 of the FAC—just to name a few— Plaintiffs alleged Defendants' excessive force severely injured hundreds of protestors. Specifically, in Paragraph 396, Plaintiffs alleged that Defendants are in possession of thousands of use of force reports from which additional statistical analysis may be drawn to establish the disparate treatment of Black and brown people in Rochester and establish the numerosity of the First Plaintiff Class. In addition, publicly available press coverage showed hundreds, or thousands, of protesters subjected to the use of chemical weapons; thus, common sense alone establishes that the Second Plaintiff Class meets the numerosity requirement.

To demonstrate commonality, Plaintiffs needed only plausibly plead that their claims "depend on a common contention…of such a nature that it is capable of class wide resolution— which means that determination of its truth or falsity will resolve the issue that is central to the validity of each of the claims in one stroke." *Wal-Mart Stores, Inc.* v. *Dukes*, 564 U.S. 338, 350 (2011). Accordingly, interpreting *Dukes*, courts in this Circuit have found that identification of specific practices and procedures that are uniformly or widely applied is sufficient to establish the commonality requirement. *See Chen-Oster*, 877 F. Supp. 2d at 118. Here, Plaintiffs have alleged that the First Plaintiff Class was, as a result of specific policies and the failure to supervise, train, or discipline RPD officers and Sheriff's deputies, subject to more frequent and more severe force than their white counterparts. FAC ¶¶ 392, 426. Plaintiffs have also offered statistical evidence to support their allegations. *Id*. ¶ 425. Given the representatives alleged to be members of this class

and the existence of widespread, specific, statistically provable policy, Plaintiffs have sufficiently alleged commonality between the claims alleged by the Plaintiffs and those of the members of the First Plaintiff Class.

As for the Second Plaintiff Class, Plaintiffs' claims of excessive force are based on specific policies, practices, and customs and the deliberate indifference resulting in one of three specific acts during the protests: (1) use of chemical weapons at close range on crowds of people; (2) firing tear gas canisters at close range; and/or (3) use of pepper bullets at close range and intentionally firing the same at vulnerable body parts.   *Id*. ¶ 414. The Second Plaintiff Class satisfies the standard for commonality not merely because each member claims violation of the same law, but because each was subject to a specific policy, as a part of the same set of events, and subject to the same or similar injuries as a result of the deployment of chemical weapons. Additionally, Plaintiffs alleged that the policy and deployment of the chemical weapons were command decisions. *Id*. ¶¶ 102–14. As in *Puente*, together, these facts plausibly establish common questions of fact and law sufficient to certify a class. But there is more; Plaintiffs listed no less than 10 other common questions of fact and law that would be uniform within the class.   FAC ¶ 417.   Accordingly, like the First Plaintiff Class, the Second Plaintiff Class satisfies the standard for commonality.

"Typicality requires that the claims or defenses of the class representatives be typical of the claims or defenses of the class members." *Brown*, 609 F.3d at 475. "This requirement is satisfied when each class member's claim arises from the same course of events, and each class member makes similar legal arguments to prove the defendant's liability." *Id*. "The commonality and typicality requirements often tend to merge into one another, so that similar considerations animate analysis of both." *Id*.

As noted above, the claims of the class representatives are typical of the claims of the class members in each proposed class. For example, the class representatives in the First Plaintiff Class, all Black and brown people, were all subject to more frequent and more severe use of force as a result of the specific, widespread, and longstanding policies, practices and customs, and the deliberate indifference by Defendants.   Each class representative and class member will seek to establish this disparate treatment with statistical and other direct evidence, some of which was already pleaded in the FAC.

Likewise, the class representatives of the Second Plaintiff Class make claims that are typical of those of the class members. The class representatives and class members will all seek to establish that the close-range use of chemical weapons constitutes excessive force and that each class member was a victim of such force during the class period.   Accordingly, both classes meet the typicality standard.

The Second Plaintiff Class is also subject to the predominance and superiority elements, which Plaintiffs have plausibly pleaded.

