UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK

ANTHONY HALL, et al.,

                                        Plaintiffs,

                                                            Case # 21-cv-06296-FPG

v.

                                                            DECISION AND ORDER

LOVELY ANN WARREN, et al.,

                                        Defendants.

## INTRODUCTION

This is one of many cases pending before the Court that arises out of racial justice protests in the City of Rochester following the deaths of several unarmed black men.  The largest protests erupted in September 2020 following the release of news that Daniel Prude, an unarmed black man, died during an encounter with police in March 2020.  Plaintiffs Anthony Hall, Stanley Martin, Nicholas Robertson, Devorah Chatman, Reynaldo Deguzman, Emily Good, Winona Miller, Dynasty Buggs, Lore McSpadden-Walker, Emily McIntyre, Free the People Roc, and National Lawyers Guild Rochester, Inc. ("NLG"), on behalf of themselves and other people similarly situated, are protestors who allege they were injured during the protests, and filed this action against Defendants Former Mayor Lovely Ann Warren, Former Rochester Police Department ("RPD") Chief La'Ron Singletary, Officers Henry C. Favor, Raymond W. Dearcop, Ralph Montinarelli, Samuel Lucyshyn, Randy Potuck, William Baker, Alexander Elmore, John Clinkhammer, Domenic Borrelli, Matthew Drake, Dakota Vanbrederode, Ethan Paszko, Stephen Boily, Sheriff Todd Baxter, New York State Trooper Stephen A. Dellasala, the City of Rochester ("City"), County of Monroe ("County"), Monroe County Sheriff's Office ("MCSO"), "John Doe" RPD Officers 1-200, and "Richard Roe" Monroe County Sheriff's Deputies 1-200.[1]  ECF No. 1.

---

[1] Individual RPD Officers and the City are collectively referred to as "City Defendants."  Richard Roe Sheriff's deputies ("Sheriff's Deputies"), the County, the MSCO, and Baxter are collectively referred to as "County

Defendants moved to dismiss the Complaint.  ECF Nos. 31, 34, 42.  In response, on August 31, 2021, Plaintiffs filed an Amended Complaint.  ECF No. 47.  The City Defendants filed a motion to dismiss the Amended Complaint on November 10, 2021.  ECF No. 69.  Dellasala and the County Defendants filed a motion to dismiss the Amended Complaint on November 11, 2021.  ECF Nos. 70, 71.

Plaintiffs[2] raise 18 claims in the Amended Complaint: (1) municipal/*Monell* liability against the City for the RPD's practice of using disproportionate force against people of color in violation of the Fourteenth Amendment, pursuant to 42 U.S.C. § 1983; (2) municipal/*Monell* liability against the City for its deliberate indifference and failure to discipline RPD officers who use excessive force, pursuant to § 1983, (3) municipal/*Monell* liability against the City for its violations of the First, Fourth, and Fourteenth Amendments during the 2020 racial justice protests, pursuant to § 1983; (4) municipal/*Monell* liability against the County, the MCSO, and Baxter for their violations of the First, Fourth, and Fourteenth Amendments during the 2020 racial justice protests, pursuant to § 1983; (5) First Amendment infringement and retaliation against the City, Warren, Singletary, the County, the MCSO, and Baxter, pursuant to § 1983; (6) equal protection violations against the City, Warren, Singletary, the County, the MCSO, and Baxter, pursuant to § 1983; (7) excessive force against all Defendants other than Dellasala, pursuant to § 1983; (8) civil rights conspiracy against the City, Warren, Singletary, the County, the MCSO, and Baxter, pursuant to 42 U.S.C. § 1985; (9) failure to prevent civil rights conspiracy against the City, Warren, Singletary, the County, the MCSO, and Baxter, pursuant 42 U.S.C. § 1986; (10) Buggs's claim for excessive force against Paszko and Vanbrederode, pursuant to § 1983; (11) Buggs's claim for

---

Defendants."  The RPD Officers and Sheriff's Deputies are collectively referred to as "Individual Defendants."  All defendants are collectively referred to as "Defendants."

[2] Unless otherwise indicated, the claims are asserted on behalf of all Plaintiffs.

unlawful seizure/false arrest against Paszko and Vanbrederode, pursuant to § 1983; (12) Miller's claim for excessive force against Paszko, pursuant to § 1983; (13) Miller's claim for unlawful seizure/false arrest against Paszko, pursuant to § 1983; (14) Martin's claim for excessive force against Baker, pursuant to § 1983; (15) Martin's claim for excessive force against Elmore, Clinkhammer, and Borrelli, pursuant to § 1983; (16) McIntyre's claim for unlawful seizure/false arrest against Boily, pursuant to § 1983; (17) Chatman's claim against Dellasala for unlawful seizure/false arrest, pursuant to § 1983; and (18) Chatman's claim for excessive force against Dellasala, pursuant to § 1983.

Plaintiffs include class action allegations and claims for monetary, injunctive, and declaratory relief.

## FACTUAL BACKGROUND

Plaintiffs participated in large public demonstrations in Rochester following the deaths of George Floyd and Daniel Prude. The Court provides only a brief overview of the facts, taken as true for purposes of these motions, because the facts will be explored in more depth with respect to each claim.

On May 30, 2020, following the death of George Floyd, Plaintiff Deguzman—a "professional photojournalist"—attended a peaceful protest in front of the Public Safety Building ("PSB") in Rochester. ECF No. 47 ¶¶ 74, 79. During the protest, Deguzman was injured when Individual Defendants "pepper sprayed protestors, indiscriminately shot pepper balls into the crowd, physically pushed protestors and struck them with batons." *Id.* ¶ 77. Deguzman was "targeted and shot in retaliation for exercising his right to film" Individual Defendants in a public place. *Id.* ¶ 80.

