# ROTH & ROTH, LLP

192 LEXINGTON AVENUE, SUITE 802, NEW YORK, NEW YORK 10016
ROTHANDROTHLAW.COM T: (212) 425-1020 F: (212) 532-3801

**VIA ECF**  October 21, 2022
Hon. Frank P. Geraci, Jr.
Chief United States District Judge
Kenneth B. Keating Federal Building
100 State Street
Rochester, New York 14614

      Re: *Hall et al.* v. *Warren, et al.*
           21-cv-6296 (FPG)

Dear Judge Geraci,

      Plaintiffs brought this class action lawsuit on behalf of themselves and others who have been subjected to unconstitutional excessive force by the Rochester Police Department. The suit was filed after Daniel Prude's murder and in the wake of the RPD's militarized response to community protests calling for an end to the Department's racialized, violent policing. But this case is not only, or even primarily, about the police response to the summer 2020 racial justice protests. It is about protecting the life of the next Daniel Prude.

      Plaintiffs have made clear—in their Complaint and in conversations with the City—that they are seeking injunctive and declaratory relief to end the RPD's longstanding practice of racially discriminatory use-of-force. As your Honor recognized at the August 4, 2022 conference: mediation in this lawsuit could be a unique opportunity for meaningful change in the RPD and healing in the community. For Rochester's people of color, the need for that change is real and urgent. Plaintiffs have therefore proposed a two-part mediation process, as detailed below.

      To address Plaintiffs' First Claim—that RPD targets people of color, uses force more frequently against them, and has been deliberately indifferent in failing to correct that practice—Plaintiffs propose engaging the Center for Policing Equity ("CPE"), a non-profit organization that "gathers and analyzes data on behaviors within public safety systems and uses those data to help communities achieve safer policing outcomes."[1] CPE is made up of research scientists, race and equity specialists, data experts, community advocates, and former police officials; the organization has a track record of working with law enforcement and communities through a transparent process to provide resources and recommendations for structural change.[2] Importantly, CPE is also fully funded—so its work would be without cost to the City.

---

[1] *See* Center For Policing Equity, *Who We Are* (https://policingequity.org/about/who-we-are).
[2] For example, Tompkins County and the City of Ithaca engaged CPE to address issues in policing and public safety. CPE worked with volunteers, data scientists, focus groups, public commentators, and law enforcement officers to provide a data-driven, comprehensive view of how policing and public safety was

Plaintiffs met with CPE to discuss what the process could look like in Rochester: CPE would conduct an initial review, which would include both a qualitative analysis of community and law enforcement views on policing in the City (through focus groups, meetings with community leaders, public fora, surveys, etc.) and a quantitative, data-driven analysis of the RPD's policies and procedures—to identify factors and risks for policing inequities that could be reformed. After CPE concluded its initial review and analysis, it would issue findings and recommendations to improve public safety, including a plan for implementation. The parties could then mediate implementation of CPE's recommendations.

Second, while CPE is conducting its review, the parties would proceed with class discovery for the Plaintiff Class consisting of all people harmed at the 2020 summer and fall racial justice protests. As detailed below, Plaintiffs request that the Court refer the case to a Magistrate Judge to oversee discovery on these claims, which can proceed in tandem with any mediation.

Plaintiffs engaged in good faith with the City in the hopes of reaching agreement on a meaningful mediation process. Unfortunately, based on its mediation proposal, it is clear that the City is not interested in pursuing this unique opportunity to engage with the issues raised by this lawsuit and improve police-community relations. Instead, the City ignores the main thrust of this case and—incredibly—has taken the position that "all of the policies and tactics which the plaintiffs' complaint challenges have been completely revamped" by the City's recent revisions to RPD's policies concerning responses to mass gatherings. (Dkt. 121-1 at 3).