"The 'predominance' requirement of Rule 23(b)(3) 'tests whether proposed classes are sufficiently cohesive to warrant adjudication by representation.'" *Myers*, 624 F.3d at 547 (quoting *Amchem Prods., Inc.* v. *Windsor*, 521 U.S. 591, 623 (1997)). Its purpose is to "ensure[ ] that the class will be certified only when it would achieve economies of time, effort, and expense, and promote uniformity of decision as to persons similarly situated, without sacrificing procedural fairness or bringing about other undesirable results." *Cordes & Co. Fin. Servs., Inc.* v. *A.G. Edwards & Sons, Inc.*, 502 F.3d 91, 104 (2d Cir. 2007) (internal quotations and citations omitted). Predominance is satisfied "if resolution of some of the legal or factual questions that qualify each class member's case as a genuine controversy can be achieved through generalized proof, and if

these particular issues are more substantial than the issues subject only to individualized proof." *Moore* v. *Paine Webber. Inc.*, 306 F.3d 1247, 1252 (2d Cir. 2002).

Here, all questions of law are consistent among class members in each proposed class. Whether the statistical evidence establishes that more frequent and more severe force was used on Black and brown people by Defendants is a question each class member in the First Plaintiff Class must have resolved by this court. That question predominates over the extent of each class member's injuries or any other individualized questions.

Whether the close-range use of chemical weapons, close range shots with tear gas canisters, and close range pepper ball shots at vulnerable body parts constitutes excessive force is a question common to all members of the Second Plaintiff Class and predominates over the extent of each class member's injuries. For each class member, likely numbering in the hundreds, if not more than a thousand, to bring an individual suit to resolve these predominating questions would be a waste of judicial and individual resources as individual defendants would be subject to hundreds if not over a thousand depositions and document requests on the same issues. Thus, not only do the common issues of fact and law predominate over those requiring individualized proof, but a class action is the superior vehicle for managing these issues most efficiently.

Despite Defendants' insistence, the First Plaintiff Class, alleged pursuant to Rule 23(b)(2), does not require predominance, however predominance is plausibly established in the FAC.

Since Plaintiffs have yet to engage in class discovery and have yet to move to certify any class, Defendants motions to dismiss or strike the class allegations are procedurally premature.  Given the certification of classes asserting the same claims as Plaintiffs, Defendants cannot plausibly argue that it would be impossible, from the face of the FAC, for Plaintiffs to certify *any* class given the claims alleged.   Finally, Plaintiffs have plausibly alleged each element required by Rule 23

60

for the respective classes—all that is required at this stage in the litigation.   Accordingly,

Defendants motions must be denied.[14]

## **CONCLUSION**

For all of the foregoing reasons, Defendants motions should be denied in their entirety.

Dated: New York, New York
      January 28, 2022

ROTH & ROTH, LLP                       NEUFELD SCHECK & BRUSTIN, LLP

By:      ~//s//~                  By:      /s
         Elliot D. Shields                      Nick Brustin
         David A. Roth                       Katie McCarthy
     192 Lexington Avenue, Suite 802        99 Hudson Street
     New York, New York 10016             New York, New York 10013
     Ph: (212) 425-1020                    Ph: (212) 965-9081
     eshields@rothandrothlaw.com         katie@nsbcivilrights.com

THE LAW OFFICE OF JOSHUA          EASTON THOMPSON KASPEREK
MOSKOVITZ, P.C.                         SHIFFRIN LLP

By:      /s                          By:      /s
     Joshua S. Moskovitz                  Donald Thompson
     14 Wall Street, Suite 1603            The Powers Building
     New York, New York                  16 West Main Street, Suite 243
     Ph: (212) 380-7040                   Rochester, New York 14614
     josh@moskovitzlaw.com              Ph: (585) 423-8290
                                   dmthompson@etksdefense.com

BAKER & HOSTETLER, LLP

By:      /s
         Edward J. Jacobs
     Ivory L. Bishop
     45 Rockefeller Plaza

---

[14] Dellasalla argues that the class claims against him should be dismissed, but no such claims were pled.

61

New York, New York 10111
Ph: (212) 589-4200
ejacobs@bakerlaw.com
ibishop@bakerlaw.com