Between May and July 2020, the RPD "quietly updated its departmental policy on usage of the PepperBall Launching System ('PLS')" to "allow officers on the patrol division to use the PLS," vastly expanding the scope of law enforcement officers who could use this dangerous weaponry. *Id.* ¶ 84. Prior to the amendment of this policy, only members of the SWAT team were eligible to use PLS. *Id.*

In September 2020, after the body camera footage of Daniel Prude's death was released, protestors gathered outside the PSB, "chanted, and held signs" and "decried the pattern of racialized, violent policing in Rochester, of which Mr. Prude's killing was the latest, most egregious example." *Id.* ¶ 87.

The largest protests were between September 2 and September 5, 2020. *Id.* ¶ 88. "As part of its common practice, the RPD responded to these protests with extreme and unnecessary force—including the indiscriminate use of tear gas and pepper spray, 40 millimeter blunt-impact projectiles, thousands of pepper balls, flash-bang grenades and other supposedly 'less-than-lethal' munitions." *Id.* Despite that these devices are termed "less-than-lethal," they are "military-grade crowd control devices" that can cause serious injury or even death. *Id.* "The City's use of violent, militarized police tactics against Black and brown protestors and their allies was in line with their decades-long practice of suppressing police critics through unconstitutional means." *Id.* City Defendants coordinated with County Defendants and the State Police to suppress these peaceful demonstrations by, among other things, creating an intimidating, militarized, and disproportionate law enforcement presence. *Id.* ¶¶ 94-99.

As part of the multi-agency response, Singletary deployed the SWAT team, the Mobile Field Force, the Grenadier Team, and the Tactical Unit, each with its attendant military-grade

equipment.  Along with other City Defendants, Singletary developed RPD's response plan in conjunction with Baxter and the County.  *Id.* ¶¶ 99-106.

As a result of these policies and practices, Plaintiffs were injured and falsely arrested.

Similar protests occurred on September 12 and 13, 2020, September 16, 2020, and October 13, 2020.  *Id.* ¶¶ 214-31.

## LEGAL STANDARD

To survive a motion to dismiss under Rule 12(b)(6), "a complaint must contain sufficient factual matter . . . 'to state a claim to relief that is plausible on its face.'"  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).  A claim for relief is plausible when the plaintiff pleads facts sufficient to allow the Court to draw reasonable inferences that the defendant is liable for the alleged misconduct.  *Id.*  In reviewing a motion to dismiss under Federal Rule of Civil Procedure 12(b)(6), the Court must accept as true the factual allegations in the complaint and draw all reasonable inferences in favor of the plaintiff.  *See Nechis v. Oxford Health Plans, Inc.*, 421 F.3d 96, 100 (2d Cir. 2005).  At the same time, the Court is not required to credit "[l]egal conclusions, deductions, or opinions couched as factual allegations . . . [with] a presumption of truthfulness."  *In re NYSE Specialists Sec. Litig.*, 503 F.3d 89, 95 (2d Cir. 2007) (internal citations and quotations omitted).  The "touchstone for a well-pleaded complaint under Federal Rules of Civil Procedures 8(a) and 12(b)(6) is plausibility."  *In re AOL Time Warner, Inc. Sec. Litig.*, 503 F. Supp. 2d 666, 670 (S.D.N.Y. 2007) (citing *Twombly*, 550 U.S. at 560-61).  To meet this plausibility standard, the factual allegations must permit the Court "to infer more than the mere possibility of misconduct."  *Iqbal*, 556 U.S. at 679.

**DISCUSSION**

The Court turns first to whether certain Plaintiffs have standing to sue and whether certain Defendants are properly sued.  Next, the Court addresses Plaintiffs' damages claims.  Having determined the proper parties and categories of damages, the Court moves on to address the sufficiency of each of Plaintiffs' claims.

**I.**     **NLG's Standing**

Although Defendants' move to dismiss much of the Amended Complaint for failure to state a claim under Rule 12(b)(6), the County Defendants also move to dismiss portions of the Amended Complaint asserted on behalf of NLG for lack of standing.

"A motion to dismiss for lack of Article III standing challenges the subject-matter jurisdiction of a federal court and, accordingly is properly brought under Fed. R. Civ. P. 12(b)(1)." *SM Kids, LLC v. Google LLC*, 963 F.3d 206, 210 (2d Cir. 2020).  An organization may establish organizational standing based on a direct injury to the organization itself.  *See Warth v. Seldin*, 422 U.S. 490, 511 (1975).  To establish organizational standing, it is NLG's burden to "independently satisfy the same Article III standing inquiry that applies to individuals," *i.e.*, "(1) an injury in fact to a legally protected interest that is both (a) concrete and particularized, and (b) actual or imminent, not conjectural or hypothetical, (2) a causal connection between the injury and the conduct complained of, and (3) that it is likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision."  *Nat. Res. Def. Council, Inc. v. Wheeler*, 367 F. Supp. 3d 219, 228 (S.D.N.Y. 2019) (internal quotation marks omitted).  To establish associational standing, an organization must "name at least one of its affected members."  *Pen Am. Cntr., v. Trump*, 448 F. Supp. 3d 309, 320 (S.D.N.Y. 2020).

With respect to organizational standing, County Defendants argue that NLG has failed to allege that County Defendants ever injured NLG.  ECF No. 71-3 at 29.  However, the Amended Complaint does state that RPD Officers "targeted NLG Rochester Legal Observers, who were wearing bright green 'NLG' hats that clearly indicated they were Legal Observers."  ECF No. 47 ¶ 182.  NLG "helps coordinate legal representation for protestors who are arrested" and trains legal observers to document police behavior during protests, including during the 2020 racial justice protests.  *Id.* ¶ 22.  Law enforcement's targeting of NLG observers during these protests damages the organization itself because it cuts at the core of its mission.  *See Nnebe v. Daus*, 644 F.3d 147, 158 (2d Cir. 2011).