As discussed further herein, that is simply not the case. The mediation plan proposed by the City completely disregards Plaintiffs' demands for class-wide equitable relief concerning the RPD's discriminatory use-of-force practices. The City and County's proposals also both fail to acknowledge that Rule 23(e) applies in this putative class action—and that, for purposes of mediation, the Court must presume that the class has been certified, even prior to actual certification. *McDowall v. Cogan*, 216 F.R.D. 46, 50 (E.D.N.Y. 2003).

For these reasons, Plaintiffs strongly object to the mediation proposals from the City and County. Plaintiffs welcome a conference with the Court to discuss these issues and their mediation proposal, which is sensible, cost-effective, and would efficiently accomplish the goals Your Honor described in asking the parties to engage in this process.

### I.     Background

The claims in this case necessarily provide the framework for what a meaningful mediation must entail. Your Honor's Decision and Order (Dkt. 94) recognized that the Amended Complaint includes three distinct, legally cognizable *Monell* claims against the City, and one *Monell* claim against the County. Plaintiffs' First Claim is based on "the RPD's practice of using disproportionate force against people of color in violation of the Fourteenth Amendment, pursuant to 42 U.S.C. § 1983." *Id.* at 23.  The second *Monell* claim is based on the City's "deliberate

---

currently working—and not working—and to provide an evidence-based, attainable plan for the creation of a new Department of Community Solutions and Public Safety better aligned with community values, resources, and officer abilities. *See* CPE Report: Redesigning Public Safety in Ithaca (https://policingequity.org/redesigning-public-safety/41-cpe-report-redesigning-public-safety-ithaca/file).

indifference and failure to discipline RPD officers who use excessive force, pursuant to § 1983." *Id.* at 24. The City moved to dismiss these claims but, as this Court explained in denying that motion, in doing so: "The City ignore[d] the main thrust of Plaintiffs' allegations." *Id.* at 12.

The "main thrust" of Plaintiffs' *Monell* claim, as aptly described by this Court, are that "the RPD targets people of color, uses more force more frequently against them than against white people, and has been deliberately indifferent in failing to correct that practice." Dkt. 94 at 12 (June 30, 2022 Decision and Order). This First Claim rests in part on statistics that show, as the Court explained, "that RPD officers' use of force 'was overwhelmingly against people of color.'" *Id.* Plaintiffs' Complaint also discussed more than forty other lawsuits and cases involving RPD officers using excessive force against people of color, and a long history of public reports of disproportionate force by the RPD against people of color. *Id.* at 12-13; *see also id.* at 13 ("Moreover, the City ignores that, far from being irrelevant, the newspaper articles, cartoons, and previous lawsuits actually suggest that the City was aware of but disregarded the discriminatory application of excessive force.").

Plaintiffs' first two *Monell* claims are <u>not</u> limited to the law enforcement response to the 2020 racial justice protests.[3] Rather, these claims are based on the extensive allegations in the Amended Complaint about decades of abuse and unconstitutional violence against people of color in Rochester. Critically, the Court also denied the City and County's requests to strike the Plaintiffs' class allegations at this juncture. The First Plaintiff Class is a class people injured as a result of the City's "policies, practices, customs, and deliberate indifference that encouraged the use of more frequent and greater levels of force against people of color because of their race." *Id.* at 23. That class seeks injunctive and declaratory relief.[4] *Id.*

A meaningful mediation here <u>must</u> address the main thrust of this case—the RPD's widespread, racist, and unconstitutional policing practices—and take into consideration the putative classes. Plaintiffs made this clear from the outset. It is deeply disappointing, then, that instead of embracing the opportunity to work collectively to reform the RPD, rebuild community trust, and prevent another Daniel Prude, the City instead limits its view of this case to the police response to the 2020 racial justice protests and the City's "policies concerning responses to such mass gatherings," which the City says, "have been completely revamped." (Dkt. 121-1 at 3).