NLG also establishes associational standing.  The Amended Complaint states that RPD Officers and Sheriff's Officers attacked Emily Good, an NLG legal observer, with "a large amount of tear gas."  *Id.* ¶ 209.  At this stage, the Court concludes that these allegations, taken together, are sufficient to establish NLG's standing.  *See Pen Am. Cntr., v. Trump*, 448 F. Supp. 3d 309, 320 (S.D.N.Y. 2020).

## II.    Defendants

### A.    MCSO Cannot be Sued

Plaintiffs lodge several claims against the MCSO.  However, County Defendants are correct that the MCSO is not a legal entity that can be sued.  *Lin v. Cnty. of Monroe*, 66 F. Supp. 3d 341, 353 n.4 (W.D.N.Y. 2014) ("The Monroe County Sheriff's Department also must be dismissed because a department is merely an administrative arm of the County, and it therefore lacks the capacity to be sued." (internal quotation marks omitted)); *Colpoys v. Cnty. of Erie*, No. 12-CV-908S, 2013 WL 5437635, at *3 (W.D.N.Y. Sept. 27, 2013) ("[A]ny claim against the

Sheriff's Department must be dismissed; it is merely an administrative arm of the County, and it therefore lacks the capacity to be sued."). Therefore, any claim against the MCSO is dismissed.

### B.    The County Can be Sued

The same is not true with respect to the County. The County is not immune from § 1983 liability for municipal policies, customs, and practices. *Leatherman v. Tarrant Cnty. Narcotics Intel. & Coordination Unit*, 507 U.S. 163, 166 (1993) ("[U]nlike various government officials, municipalities do not enjoy immunity from suit—either absolute or qualified—under § 1983."). Plaintiffs do not suggest that the County is liable for any claims by virtue of *respondeat superior* since § 1983 does not recognize *respondeat superior* liability.[3] *Alwan v. City of New York*, 311 F. Supp. 3d 570, 587 (E.D.N.Y. 2019). Accordingly, the Court will not dismiss the County from this case for claims falling within the long-standing principle of municipal liability as established in *Monell* and articulated below.

## III.    Damages

### A.    Declaratory Judgment

The County Defendants argue that Plaintiffs lack standing to seek declaratory relief against them. ECF No. 71-3 at 32. "An individual plaintiff may demonstrate standing to seek injunctive and declaratory relief by plausibly alleging the existence of an official policy or custom and a likelihood of future harm from that policy or custom." *In re New York City Policing During Summer 2020 Demonstrations*, 548 F. Supp. 3d 383, 396 (S.D.N.Y. 2021). As explained below, Plaintiffs have alleged such a policy or custom. The Court can conclude that a future, similar

---

[3] The Court need not—at this juncture—determine precisely which official(s) or municipality was at fault. To be sure, "[w]hether the official in question possessed final policymaking authority," and is thus liable under § 1983, "is a legal question . . . which is to be answered on the basis of state law." *Jeffes v. Barnes*, 208 F.3d 49, 57 (2d Cir. 2000) (concluding that sheriff was the county's final policy-maker and that such a finding "would suffice for the imposition of liability on the County"). Suffice it to say that Plaintiffs have alleged that the County, in conjunction with Sheriff Baxter, implemented the polices, practices, and customs they now challenge.

encounter with law enforcement is not speculative. *See id.* (concluding that the "allegations of repeated unlawful conduct, combined with the sheer volume of violations alleged by Plaintiffs, are sufficient to conclude that the possibility of an encounter with the NYPD, and with NYPD policies, is far from speculative").

### B.      Punitive Damages

"[A] municipality is immune from a claim for punitive damages." *De Michele v. City of New York,* No. 09 CIV. 9334 PGG, 2012 WL 4354763, at *22 (S.D.N.Y. Sept. 24, 2012). However, "that immunity does not extend to a municipal official sued in his individual capacity." *Id.* Accordingly, to the extent Plaintiffs seek punitive damages from the City or County, those requests are stricken.[4]

### IV.    Municipal/*Monell* Claims

In their First, Second, Third, and Fourth Claims, Plaintiffs seeks to hold the City,[5] the County, and Baxter liable for First and Fourth Amendment violations under *Monell v. Dep't Soc. Servs.*, 436 U.S. 658, 693 (1978).  In essence, Plaintiffs assert that Individual Defendants who caused Plaintiffs' injuries were acting in accordance with the City's and County's unconstitutional customs or policies relating to the use of force during peaceful protests.  Defendants, for their part, argue that Plaintiffs have not adequately pled such a custom or policy.  For the reasons explained below, the Court disagrees with Defendants and permits the *Monell* claims to proceed.

---

[4] Dismissal of a punitive damages request is typically inappropriate at the pleading stage. *See Horowitz v. Spark Energy, Inc.*, 19cv7534, 2020 WL 6561600, at *1 (S.D.N.Y. July 31, 2020) ("[A] demand for punitive damages is more properly characterized as a request for relief, rather than as an independent claim, such that dismissal at the pleading stage is inappropriate.").  But because municipalities are immune from punitive damages awards, the Court finds it prudent to dismiss those requests now.  *See Chen v. City of Syracuse*, No. 606CV-1143 NPM/GHL, 2007 WL 764639, at *5 (N.D.N.Y. Mar. 9, 2007) (dismissing punitive damages request against municipalities at pleading stage).

[5] City Defendants argue that Plaintiffs have not stated a *Monell* claim against Mayor Warren, Former Chief Singletary, Former Chief Harriet-Sullivan, and various supervisory staff. ECF No. 69-1 at 16-20.  But Plaintiffs do not assert *Monell* claims against these individuals; only claims for the individual violations.

### A.   Legal Standard

"[A] local government is liable under § 1983 for its policies that cause constitutional torts."