---

[3] Plaintiffs' third and fourth *Monell* claims are based on the City and County's violations of the First, Fourth, and Fourteenth Amendments during the 2020 racial justice protests, pursuant to § 1983. *Id.* Only these *Monell* claims are limited to the law enforcement response to the 2020 racial justice protests. In addition to these *Monell* claims, the Court allowed five claims to proceed against the City, the former Mayor, the former Chief of Police, the County and the Sheriff for "First Amendment infringement and retaliation," "equal protection violations," "excessive force," "civil rights conspiracy," and "failure to prevent civil rights conspiracy." *Id.* at 24. The Court also allowed all the claims by the named plaintiffs to proceed against individually named RPD officers, Sheriff's Deputies and State Trooper Dellasala. *Id.*

[4] The Second Plaintiff Class is a class of people injured during the 2020 racial justice protests. That class seeks injunctive and declaratory relief as well as compensatory damages against the City and County. The Court declined to dismiss or strike either of these classes "before Plaintiffs have an opportunity to engage in class discovery or move for class certification." *Id.* at 23.

From that, the City contends, "all of the policies and tactics which the plaintiffs' complaint challenges have been completely revamped." *Id.* This statement is deeply disingenuous, especially in light of the Court's Decision and Order admonishing the City for ignoring "the main thrust of this lawsuit." Daniel Prude was not killed during a protest; and his death was not the result of the RPD's policies concerning responses to mass gatherings.[5] And since Daniel Prude's murder, RPD has continued to use excessive force in routine interactions with people of color in Rochester, including handcuffing and pepper spraying a 9-year-old Black girl and fatally shooting another Black man having a mental health crisis.

The City also highlights that it is a new administration that adopted these "revamped" policies for mass gatherings, pointing to that as a reason why resolution of individual claims for injury "should take priority over resolution of the issues surrounding a class action or a claim for injunctive relief." (*Id.*). But even though these policies may be a step forward in de-militarizing RPD's response to mass gatherings, there is nothing new about the process by which this administration adopted them. As the Police Accountability Board observed: "the [Board] requested but [did] not receive final or draft versions of the policies." Instead, the "City and RPD announced these new policies but provided few details" and public statements by "Corporations Counsel Linda Kingsley and Communications Chief Barbara Pierce" following the press release "cast doubt on whether the details of the new policies deliver the promised changes." RPD also has not provided evidence that it has implemented the policies through training, nor has it stated what training would be provided to officers."[6]

Thus, Plaintiffs cannot accept the City's proposal to focus on settling out the named Plaintiffs' individual damages claims while ignoring the class claims and relegating Plaintiffs' injunctive and declaratory claims—"the main thrust" of this lawsuit—to an afterthought. The City laments that it "necessarily would take considerable more time to resolve" "the issues surrounding a class action or a claim for injunctive relief" and "[s]uch policy considerations would necessarily involve additional stakeholders including but not necessarily limited to the Mayor, City Council, the Police Chief and various operational divisions having to play a part in resolution." City's Ltr. at 2. Yes, it surely would. But that is precisely the effort that the Court asked the City to make in this case. It is also precisely the sort of process that Plaintiffs—members of the Rochester community most affected by the RPD's unconstitutional policing practices—have repeatedly asked for: to have a seat at the table with the City's relevant stakeholders to build trust and work toward real, meaningful change. Plaintiffs sincerely hope the City will rethink its reluctance to put

---

[5] It is troubling to see the City say, in a publicly-filed statement nonetheless, that it is "fortunate[]" "there have been no such mass gatherings, protests, or demonstrations since the fall of 2020." City's Ltr. at 2. This view by City policymakers that First Amendment activity is unfortunate is the basis for Plaintiffs' First Amendment retaliation claim. It is inconsistent with the First Amendment for City policymakers to view free speech activity as something that it is good to avoid; and this statement in the City's letter casts serious doubt on the City's assertion that it has reformed its protest-related policing policies.