*McMillian v. Monroe Cnty., Alabama*, 520 U.S. 781, 784 (1997); *see Monell*, 436 U.S. at 693.  A

plaintiff who seeks to impose liability on local governments pursuant to 42 U.S.C. § 1983 must

demonstrate that "action pursuant to official municipal policy" caused the injury.  *Monell*, 436

U.S. at 692.  "Official municipal policy includes the decisions of a government's lawmakers, the

acts of its policymaking officials, and practices so persistent and widespread as to practically have

the force of law."  *Connick v. Thompson*, 563 U.S. 51, 61 (2011) (citing *Monell*, 436 U.S. at 691)

(additional citations omitted).  A plaintiff may demonstrate a policy or custom exists by showing:

> (1) a formal policy officially endorsed by the municipality; (2)
> actions taken by government officials responsible for establishing
> the municipal policies that caused the particular deprivation in
> question; (3) a practice so consistent and widespread that, although
> not expressly authorized, constitutes a custom or usage of which a
> supervising policy-maker must have been aware; or (4) a failure by
> policymakers to provide adequate training or supervision to
> subordinates to such an extent that it amounts to deliberate
> indifference to the rights of those who come into contact with the
> municipal employees.

*Jones v. Westchester Cnty.*, 182 F. Supp. 3d 134, 158 (S.D.N.Y. 2016) (quoting *Brandon v. City*

*of New York*, 705 F. Supp. 2d 261, 276-77 (S.D.N.Y. 2010)).

"Although there is no heightened pleading requirement for complaints alleging municipal

liability under § 1983, . . . a complaint does not suffice if it tenders naked assertions devoid of

further factual enhancement."  *Green v. City of Mount Vernon*, 96 F. Supp. 3d 263, 301-02

(S.D.N.Y. 2015) (internal quotation marks and brackets omitted).  "To survive a motion to dismiss

a municipal liability claim, a plaintiff must allege facts tending to support, at least circumstantially,

an inference that a municipal policy or custom exists."  *McLennon v. City of New York*, 171 F.

Supp. 3d 69, 95 (S.D.N.Y. 2016) (internal quotation marks and ellipsis omitted); *see also Cruz v.*

*Vill. of Spring Valley*, No. 21-CV-2073, 2022 WL 428247, at *6 (S.D.N.Y. Feb. 11, 2022) (collecting cases).  Put simply, to allege "there is a policy does not make it so." *Vassallo v. City of New York*, No. 15-CV-7125, 2016 WL 6902478, at *14 (S.D.N.Y. Nov. 22, 2016) (internal quotation marks omitted); *see also Cruz*, 2022 WL 428247, at *6 ("Plaintiff cannot, through conclusory allegations, merely assert the existence of a municipal policy or custom, but must allege facts tending to support, at least circumstantially, an inference that such a municipal policy or custom exists." (internal quotation marks omitted)).

**B.    First Claim: RPD's Practice of Using Disproportionate Use of Force Against People of Color – City**

The Fourteenth Amendment's Equal Protection Clause declares that "[n]o State shall . . . deny to any person within its jurisdiction the equal protection of the laws."  U.S. Const., amend. XIV.  This clause "is essentially a direction that all persons similarly situated should be treated alike."  *City of Cleburne v. Cleburne Living Ctr., Inc.*, 473 U.S. 432, 439 (1985).

The Second Circuit has outlined "several ways for a plaintiff to plead intentional discrimination that violates the Equal Protection Clause."  *Floyd v. City of New York*, 959 F. Supp. 2d 540, 570 (S.D.N.Y. 2013).

> *First,* [a] plaintiff could point to a law or policy that expressly classifies persons on the basis of race. *Second,* a plaintiff could identify a facially neutral law or policy that has been applied in an intentionally discriminatory manner. *Third,* [a] plaintiff could also allege that a facially neutral statute or policy has an adverse effect and that it was motivated by discriminatory animus.  In none of these three cases is a plaintiff obligated to show a better treated, similarly situated group of individuals of a different race in order to establish a claim of denial of equal protection.

*Id.* at 570-71 (internal quotation marks and citations omitted) (emphasis in original).

To show intentional discrimination in the second or third models, "plaintiffs need not prove that the challenged action rested solely on racially discriminatory purposes, or even that a discriminatory purpose was the dominant or primary one."  *Id.*  "Rather, plaintiffs must prove that

a discriminatory purpose has been *a* motivating factor in the challenged action." *Id.* (emphasis in original).  In other words, Plaintiffs must show that Defendants "selected or reaffirmed a particular course of action at least in part because of, not merely in spite of, its adverse effects upon an identifiable group." *Id.* (internal quotations marks and citations omitted).

Plaintiffs allege that the City "has a widespread and longstanding practice of RPD officers us[ing] disproportionate force against people of color—they use force more frequently and they use more severe amounts of force against people of color—than they do against white people," and that, although the City was aware or should have been aware of this practice, they did nothing to remedy it.  ECF No. 47 ¶¶ 426-28.  In essence, Plaintiffs allege that the RPD targets people of color, uses more force more frequently against them than against white people, and has been deliberately indifferent in failing to correct that practice.

The City argues[6] that Plaintiffs have not put forth any evidence that the RPD used excessive force against people of color on a disproportionate basis.  It argues that the several newspaper blurbs and cartoons and 40 lawsuits regarding the RPD's use of excessive force against people of color—all of which are recounted in the Amended Complaint—are not evidence of any of the types of discrimination articulated above.  The City ignores the main thrust of Plaintiffs' allegations.