[6] Rochester Police Accountability Board, *2022 Protests and Mass Gatherings Policy Audit and Recommendations* (May 26, 2022), https://www.rocpab.org/2022-protests-and-mass-gatherings-policy-audit-and-recommendations/. The PAB further observed that the new policies continue to permit flash bangs, tear gas, and pepper ball guns, and that the policies to do provide criteria for declaring "civil disorder," during which now "banned" weapons can still be used. *Id.*

4

in the time and effort that will necessarily be required to meaningfully address the claims in this case.

Moreover, the City and the County's mediation proposals disregard that this case was brought as a class action, and "[a] representative plaintiff in a class action cannot simply agree to a settlement that might be advantageous for him personally but not for the other plaintiffs." *McDowall v. Cogan*, 216 F.R.D. 46, 49 (E.D.N.Y. 2003). This is true prior to class certification. *See id.* at 50 ("[C]ourts, for the purposes of settlement, must presume that a class action is 'proper,' *i.e.*, that the class has been certified, prior to actual certification"); *see also* 4 Alba Conte & Herbert Newberg, *Newberg on Class Actions* § 11:65 (2002) ("It is well settled law that during the interim between filing of a class action and the [Fed. R. Civ. P.] 23(c)(1) determination by the court, it must be assumed to be a class action for purposes of dismissal or compromise under 23(e) unless and until a contrary determination is made under 23(c)(1)."); *Ross v. Warner*, 80 F.R.D. 88, 90 n. 2 (S.D.N.Y. 1978) ("It is well settled law that from the time of filing a class action, including the period before its certification, it is to be dealt with as such for purposes of dismissal or compromise.").

The one thing that it appears all parties agree on is that at least some discovery is necessary to proceed with meaningful settlement discussions. The City's proposal that to proceed with class settlement discussions Plaintiffs be required, essentially, to make a class certification motion without an opportunity to conduct class discovery, *see* Dkt. No. 121-1 is inconsistent with Rule 23(e) and the Court's Decision and Order. *See* Dkt. 94 at 23. Thus, as detailed below, Plaintiffs request that the Court refer the case to a Magistrate Judge to oversee discovery, which can proceed in tandem with any mediation. Allowing discovery to proceed is consistent with the Western District's Alternative Dispute Resolution Plan and Rule 16 of the Court's Local Rules of Civil Procedure.

## II.   Plaintiffs' Mediation Proposal

### A.   Mediation must include negotiations concerning the class claims.

In developing a robust proposal for mediating <u>all</u> of the claims in this case, Plaintiffs have considered their obligations under Rule 23(e) to negotiate the class claims. *See McDowall*, 216 F.R.D. at 50; *Newberg on Class Actions* § 11:65. The class claims cannot be "mooted" by settling the named plaintiffs' individual damages claims. "Such a policy would allow defendants to essentially opt-out of Rule 23, by allowing a defendant to avoid liability for class wide relief." *Tanasi v. New All. Bank*, No. 12-CV-646S, 2013 WL 12308197, at *5 (W.D.N.Y. Aug. 27, 2013), *aff'd*, 786 F.3d 195 (2d Cir. 2015), as amended (May 21, 2015) (internal alterations omitted).

### B.   Plaintiffs' proposal for mediating the injunctive and declaratory relief claims concerning the RPD's decades-long practice of using disproportionate force on people of color.

Because the thrust of Plaintiffs' case involves claims related to complicated issues of race and police practices, Plaintiffs made the sensible proposal to engage the preeminent institution in the United States, perhaps in the world. That organization is the Center for Policing Equity (CPE).

5

The idea is for CPE to assist the parties in identifying the underlying issues via quantitative and qualitative analysis. In collaboration with both city government, the community and other necessary stakeholders, CPE would help identify what reforms, re-designs and initiatives may be appropriate to address the claims concerning the RPD's disproportionate use of force on people of color. . Plaintiffs' counsel made extensive efforts to contact and engage CPE in this process, and to encourage the City to work with CPE. Unfortunately, Rochester has not yet accepted the invitation to speak with CPE staff, who have expressed their open willingness to meet with City officials.