Indeed, Plaintiffs cite statistics that show that RPD officers' use of force "was overwhelmingly against people of color: of the 3,368 incidents reviewed, 2,632 incidents, or 78%

---

[6] The Court pauses to address the quality and tone of the City's briefing.  The City fails to move against several causes of action and, at some points, makes incorrect assumptions.  For example, the City incorrectly declares that "plaintiffs have not asserted an equal protection claim."  ECF No. 69-1 at 28.  The City also makes some incomplete and unsupported arguments.  The Court will not attempt to parse these undeveloped arguments.  *United States v. Zannino*, 895 F.2d 1, 17 (1st Cir. 1990) ("It is not enough merely to mention a possible argument in the most skeletal way, leaving the court to do counsel's work, create the ossature for the argument, and put flesh on its bones.").

involved a person of color."[7]  ECF No. 47 ¶ 424.   Plaintiffs also cite a dissertation from Charles LoFaso, a former RPD investigator, who, in compiling these statistics, concluded that RPD officers "use force more often and at more severe levels only when interacting with citizens in neighborhoods with higher percentages of Black and Hispanic residents." *Id.* ¶ 425.  Moreover, the City ignores that, far from being irrelevant, the newspaper articles, cartoons, and previous lawsuits actually suggest that the City was aware of but disregarded the discriminatory application of excessive force.

It remains to be seen whether the evidence proffered in the Amended Complaint ultimately turns out to prove Plaintiffs' claims.  But, to the extent the City argues that the evidence is insufficient at this stage, the Court declines to engage in such an analysis.  *Vann v. City of Rochester*, No. 18-CV-6464, 2019 WL 1331572, at *11 (W.D.N.Y. Mar. 25, 2019) ("The Second Circuit has explained that evidentiary questions . . . should especially be avoided at such a preliminary stage of the proceedings, and ordinarily neither a district court nor an appellate court should decide to strike a portion of the complaint on the grounds that the material could not possibly be relevant on the sterile field of the pleadings alone." (internal citations and quotations omitted)).

The Court concludes that, at this stage, Plaintiffs have pled a *Monell* claim for the City's practice of using disproportionate force against people of color.  Accordingly, the First Claim may proceed.

### C.    Second Claim: RPD's Deliberate Indifference and Failure to Discipline RPD Officers Who Used Excessive Force – City

The City does not move against this claim.  Therefore, it may proceed.

---

[7] A 2014 study of RPD arrest records also demonstrated that "RPD officers arrest Black people at a rate 2.7 times higher than non-Black people; that is, 66% of RPD arrests were of Black people, though Black people only made up 42% of the City's population at the time." *Id.* ¶ 271.

**D.    Third Claim: Violations of the First, Fourth, and Fourteenth Amendments During the Summer and Fall 2020 Racial Justice Protests – City**

Again, the City does not move against this claim and it may therefore proceed.

**E.    Fourth Claim: Violations of the First, Fourth, and Fourteenth Amendments During the Summer and Fall 2020 Racial Justice Protests – County, MCSO, and Baxter**

For the reasons explained above, the MSCO is dismissed from the action.  Nevertheless, the County and Baxter argue that Plaintiffs have failed to state a municipal liability claim with respect to the County's alleged customs, policies, and practices related to the 2020 protests.

They take issue with Plaintiffs' reference in the Amended Complaint to the County's "Hazard Mitigation Plan," under which the County trained Sheriff's Deputies to use force for both peaceful demonstrations *and* acts of violence.  ECF No. 47 ¶¶ 253-54.  The County and Baxter argue that this Hazard Mitigation Plan is intended to "reduce the potential impact of natural hazards" and therefore "clearly has nothing at all to do with specific training for Sheriff's Deputies who are working during a protest."  ECF No. 71-3 at 14.  However, the County and Baxter ignore the crux of Plaintiffs' other allegations, which, like those against the City, detail unconstitutional municipal policies, practices, and training failures.

For example, Plaintiffs allege that Baxter and the County subscribed to the theory that peaceful protests and violent mobs should be treated similarly, and that they trained Sheriff's Deputies to utilize excessive force to quell those peaceful protests.  ECF No. 47 ¶¶ 256-60.

Unlike Plaintiffs' allegations against the City, the Amended Complaint does not contain specific allegations of prior instances in which the Sheriff's Deputies used excessive force against protestors.  The County and Baxter argue that the absence of such allegations demonstrates that neither could have had knowledge that any problems were widespread.  However, Plaintiffs *do* allege that prior to the protests which are the subject of this lawsuit, County legislators called on

Baxter to implement new training protocols to correct its deficient practices. *Id.* ¶ 259. Although this is a close call, the Court determines at this early stage that such factual allegations are sufficient to survive the motion to dismiss.

**V.    Fifth Claim: First Amendment Retaliation – the City, Warren, Singletary, the County, the MCSO, and Baxter**

The Amended Complaint advances two theories of First Amendment liability: (a) that Defendants "retaliated against Plaintiffs for engaging in speech and/or conduct protected by the First Amendment" and (b) that Defendants "imposed restrictions on such protected speech and/or conduct that violated Plaintiffs' First Amendment rights, including, but not limited to, falsely arresting Plaintiffs, subjecting Plaintiffs to excessive force, selectively enforcing laws and regulations against Plaintiffs, and in otherwise violating Plaintiffs' rights." ECF No. 47 ¶ 454. Both theories are premised on Defendants' retaliation for Plaintiffs expressing their views.

To plead a First Amendment retaliation claim, a plaintiff must show: "(1) he has a right protected by the First Amendment; (2) the defendant's actions were motivated or substantially caused by his exercise of that right; and (3) the defendant's actions caused him some injury." *Dorsett v. Cnty. of Nassau*, 732 F.3d 157, 160 (2d Cir. 2013).

The County Defendants argue that Plaintiffs have not established any constitutional injury because some Plaintiffs have not alleged that they were unable to protest or stopped protesting because of any action taken by the Sheriff's Deputies.