CPE is a non-profit organization that uses the scientific method to "gather and analyze data on behaviors within public safety systems and use those data to help communities achieve safer policing outcomes." See https://policingequity.org/about/who-we-are. They have been invited by other municipalities to assess the policies of their public safety systems and practices to make recommendations for reforms that are intended to achieve a more equitable outcome in policing activities for people of color. CPE is, in Plaintiffs' view, the most well-equipped organization in the country to assist the parties here in identifying the policies and practices in the RPD that could be reformed to mitigate the possibility of another tragedy like the death of Daniel Prude.

To be clear, Plaintiffs are *not* proposing—and we have made this perfectly clear in our discussions with the City attorneys—that CPE serve as a mediator or an expert for either party. Rather, CPE would serve a neutral role of reviewing the available data, collaborating with all stakeholders and preparing a public report that outlines the data and makes evidence-based recommendations. As explained to us by CPE staff, CPE's analysis would involve a digestion of pre-existing analysis and recommendations; qualitative analysis of the community's views on policing and law enforcement in Rochester; interviews and surveys of police and union officials to gather their views on the same topics; and a quantitative, data-driven analysis of the RPD's policies, practices, and procedures to identify statistically significant law enforcement activities that disproportionately impact communities of color. CPE would report these findings and, based on the data, offer recommendations that would lower racial disparities in law enforcement activity and produce an improved public safety system. The parties could then use CPE's report and proposals to focus and guide their discussions with the mediator about mutually-agreeable reforms to resolve the equitable claims in this case.

The advantages of working with CPE are numerous. Most importantly, they have the background and experience to address precisely the issues in this case. Their senior analysts include former police chiefs and police executives, social scientists, and staff with a deep understanding of meaningful community and police engagement. CPE could bring into this process, the views and lived experiences of the community, based on robust qualitative methods. And CPE is currently fully funded, so their work would be without cost to the City.

The City's lack of response to Plaintiffs' proposal to engage CPE has been deeply disappointing. We hope the Court will encourage the City to reconsider; at the very least, Plaintiffs believe that it would be useful for the Mayor and the Chief of Police, and other City policymakers, to speak with CPE staff to hear what they have to offer.

### C. Discovery from both the City and County is necessary to mediate the claims of the Second Plaintiff Class.

While CPE is conducting its review, the parties should proceed with class discovery for the Second Plaintiff Class, which is clearly necessary to mediate both the injunctive and damages claims. Based on their mediation proposals, the City and the County agree that at least some discovery is necessary before the parties can meaningfully discuss settlement of the plaintiffs' money damages claims, including the damages claims for the class of people injured during the summer 2020 racial justice protests—the Second Plaintiff Class.

#### 1. *Injunctive relief sought by the Second Plaintiff Class*

Discovery is necessary from both the City and the County regarding the injunctive relief sought by the Second Plaintiff Class.

With respect to the injunctive claims of the Second Plaintiff Class, the City claims in its proposal that "all of the policies and tactics which the plaintiffs' complaint challenges have been completely revamped." (City proposal p. 2) Plaintiffs strongly disagree that the City has "completely" eradicated all the challenged protest policies; as demonstrated by the Police Accountability Board's audit of the City's voluntary protest policy changes, the City's reforms did not go nearly far enough. (https://www.rocpab.org/2022-protests-and-mass-gatherings-policy-audit-and-recommendations/). Plaintiffs believe that an even stronger set of policy changes must be ordered by this Court to ensure that the rights of protesters are protected and that the widespread violence on the part of law enforcement is not repeated.