However, some Plaintiffs were detained and their detentions are the subject of the false arrest claims. To the extent those Plaintiffs were in fact detained, they were no longer able to protest for the duration of their detention, thereby incurring an injury.

That said, "[t]he type of allegations necessary to satisfy the injury element of a First Amendment retaliation claim vary depending on the factual context." *Morales v. Valley Stream*

*Union Free Sch. Dist. 24*, 527 F. Supp. 3d 470, 474 (E.D.N.Y. 2021) (quoting another case).  As a result, "[c]hilled speech is not the *sine qua non* of a First Amendment claim.  A plaintiff has standing if he can show *either* that his speech has been adversely affected by the government retaliation or that he has suffered some other concrete harm."  *Dorsett*, 732 at 160 (emphasis in original).

Here, Plaintiffs allege that they were physically injured because Defendants did not agree with their views on policing.  ECF No. 47 ¶ 454.  Viewed in the light most favorable to Plaintiffs, at this stage, the Court concludes that such physical injuries are "some other concrete harm" and therefore meet the causation requirement.

To the extent City Defendants argue that the City's emergency order vitiates any First Amendment retaliation claim, that argument is misplaced.  To be sure, in *Martin v. Warren*, 482 F. Supp. 3d 51 (W.D.N.Y. 2020), District Judge Charles J. Siragusa denied plaintiff-protestors' motion for a preliminary injunction, concluding that they were not likely to succeed on their arguments that the emergency order's curfew was pretextual, unrelated to significant government interests, or not narrowly tailored.  But he did not affirmatively find that the emergency order was a reasonable time, place, and manner restriction.  And even if he did, there is nothing to suggest that police action purportedly taken under the emergency order could not supply the basis for a retaliation claim.  Finally, as Plaintiffs point out, many of the alleged retaliatory acts did not take place during the time the emergency order was in force.

The City Defendants' intimate that the disruptive nature of the protests somehow negates Plaintiffs' First Amendment claims.  But this argument assumes that the protests were violent.  Such a suggestion is not found anywhere in the Amended Complaint.  Rather, Plaintiffs allege the

opposite: that the protests were peaceful.  The Court will not resolve this factual issue on a motion to dismiss and, accordingly, Plaintiffs' Fifth Claim may proceed to discovery.

## VI.     Sixth Claim: Equal Protection – the City, Warren, Singletary, the County, the MCSO, and Baxter

Plaintiffs next allege that Defendants "engaged in viewpoint discrimination against the Plaintiffs and other protestors by attacking them and using brutal levels of force" while treating other similarly situated protestors (such as "Blue Lives Matter" protestors") differently based on the content of their message.  ECF No. 47 ¶¶ 469, 472.

The City Defendants do not move against this claim.  For their part, the County Defendants suggest that the Sixth Claim must be dismissed because Plaintiffs do not allege that the protestors—many of whom were white—were targeted for their "racial makeup."  ECF No. 71-3 at 20-21.  True, Plaintiffs do not allege racial discrimination in the context of the protests.  But they need not.

To plead a selective enforcement claim under the Equal Protection Clause, Plaintiffs must plead that (1) they were treated differently from other similarly situated individuals and (2) "such differential treatment was based on impermissible considerations such as race, religion, intent to inhibit or punish the exercise of constitutional rights, or malicious or bad faith intent to injure a person."  *Wandering Dago, Inc. v. Destito*, 879 F.3d 20, 40 (2d Cir. 2018) (internal quotation marks and citations omitted).  Plaintiffs have indeed pled that Defendants punished them for the exercise of their constitutional rights, *i.e.*, their freedom to speak out against racially-motivated police action.  The Sixth Claim may proceed.

## VII.    Seventh Claim: Excessive Force – All Defendants Except Dellasala

To the extent Plaintiffs assert their excessive force claims against Baxter, that claim will not be dismissed.  "A supervisory defendant must have been personally involved in a constitutional

deprivation to be held liable under § 1983." *Bryant v. Ciminelli*, 267 F. Supp. 3d 467, 475 (W.D.N.Y. 2017).  The Amended Complaint contains no allegations that Baxter personally used excessive force on Plaintiffs.  However, as explained below, Plaintiffs allege that unknown Sheriff's deputies used excessive force against them.  The Second Circuit has recognized "the appropriateness of maintaining supervisory personnel as defendants in lawsuits stating a colorable claim until the plaintiff has been afforded an opportunity through at least brief discovery to identify the subordinate officials who have personal liability."  *Davis v. Kelly,* 160 F.3d 917, 921 (2d Cir. 1998).  Accordingly, the Court will not dismiss Baxter from the case until Plaintiffs have an opportunity to conduct discovery as to the identities of the Sheriff's deputies.  Once such discovery reveals the identifies of the Sheriff's deputies, Baxter may again move to dismiss.  *Murphy v. Goord*, 445 F. Supp. 2d 261 (W.D.N.Y. 2006) (denying supervisor's motion to dismiss so that plaintiff could conduct discovery to ascertain identity of John Doe defendants).

The remaining County Defendants argue that the claims against individual, unnamed Sheriff's Deputies must be dismissed because Plaintiffs' allegations constitute impermissible "group pleading."[8]  ECF No. 71-3 at 23.  A complaint that "lump[s] all the defendants together in each claim provid[es] no factual basis to distinguish their conduct . . . . fail[s] to satisfy [the] minimum [pleading] standard."  *Atuahene v. City of Hartford*, 10 F. App'x 33, 34 (2d Cir. 2001) (summary order) (internal quotations omitted).  But Plaintiffs have not lumped all Defendants' conduct together.  Rather, Plaintiffs claim that unknown Sherriff's Deputies "and/or" unknown RPD Officers shot tear gas, pepper balls, foam bullets, and other military-grade weapons at them.  ECF No. 47 ¶¶ 89-93.  That is a specific allegation regarding as-of-yet unknown deputy or

---

[8] The County Defendants repeat this same argument as a reason to dismiss each claim.  For the same reasons outlined below with respect to the excessive force claim, the Court finds this argument unpersuasive as a basis to dismiss the remaining claims.

deputies.  Given the presence of law enforcement from multiple jurisdictions at the protests, such a claim is not implausible.  The Court will permit Plaintiff to conduct discovery to determine the identities of any such Sheriff's Deputies.