Even if the City had voluntarily ceased all the offending protest policies, that is still insufficient to "moot" the injunctive claims of the Second Plaintiff Class, as the City's mediation proposal suggests. "It is well settled that a defendant's voluntary cessation of a challenged practice does not deprive a federal court of its power to determine the legality of the practice." *Friends of the Earth, Inc.* v. *Laidlaw Env't Servs. (TOC), Inc.*, 528 U.S. 167, 189 (2000) (quotation omitted). Cessation of allegedly illegal activities can moot a claim only "if the defendant can demonstrate that (1) there is no reasonable expectation that the alleged violation with recur and (2) interim relief or events have completely and irrevocably eradicated the effects of the alleged violation." *Seidmann* v. *Bowen*, 499 F.3d 119, 128 (2d Cir. 2007) (quoting *Granite State Outdoor Advert., Inc. v. Town of Orange, Conn.*, 303 F.3d 450, 451 (2d Cir. 2002)). "The heavy burden of persuading the court that the challenged conduct cannot reasonably be expected to start up again lies with the party asserting mootness." *Laidlaw*, 528 U.S. at 189.

Here, there is no guarantee that the City won't change its policy in the future. Mayor Malik Evans' successor could simply undo all his administration's protest policy changes. The only way to guarantee that the important protest policy changes voluntarily implemented by the City are not reversed in the future—such as the ban on the use of tear gas—is for this Court to grant the permanent injunction sought by Plaintiffs in their complaint.

Unlike the City, the County does not claim that it has made any voluntary changes to its policies with respect to responding to protests. Furthermore, as reflected in discussions with the

Defendants and in the Defendants' recently filed answers, there are factual questions regarding the delineation of responsibilities between different law enforcement agencies. Discovery on these threshold issues will aid mediation of class certification, injunctive relief, and damages issues related to the Second Plaintiff Class.

### 2. *Damages sought by the Second Plaintiff Class*

According to the City's estimates, there were thousands of individuals present at the protests in September 2020. According to the RPD's paperwork, on the nights of September 4 and 5 alone, RPD officers fired over 6,000 pepper balls into the crowds.

Only a small fraction of the people present at the protests have filed individual damages cases. Class discovery is necessary to identify the remaining members of the Second Plaintiff Class, assess the nature and range of their injuries, and resolve their claims. This class of people likely numbers in the hundreds.

### D. Mediators and referral to a magistrate judge

Given the scope of this case, plaintiffs agree with the Court's suggestion for two mediators in this case. Plaintiffs also believe imperative that any mediator have prior experience resolving cases of similar complexity and scope. At the same time, Plaintiffs request the case be referred to a magistrate judge to oversee discovery.

The mediators' role would be to oversee the larger mediation process and assist the parties in negotiating a possible resolution of some or all of the claims in the case this case. The magistrate judge would oversee discovery and decide all discovery disputes.

We propose that two or more of the following mediators serve in this case: Hon. Shira Scheindlin (ret.), Hon. Carol Heckman (ret.), Hon. Jonathan Feldman and Hon. LaShann DeArcy Hall.

The Plaintiffs would request the City and County pay for any costs associated with the mediation. Since CPE's work will cost the City nothing, the financial burden of mediation will not be substantial, and will save the City the tremendous cost and time that litigation would otherwise require.

## Conclusion

For the foregoing reasons, we ask the Court to refer this case to a Magistrate Judge to begin discovery. We also believe the City's mediation proposal is improper and strenuously object to forcing the plaintiffs to participate in it. We welcome a conference with the Court to discuss these issues, and Plaintiffs' mediation proposal, which is sensible, cost-effective, and would efficiently accomplish the goals Your Honor described in asking the parties to engage in this process.

Respectfully submitted,

Elliot Shields
David Roth
ROTH & ROTH

Joshua S. Moskovitz
HAMILTON CLARKE, LLP

Katie McCarthy
Nick Brustin
NEUFELD SCHECK & BRUSTIN, LLP

Donald Thompson
EASTON THOMPSON KASPEREK SHIFFRIN LLP

Edward Jacobs
Brittany K. Sykes
BAKER & HOSTETLER LLP

cc: All counsel of record (via ECF)