The County and City Defendants further argue that Fourth Amendment liability is premised on the use of "excessive force when detaining or arresting individuals," and that only some of the Plaintiffs were actually arrested.  *See* ECF No. 69-1 at 24-25; *see Jones v. Parmley*, 465 F.3d 46, 61 (2d Cir. 2006).  But Plaintiffs allege that Defendants used "less lethal" military-grade weapons and chemical weapons against Plaintiff.  ECF No. 47 ¶ 89.  Courts have routinely concluded that the use of such weapons against protestors constitutes a seizure for purposes of the Fourth Amendment.  *See Edrei v. Maguire*, 892 F.3d 525, 540-42 (2d Cir. 2018) ("Our sister circuits and district courts in this Circuit have routinely applied excessive force principles to crowd control situations.").  Accordingly, this claim, too, may proceed.

## VIII.   Eighth Claim: Civil Rights Conspiracy (42 U.S.C. § 1985) – the City, Warren, Singletary, the County, the MCSO, and Baxter

The elements of a civil rights conspiracy claim under § 1985 are (1) that the defendants had a racial or other class-based, invidiously discriminatory animus; (2) that such animus motivated the defendants to enter into a conspiracy; (3) to deprive plaintiff of a constitutional or other federal right; (4) that a defendant committed an overt act in furtherance of that conspiracy; (5) resulting in injury to the plaintiff.  *Bray v. Alexandria Women's Health Clinic*, 506 U.S. 263, 267 (1993).

As with the Equal Protection Claim, County Defendants[9] argue that Plaintiffs have failed to allege that Defendants acted with the requisite discriminatory animus.  ECF No. 71-3 at 22-23. But, as explained above, Plaintiffs have pled "other class-based" animus—*i.e.*, that they were

---

[9] City Defendants do not move against either conspiracy claim.

treated differently because of the First Amendment-protected viewpoint they were espousing. ECF No. 47 ¶ 106. Indeed, Plaintiffs have also pled that "[t]he purpose of this conspiracy was to deprive the protesters of the equal protection of the laws, *based on their message*." *Id.* (emphasis added). County Defendants do not challenge the remaining elements of a civil rights conspiracy, therefore, the claim may proceed.

## IX.   Ninth Claim: Failure to Prevent Civil Rights Conspiracy (42 U.S.C. § 1986) – the City, Warren, Singletary, the County, the MCSO, and Baxter

Section 1986 "provides a cause of action against anyone who having knowledge that any of the wrongs conspired to be done and mentioned in section 1985 are about to be committed and having power to prevent or aid, neglects to do so." *Adams v. Smith*, No. 07-CV-452, 2007 WL 2323435, at *2 (N.D.N.Y. Aug. 9, 2007).

County Defendants proffer only one argument in support of dismissal of this claim: that this claim fails with the § 1985 claim. But, as explained above, that claim may proceed, and accordingly, the Ninth Claim may also proceed.

## X.   Tenth, Twelfth, Fourteenth, and Fifteenth Claims: Excessive Force – Certain Individual Defendants

Defendants do not move against these claims and, therefore, they may proceed.

## XI.   Eleventh, Thirteenth, and Sixteenth Claims: False Arrest – Certain Individual Defendants

"The elements of a claim of false arrest under § 1983 are substantially the same as the elements of a false arrest claim under New York law." *Maron v. Cnty. of Albany*, 166 F. App'x 540, 541 (2d Cir. 2006) (summary order) (internal quotation marks omitted). "[U]nder New York law, the elements of a false arrest claim are: (1) the defendant intended to confine the plaintiff, (2) the plaintiff was conscious of the confinement, (3) the plaintiff did not consent to the confinement, and (4) the confinement was not otherwise privileged." *Id.* "The existence of probable cause to

arrest" renders the confinement privileged "and is a complete defense to an action for false arrest." *Horvath v. City of New York*, No. 12-CV-6005, 2015 WL 1757759, at *3 (E.D.N.Y. Apr. 17, 2015). "Probable cause exists when one has knowledge of, or reasonably trustworthy information as to, facts and circumstances that are sufficient to warrant a person of reasonable caution in the belief that an offense has been or is being committed by the person to be arrested." *Martinez v. City of New York*, 340 F. App'x 700, 701 (2d Cir. 2009) (summary order) (internal quotation marks and brackets omitted).

City Defendants' only argument for dismissal of these claims is that Plaintiffs have failed to allege a "favorable termination." ECF No. 69-1 at 24. Favorable termination is an element of a malicious prosecution claim, not a false arrest claim. *Rodriguez v. City of New York*, No. 21CV1649AMDRLM, 2022 WL 768159, at *6 (E.D.N.Y. Mar. 14, 2022) (quoting other sources). The Court declines to manufacture additional arguments in favor of dismissal that City Defendants fail to raise themselves. *See Zannino*, 895 F.2d at 17 ("It is not enough merely to mention a possible argument in the most skeletal way, leaving the court to do counsel's work, create the ossature for the argument, and put flesh on its bones."). Accordingly, these claims may proceed.

## XII. Seventeenth & Eighteenth Claims: Chatham's Claim for False Arrest and Claim for Excessive Force – Dellasala

Dellasala incorrectly assumes that the class action allegations are lodged against him. On this basis, he moves to dismiss all of the allegations. ECF No. 70-3 at 5-11. But as the Amended Complaint articulates very clearly, the only claims against Dellasala are Chatham's claims against him for false arrest and excessive force. Chatham also asserts *Monell* claims against the City and County in the First through Seventh Claims. But the class action allegations are only against the City and County.

Dellasala also argues that the claims against him should be severed given that there are so many claims against so many Defendants and that the Amended Complaint includes class action allegations—none of which are asserted against him. ECF No. 70-3. Rule 20(b) grants the Court the discretion to sever claims. Fed. R. Civ. P. 20(b). The Court declines to sever Dellasala at this juncture, since all of the claims are related. *Gokdogan v. Slap Shot Pizza Enterprises Ltd.*, No. 20CV5201MKBST, 2021 WL 4441417, at *16 (E.D.N.Y. Sept. 27, 2021) (declining to sever at the pre-discovery stage).

## XIII.   Class Action Allegations

Finally, Defendants move to strike the class action allegations in the Amended Complaint. The Court declines to do so at this time.

The Amended Complaint outlines two classes: (1) those injured from April 5, 2018 to present "as a result of the policies, practices, customs, and deliberate indifference that encouraged the use of more frequent and greater levels of force against people of color because of their race" (the "First Class"), ECF No. 47 ¶ 392; and (2) those "who were subjected to excessive force by law enforcement officials in the City of Rochester during the George Floyd and Daniel Prude protests that occurred between May 30, 2020 and April 6, 2021 . . . as a result of the same policies, customs, and deliberate indifference of the Defendants described above" (the "Second Class"), *id.* ¶ 406. The First Class seeks only injunctive relief. *Id.* ¶ 393.

Defendants argue that these classes—which allege that putative class members suffered a common legal injury—do not meet the commonality or typicality requirements of Federal Rule of Civil Procedure 23(a) or the predominance requirements of Federal Rule of Civil Procedure 23(b). *See* ECF No. 71-3 at 35.

That appears more correct with respect to the First Class than with respect to the Second Class, for it is hard to say at this stage whether the common question, *i.e.*, whether law enforcement used excessive force with respect to each putative class member, is capable of class-wide resolution.

That said, the Court declines to decide this issue now. Courts in this Circuit are reluctant to take the extreme step Defendants advocate here: dismissing or striking class allegations before Plaintiffs have an opportunity to engage in class discovery or move for class certification. *See, e.g.*, *Chen-Oster v. Goldman, Sachs & Co.*, 877 F. Supp. 2d 113, 117 (S.D.N.Y. 2012) ("Generally speaking . . . motions of this kind are deemed procedurally premature."). Moreover, Defendants have not established that class certification of either class is impossible. *Mayfield v. Asta Funding*, 95 F. Supp. 3d 685, 696 (S.D.N.Y. 2015) (noting that an exception to the general rule against striking class allegations is where, from the face of the complaint, "it would be *impossible* to certify the alleged class regardless of the facts Plaintiffs may be able to obtain during discovery").

Accordingly, the class allegations may proceed at this time.

## CONCLUSION

For the reasons explained above, Defendants' motions to dismiss, ECF Nos. 69-71, are GRANTED IN PART and DENIED IN PART. The MCSO is DISMISSED from this action. To the extent Plaintiffs request punitive damages from the City or County, those requests are STRICKEN. The motions are denied in all other respects. The following claims may proceed:

(1)     municipal/*Monell* liability against the City for the RPD's practice of using disproportionate force against people of color in violation of the Fourteenth Amendment, pursuant to 42 U.S.C. § 1983;

(2)     municipal/*Monell* liability against the City for its deliberate indifference and failure to discipline RPD officers who use excessive force, pursuant to § 1983;

(3)     municipal/*Monell* liability against the City for its violations of the First, Fourth, and Fourteenth Amendments during the 2020 racial justice protests, pursuant to § 1983;

(4)     municipal/*Monell* liability against the County and Baxter for their violations of the First, Fourth, and Fourteenth Amendments during the 2020 racial justice protests, pursuant to § 1983;

(5)     First Amendment infringement and retaliation against the City, Warren, Singletary, the County, and Baxter, pursuant to § 1983;

(6)     equal protection violations against the City, Warren, Singletary, the County, and Baxter, pursuant to § 1983;

(7)     excessive force against all Defendants other than Dellasala and the MCSO, pursuant to § 1983;

(8)     civil rights conspiracy against the City, Warren, Singletary, the County, and Baxter, pursuant to 42 U.S.C. § 1985;

(9)     failure to prevent civil rights conspiracy against the City, Warren, Singletary, the County, and Baxter, pursuant 42 U.S.C. § 1986;

(10)    Buggs's claim for excessive force against Paszko, and Vanbrederode, pursuant to § 1983;

(11)    Buggs's claim for unlawful seizure/false arrest against Paszko and Vanbrederode, pursuant to § 1983;

(12)    Miller's claim for excessive force against Paszko, pursuant to § 1983;

(13)    Miller's claim for unlawful seizure/false arrest against Paszko, pursuant to § 1983;

(14)    Martin's claim for excessive force against Baker, pursuant to § 1983;

(15)    Martin's claim for excessive force against Elmore, Clinkhammer, and Borrelli, pursuant to § 1983;

(16)    McIntyre's claim for unlawful seizure/false arrest against Boily, pursuant to § 1983;

(17)    Chatman's claim against Dellasala for unlawful seizure/false arrest, pursuant to § 1983; and

(18)    Chatman's claim for excessive force against Dellasala, pursuant to § 1983.

A status conference in all protest-related cases is scheduled for July 21, 2022, at 3:00 p.m.

IT IS SO ORDERED.

Dated: June 30, 2022
      Rochester, New York                               _____
                                                        HON. FRANK P. GERACI, JR.
                                                        United States District Judge
                                                        Western District of New York